UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FRESH AIR FOR THE EASTSIDE, INC., ELIZABETH AGTE,
CHERYL ALLEN, DIANE ALLEN, LINDA ALLISON, CHAD
ANDERSON, JULIE ANDERSON, MARC ANDERSON,
SAMANTHA ANDERSON, PATRICIA ANDERSON, TODD
ANDERSON, BRANDIE ANTENUCCI, GLENN BATCHELOR,
MALISSA BECKWITH, KIM BENDER, KRISTEN
BETZENHAUSER, MATTHEW BETZENHAUSER, DANIEL
BOND, SARA BOND, LISA BRANCATO, TONY BRANCATO,
ANDREW BRICKLE, ERIN BROOKS, KAYE BROTZMAN, MARK
BROTZMAN, NATHAN BUBB, JUSTIN BUSCH, LEANNE
BUSHART, BRIAN CAIAZZA, MARLY CALDERON-SINGER,
ANDREW CITTADINO, LAURA CLARK, JOHN CLARK,
KRYSTINA CLARK, PETER CLIFFORD, WENDY CLIFFORD,
JOSH DAWSON, SARAH DAWSON, MEGHAN DEFISHER,
CHRISTINE DEHM, CURTIS DEHM, ANNE DEWITTE, DONNA
DIMARIA, STACEY DINICOLA, PATRICK DOMARATZ,
PATRICIA DONOHUE, CRAIG EPHRAIM, CHRISTINA FERG,
JOHN FISH, JUSTIN FOLEY, KAITLYN FOLEY, MARIA
FRAZER, CATHERINE FREEMANTLE, ROBERT FREEMANTLE,
BRYAN GARDNER, SUSAN GARDNER, KIM GARRISON, JANE
GATEWOOD, COOPER GILBERT, EMILY GIUNTA, ELMER
GORDNER, JILL GORDNER, JILL GRESS, TONY GRIFFEY,
DAVID C. GROSS, DAVID GROSS, HELEN GROSS, HARVEY
GROSS, VIRGINIA GULLO, ADAM GURSSLIN, TAKAHIRO
HACHIYA, CAROL HALLENBECK, STEPHEN HALLENBECK,
BARBARA HARVEY, GLENN HARVEY, CHRISTINE HEFLEY,
JERRY HEFLEY, APHRODITE HOLLWAY, REID HOLMES,
LESLIE HOUCK, MATTHEW HOUCK, JENNIFER JACKSON,
MICHAEL JACKSON, KEN JONES, JESSICA JONES, MALIQUE
JONES, RANDY JONES, LISA KAISER, MICHAEL KAISER,
CAROL KANE, CATHERINE KING, FERNI KINNAW, WILLIAM
KINNAW, REBECCA KOPPMANN, KEVIN KRAY, JASON
KUMP, JENNIFER KUMP, PHILIP LANG, ELLEN LARZELERE,
ERICA LARZELERE, MARK LASKOSKI, TRACY LYN LAUSE,
HEATHER LITTLE, MARISSA LOGUE, SHAUN LOGUE, DONNA
LOZIPONE, CAMILLE MANCUSO, JEFFREY MARASCO, PAULA
MARASCO, SHARON MARBLE, AMANDA MARTIN, MATTHEW
MARTIN, VICKI MARTUSCELLO, GARY MCNEIL, JENNIFER
MCNEIL, PAULA MENCUCCI, HEATHER MERLO, MICHAEL
MERLO, DAVID MESSINA, SCOTT MIGA, JAMES MILLER,
THOMAS MILLER, WENDY MILLER, BRIAN MILLER, ANN

**COMPLAINT**

Civil Action No.:_____

**TRAIL BY JURY
DEMANDED**

MOFFITT, KEVIN MORAVEC, LAUREN MORAVEC, JODY
MOULTON, CATHERINE MURRAY, THOMAS MURRAY,
JAMES NAIL, KEVILYN O'CONNOR, JAMES OLIVERIO,
SHANNON OLIVERIO, EMILY OLSEN, KATHLEEN OLSEN,
DEREK ORF, DANIEL OSIMOWICZ, NICOLE OSIMOWICZ,
AMY PASLEY, TIMOTHY PASLEY, MELISSA PEASE, SCOTT
PEASE, PAULA PENTONEY, JENNIFER PISKOROWSKI, JOHN
POLCHOWSKI, PATRICIA POLCHOWSKI, KATHLEEN POLEON,
DEBRA RAMSPERGER, JOHN RAMSPERGER, KARYN RANDO,
KENNETH RANDO, ROSEMARIE REIDY, THOMAS REIDY,
BRYAN REINICKE, ELIZABETH REISINGER, JON REISINGER,
CORRINE RENAULT, JON RENAULT, KATHLEEN ROETERS,
DWIGHT ROETERS, GEORGE RODIBAUGH, MOLLY
ROMAGNOLA, ALECIA ROMANO, NICHOLAS ROMANO,
JEREMY SAUCIER, TARA SAUCIER, ANN SCHAUMAN, DAVID
SCHINSING, CHERYL SCHMIDT, PETER SCHUCH,
JACQUELINE SCOTT, MARK SCOTT, MATTHEW
SCOZZAFAVA, VICTORIA SCOZZAFAVA, ERINNE SELIM,
BRIAN SHAUGHNESSY, BRITTANY SHAUGHNESSY, DANIEL
SHELLEY, CHARLIE SHOEMAKER, KATHERINE SHORT,
CHRISTOPHER SIENKIEWYCZ, MARY SLAUGHTER, WAYNE
SLAUGHTER, REBECCA SNYDER, JACQUELINE STEIN,
BRANDON STEIN, ELIZABETH STEVENS, JULIE STUVER,
MICHAEL STUVER, JOHN SYKES, ANTHONY TEMPESTA,
WINFIELD TERRY, NICOLE THIBAULT, CLAIRE THOMAS,
GEORGE THOMAS, ROBIN THOMPSON, MATTHEW TICE,
GERALD TOTSLINE, TRACI TOTSLINE, JOHN TURANO,
SHERRIE TURANO, DAVE VALLE, DIANNE VALLE, LORINDA
VANDERLINDE, MEGAN VOLHEJN, CHUCK VOLO, RALPH
VOLPE, MEREDITH WEBER, PAUL WEBER, SUSAN WIDRICK,
CHRISTOPHER WILLIAMS, MALLORY WILLIAMS, DEBBIE
YENDRZESKI, JENNIFER ZAFFER, JONATHAN ZAFFER

**COMPLAINT**

Civil Action No.:_____

**TRAIL BY JURY
DEMANDED**

Plaintiffs,

vs.

WASTE MANAGEMENT OF NEW YORK, L.L.C.,

Defendant.

_____

Plaintiffs **FRESH AIR FOR THE EASTSIDE, INC.** ("FAFE") and each individual (the "Individual Plaintiffs") listed in this Complaint (together FAFE and the Individual Plaintiffs are the "Plaintiffs"), for their Complaint ("Complaint"), by their undersigned attorneys, Knauf Shaw LLP, allege as follows:

## PRELIMINARY STATEMENT

1.    In this action, Plaintiffs complain, *inter alia*, of the persistent, noxious, and offensive odors of garbage (the "Garbage Odors") and landfill gas ("Landfill Gas Odors," together the Garbage Odors and Landfill Gas Odors are the "Odors") being emitted from the High Acres Landfill ("the Landfill"), located at or near 425 Perinton Parkway in the Town of Perinton, Monroe County, and in the Town of Macedon, Wayne County in the State of New York, owned and operated by Defendant Waste Management of New York, L.L.C. ("Defendant" or "WMNY"), into the surrounding community ("Community") where all of the Individual Plaintiffs reside or have recently resided.

2.    The Odors arise from the negligent, intentional, wrongful, and/or illegal non-discretionary acts and/or omissions on the part of WMNY to adequately install, maintain, and operate the landfill gas (the "Landfill Gas") collection system at the Landfill and the receipt and negligent management by WMNY of large volumes of odorous municipal solid waste ("MSW"), including MSW transported by rail from the City of New York (the "NYC Garbage").

3.    The Odors have been described by Plaintiffs as sickening, obnoxious, putrid, foul, and nauseating.

4.    WMNY has caused and continues to cause the Odors to unreasonably interfere with Plaintiffs' comfortable enjoyment of life and property.

5.    Because of the continuing Odors and non-compliant Landfill Gas collection system, WMNY continues to violate its 6 N.Y.C.R.R. Part 360 Solid Waste Management Facility

Permit (the "Landfill Permit") and Title V Clean Air Act Permit (the "Air Permit," together with the Landfill Permit the "Permits") for the Landfill issued by the New York State Department of Environmental Conservation ("NYSDEC").

6.    WMNY is also causing an imminent and substantial endangerment to health or the environment as a result of its past and present handling, storage, treatment, transportation, or disposal of solid waste because of continued Odors and Landfill Gas emissions impacting the Community, and specifically Plaintiffs.

7.    Because of the Odors, Plaintiffs seek from WMNY, pursuant to the Resource Conservation and Recovery Act ("RCRA") §7002(a)(1), 42 U.S.C. § 6972(a)(1), and Clean Air Act ("CAA") § 304(a)(1), 42 U.S.C. §7604(a)(1), and common law theories of public nuisance, negligence and trespass:

    a.    An injunction enforcing the Permits for the Landfill because of continuing violations of 6 N.Y.C.R.R. 360-1.14(m), 6 N.Y.C.R.R. § 360.19(i), and 6 N.Y.C.R.R. § 211.1 (collectively the "Violated Regulations"), that:

        i.    enjoins WMNY from disposing of NYC Garbage and other MSW received by rail at the Landfill until means and methods are developed to manage these materials in a manner that complies with the Violated Regulations pursuant to the Odor Control Plan of the Landfill Permit;

        ii.    enjoins WMNY from future disposal of solid waste within Landfill Cells 10 and 11 for failure to comply with the Landfill Gas collection requirements of the Permits;

        iii.    orders WMNY to abate all nuisances caused by their operation of the Landfill; and

        iv.    directs WMNY to investigate and remediate the Odors and their impact

on the Community;

b.  Compensatory damages, including Plaintiffs' damages for the diminution or complete loss in property value, a property value protection plan, interference with Plaintiffs' exclusive possession of their properties, loss of the use and enjoyment of their properties, loss of quality of life, aggravation and annoyance, and degradation of the Community proximately caused by the Odors, vectors[1] ("Vectors") (including in this case specifically rats, mice and flies), excessive fugitive gas emissions "Fugitive Emissions"), noise ("Noise"), and tremors ("Tremors") caused by the negligent Landfill operations;

c.  Exemplary and punitive damages; and

d.  Plaintiffs' costs for this litigation, including reasonable attorney and expert witness fees.

## **PARTIES**

8.   WMNY is a Delaware limited liability company authorized to do business in New York, with offices located at 425 Perinton Parkway, Perinton, New York.

9.   WMNY is the permittee for the Landfill Permit and Air Permit.

10.  FAFE is a New York not-for-profit corporation organized exclusively to carry on the activities of a charitable or educational organization as specified in Section 501(c)(3) of the Internal Revenue Code, with offices located in Monroe County in the State of New York.

11.  The mission of FAFE is to preserve and protect the environment for the benefit of the residents living in proximity to the Landfill by performing activities such as working with elected officials and the public on environmental issues and ensuring compliance with land use,

---

[1] The regulations at 6 N.Y.C.R.R. § 360.2(b)(301) define "vector" as "a carrier organism that is capable of transmitting a pathogen to another organism and includes, but is not limited to, flies and other insects, rodents, birds and vermin."

zoning and environmental laws, codes and regulations.

12.     The Individual Plaintiffs consist of residents of the Towns of Perinton ("Perinton"),
Penfield ("Penfield") Macedon ("Macedon"), and Walworth ("Walworth"), whose lives have been
and continue to be adversely impacted by the Odors, Fugitive Emissions, and Vectors, Noise,
and/or Tremors emanating from the Landfill.

13.     The Individual Plaintiffs are members of FAFE and either own property or reside
within the Community.

14.     The address of the residence of each Individual Plaintiff is provided in the chart in
**Exhibit "A"** annexed hereto.

15.     The Individual Plaintiffs live or previously lived anywhere from 0.3 to 4 miles from
the Landfill.  For illustrative purposes only, a map depicting the location of Plaintiffs in relation
to the Landfill is annexed hereto as **Exhibit "B."**

16.     A large number of the Individual Plaintiffs have considered selling their homes and
moving out of the Community due to the Odors, Excessive Fugitive Emissions and the Vectors,
Noise, and Tremors from the Landfill.

17.     Some Plaintiffs have sold their homes, moving out of the Community, or to areas
that have not been impacted by the Odors, Fugitive Emissions, Vectors, Noise, and Tremors from
the Landfill.

18.     Some Plaintiffs have sought mental health counseling due to the anxiety,
frustration, and anguish from the Odors, Fugitive Emissions, Vectors, Noise, and Tremors caused
by WMNY's negligent and non-compliant operation of the Landfill.

19.     Plaintiffs, due to the Odors, general stigma from the Landfill, and fear of either
decreasing property values or inability to sell their homes, have refrained from typical property
related activities and improvements, including: planting vegetable gardens, building decks,

replacing windows, refurbishing kitchens, finishing basements, making significant improvements to the house, landscaping, repairs roofs and siding, decorating the outdoors, building porches, repairing driveways, installing new fencing, repairing and installing hot tubs, painting indoors, installing pools, installing fire pits, adding additions onto homes, remodeling indoors, and installing retaining walls.

20.     Plaintiffs have incurred expenses due to the Odors, including expenses to purchase and operate items like: deodorizers, air purifiers, air conditioners, air masks for outside activities, eye drops, fans, atomizers, home air cleaner system for furnaces, new windows, medicines for migraines triggered by Odors, dehumidifiers, essential oils, and scented candles.

21.     Plaintiffs have taken time off work to meet and communicate with Town officials, the NYSDEC, and WMNY and its staff about the Odors.

22.     Some Plaintiffs have had to contract with exterminator services and purchase vector control devices due to the Vectors emanating from the Landfill.

23.     Plaintiffs have experienced a decreased quality of life due to the Odors, Fugitive Emissions, Vectors, Noise, and Tremors from the Landfill by: refraining from using their backyards; refraining from entertaining in their backyards; refraining from going outside; refraining from exercising outdoors; preventing children from playing outside; needing to keep windows closed to prevent the Odors from entering the interior of their homes; and experiencing headaches, eye irritation, nausea, coughing, choking, breathing problems, and lost sleep.

24.     Plaintiffs experience the Odors in public spaces within the Community as well, such as the High Acres Fairport Little League fields, Walmart, Dudley Northside Elementary School, Thomas Creek Ice Rink, Lyndon Road Little League Complex, soccer fields at Center Park West, dining in the Village of Fairport, and walking on the Erie Canal.  The High Acres Fairport Little League fields were closed this season due to the Odors.

25. Plaintiffs complain that friends, family, acquaintances and co-workers have refrained from visiting their home or moving to the Community due to the Odors.

26. Plaintiffs have experienced nauseating Odors and Fugitive Emissions during family holidays and events such as last Christmas, family birthday parties, graduation and other special family events where the Odors prevented Plaintiffs from stepping outdoors and caused their guests to become nauseous.

27. The following Plaintiffs have been impacted by the Odors, Fugitive Emissions, Vectors, Noise, and/or Tremors from the Landfill in a manner similar to that of the other Individual Plaintiffs:

   a. Plaintiffs Kevilyn O'Connor and Andrew Cittadino about 1.34 miles northwest of the Landfill, and have decided to try to sell their home after living there for over twelve years due to the Landfill issues, citing a significant increase in trucks, trains, Odors, rats and flies, and stigma associated with the Landfill. They no longer enjoy their property in which they were married and hosted regular fire pit evenings with friends who increasingly complained of Odors and vermin when visiting. Plaintiff O'Connor, a disabled war era veteran who is home more than twenty hours a day, can no longer pursue her passion for gardening, and is no longer able to place her produce for sale in the neighborhood, because it has become extremely unpleasant to tend to her garden.

   b. Plaintiff Tony Griffey resides about 0.4 miles southwest of the Landfill, and started experiencing substantial Odors entering his property in the Summer of 2015. In the Spring of 2017, he noticed that his house started to shake and rattle from the Tremors caused by the Landfill. On at least five occasions, his house shook vigorously that it caused visible cracks to form in the house, and the windows in

8

his living room still rattle on a daily basis.  He hired a plumber and heating specialist to inspect his house to rule out any other possible causes of the Tremors.  These experiences continue to cause Plaintiff Griffey mental anguish and anxiety, and the Odors cause him headaches and eye irritations.

c.  Plaintiff Kim Garrison resides about 1.4 miles southeast of the Landfill, and invested all of her and her husband's savings to build a new home for her family, but has decided to initiate actions that will potentially lead to relocating due to the Odors and Noise.  Plaintiff Garrison and family refrained from going outdoors on their property on numerous occasions and kept all windows and doors closed in the house due to the nauseating Odors and fear of health impacts to Plaintiff Garrison's newborn child.  These experiences have caused stress on Plaintiff Garrison and her family, have affected their quality of life in their own brand new home, and have caused extreme anxiety and mental anguish.

d.  Plaintiffs Charlie and Joyce Shoemaker reside about 1.4 miles west of the Landfill, and have experienced many days that the Odors caused them to cancel outdoor activities and return to the confines of their home.  Most memorable was Christmas Eve 2017, when they planned to take a winter night walk and the Odors were so bad, they returned indoors after walking 20 yards down the sidewalk.  Countless times Plaintiffs Shoemakers were forced to close windows in their home because of Odors when they otherwise would not have done so.  Even with the windows closed, Odors entered their home, and approximately five times the Odors were so overpowering that Plaintiffs Shoemakers were awakened in the middle of the night by the smell.  Having moved to Perinton to settle and raise their family, Plaintiffs Shoemakers are now seriously considering relocating to a home outside of the

9

Community because of the Odors.

e.   Plaintiff Ann Moffitt resides about 0.6 miles north of the Landfill, and is regularly impacted by the Odors and Noise, and her property value has been reduced due to the Odors.

f.   Plaintiffs Todd and Patricia Anderson reside about 1.25 miles north of the Landfill, and decided in May 2018 to sell their home due to the Odors. Their home has still not sold, despite being listed for nearly two months at $41,000 less than the recently-assessed value.

g.   Plaintiffs Gary and Jennifer McNeil reside about 0.8 miles north of the Landfill, and have refrained from making property improvements and have seriously considered selling their home. Due to Odors, Plaintiffs McNeils' children were not able to play outside on numerous occasions, and all of the children at their daughter's most recent birthday party were forced inside.

h.   Plaintiff Emily Giunta resides about 0.8 miles west of the Landfill, and has had to hire an exterminator due to newfound rodent activity in her basement and around her home and garden in the last year. She has experienced frequent migraines as a result of the Odors and the fragrances used by the Landfill in an attempt to mask the Odors. Plaintiff Giunta and her family hear the rail cars day and night, and the Noise keeps her four-year-old son awake when they are especially loud or are blasting their horns.

i.   Plaintiffs Christine and Curtis Dehm reside about 0.8 miles southwest of the Landfill, and due to the Odors have refrained from using their backyard, refrained from entertaining guests in their backyard, needed to keep windows closed when weather conditions otherwise would not so require, had Odors enter the interior of

their home, and suffered headaches, eye irritation, and nausea. Plaintiffs Dehms feel trapped, and the Odors are a constant reminder that they have no idea what they are breathing or how it is impacting their health.

j.  Plaintiff Derek Orf resides about 0.8 miles north of the Landfill, and after purchasing a new swing set for his two and four-year-old children, his children have rarely been able to use it due to the Odors.  They feel confined to their home because of the Odors.

k.  Plaintiffs Heather and Michael Merlo reside about 0.6 miles north of the Landfill, and due to the Odors limit use of their yard, and have to check weather reports and wind direction and speed before planning any outdoor activities for themselves or their children.

l.  Plaintiff Paula Pentoney resides about 1.25 miles northwest of the Landfill, and has lived there with her family for 28 years, but did not start to experience substantial Odors until 2015. Since that time, the Odors and have caused her to refrain from going outside or using her backyard, keep windows closed when weather conditions otherwise would not so require, and refrain from exercising outside. The Odors are extremely unpleasant and seep into her car while driving. Plaintiff Pentoney suffers embarrassment whenever guests come to visit.

m.  Plaintiffs Christopher and Mallory Williams reside about 0.8 miles west of the Landfill, and experience Odors regularly, but particularly recall terrible Odors on the way to the hospital for the birth of their youngest child, and now associate the birth of their child with the Landfill's Odors.

n.  Plaintiffs Melissa and Scott Pease reside about 1.25 miles northeast of the Landfill. They have lived in their home for 21 years, and their property value has declined

due to the Odors. They have also had to purchase air conditioners because they were forced to close all of their windows, and deodorizers to neutralize the Odors that seeped into their home. Particulates from the Landfill cause a black, mold-like substance to build up on the outside of Plaintiffs Peases' home, which requires frequent cleaning.

o.  Plaintiffs Justin and Kaitlyn Foley reside approximately 0.8 miles north of the Landfill. The Foleys have refrained from holding any large events at their home in fear that their guests would experience odors. They often refrain from using their backyard when Odors are present and constantly keep their windows closed in fear that the Odors will enter their home. More than ten times, Landfill Gas and accompanying Odors were so severe that Plaintiff Kaitlyn Foley experienced eye, nose, and throat irritation that lasted for several hours after the Odors had dissipated. The Odors have caused her fear and anxiety about planning daily activities that are often interrupted by Odors and the potential health impacts that the Landfill has on her and her family, which has significantly impacted her daily life and ability to focus on daily responsibilities.

p.  Plaintiff Cheryl Schmidt resides about 0.8 miles northwest of the Landfill.  She has put all home improvements on hold because she fears that she will not see any return on her investment, and regularly considers cutting her losses and selling because of the impact that the Odors have had on her life. Plaintiff Schmidt is a marathon runner, and used to run outside multiple times a week within the Community, but cannot do so anymore because the Odors bothered her breathing. She also has a three-season room that her family uses much more infrequently than in the past and often with all windows closed. She has friends or family over to her

home several times a month - and each time needs to determine if the Odors are at acceptable levels to enjoy that room or the backyard. Plaintiff Schmidt has spent countless hours writing letters, reporting Odor complaints, calling the NYSDEC, attending Town Board and WMNY meetings, and worrying about the impact that this issue has had and will have on her and her family's property and their lives.

q. Plaintiffs Catherine and Robert Freemantle reside about 0.8 miles north of the Landfill. They describe the Odors in their backyard as feeling like they were in a dumpster up to their knees in dumpster sludge. The Freemantles had their children's bus stop moved to their driveway because they would experience nausea and headaches while waiting outside. The Odors often get trapped inside their garage and into their home where the smell become inescapable.

28.    The Community members who live in Perinton and Penfield are not protected from property devaluation from the Landfill because a property value protection plan has not been offered by WMNY in those municipalities. The Town of Perinton has a host benefit agreement with WMNY, but it does not provide for property value protection.

29.    A property value protection plan is in place for residents of the Town of Macedon because it is included in the host benefit agreement between the Town of Macedon and WMNY.

## JURISDICTION AND VENUE

30.    This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this case arises under the laws of the United States of America; specifically, because the First Cause of Action is predicated upon and seeks relief under CAA § 304(a), 42 U.S.C. § 7604(a), and the Second and Third Causes of Action are predicated upon and seek relief pursuant to RCRA § 7002(a), 42 U.S.C. § 6972(a).

31.     This Court has supplemental jurisdiction over the claims arising under New York State law that are set forth in the Fourth, Fifth, Sixth, and Seventh Causes of Action, pursuant to 28 U.S.C. § 1367, which are so related to the claims in the First, Second, and Third Causes of Action that they form part of the same case or controversy.

32.     In addition, the Declaratory Judgments Act, 28 U.S.C. § 2201, authorizes this Court to grant declaratory relief in this matter.

33.     The relief requested by Plaintiffs is authorized by RCRA § 7002, 42 U.S.C. § 6972(a), CAA § 304(a), 42 U.S.C. § 7604, and 28 U.S.C. §§ 2201-2202.

34.     The Clean Air Act requires that Plaintiffs provide 60 days prior notice of actions brought under CAA § 304(a)(1), 42 U.S.C. § 7604(a)(1), pursuant to CAA § 304(b), 42 U.S.C. § 7604(b) and the requirements of 40 C.F.R. Part 54.

35.     RCRA requires that Plaintiffs provide 60 days prior notice of actions brought under RCRA § 7002(a)(1)(A), 42 U.S.C. §6972(a)(1)(A), pursuant to RCRA § 7002(b)(1), 42 U.S.C. 6972(b)(1), and the requirements of 40 C.F.R. Part 254; and that Plaintiffs provide 90 days' notice for actions brought under RCRA § 7002(a)(1)(B), 42 U.S.C. §6972(a)(1)(B), pursuant to RCRA 7002 § 7002(b)(2), 42 U.S.C. 6972(b)(2), and the requirements of 40 C.F.R. Part 254.

36.     Plaintiff FAFE, on behalf of itself and the Individual Plaintiffs who are members of FAFE, served a notice of intent to bring a civil action (the "NOI") pursuant to RCRA § 7002(a)(1)(A), 42 U.S.C. §6972(a)(1)(A), RCRA § 7002(a)(1)(B), 42 U.S.C. §6972(a)(1)(B) and CAA § 304(a)(1), 42 U.S.C. § 7604(a)(1), containing the notice requirements of 40 C.F.R. § 254.3 and 40 C.F.R. § 54.3, and served pursuant to 40 C.F.R. § 254.2 and 40 C.F.R. §54.2, as follows:

    a.  The NOI was mailed to WMNY via registered mail, return receipt requested, postmarked January 20, 2018, and addressed to the site manager at the Landfill and to its primary office;

b.  The NOI was mailed to the registered agent for WMNY via certified mail postmarked January 19, 2018;

c.  The NOI was mailed to Scott Pruitt, the Administrator of the United States Environmental Protection Agency ("USEPA") at that time, and addressed to his office via certified mail and postmarked January 19, 2018;

d.  The NOI was mailed to Peter D. Lopez, the Regional Administrator of Region 2 of the USEPA, the Regional Administrator of the USEPA for the Region in which the Landfill violation is located, addressed to his office via certified mail postmarked January 19, 2018;

e.  The NOI was mailed to Basil Seggos, the Commissioner of the NYSDEC, the chief administrative officer of the solid waste management agency for New York State, addressed to his offices via certified mail postmarked January 19, 2018;

f.  The NOI was mailed to Jared Snyder, the Deputy Commissioner of Air Resources for the NYSDEC, an authorized representative of the NYSDEC charged with responsibility for air pollution control in the State for New York, at his office via certified mail postmarked January 19, 2018;

g.  The NOI was mailed to Martin Brand, the Deputy Commissioner for the Division of Materials Management for the NYSDEC, an authorized representative of the NYSDEC charged with responsibility for solid waste management in the State for New York, addressed to his office via certified mail postmarked January 19, 2018; and

h.  The NOI was mailed to Andrew M. Cuomo, New York State Governor, addressed to his office via certified mail postmarked January 19, 2018.

37.  More than 90 days have passed since Plaintiffs served the NOI upon WMNY and

all of these agencies.

38.     The CAA violations and RCRA violations complained of in the NOI are ongoing and likely to recur.  As of the filing of this Complaint, neither USEPA nor the State of New York have commenced an enforcement action that has redressed the violations identified in the NOI, which are ongoing.

39.     Venue is proper in the United States District Court for the Western District of New York ("WDNY"), pursuant to 28 U.S.C. § 1391(b)(2), because the facility and the violations that are the subject of this Complaint are located in the Towns of Perinton, Penfield and Macedon, New York, which are located within the WDNY.

## FACTUAL BACKGROUND

**A.     The Landfill Permit**

40.     The current Landfill Permit, NYSDEC Permit Number 8-9908-00162/00032, permits WMNY to construct and operate a Mixed Solid Waste Landfill with an approved design capacity of 3,500 tons per day pursuant to Environmental Conservation Law ("ECL") Article 27, Title 7 and 6 N.Y.C.R.R. Part 360 ("Part 360").  The Landfill Permit is annexed hereto as **Exhibit "C."**

41.     The Landfill Permit was last modified on October 4, 2013 and expires July 8, 2023.

42.     Upon information and belief, the original Landfill began operating in 1972 under permits issued by the Town of Perinton and the Monroe County Health Department.

43.     Upon information and belief, the original Landfill, occupying 72 acres, was closed in 1995.

44.     The Part 360 regulations were substantially revised in 1993 to conform to 40 C.F.R. Part 258 federal criteria for municipal solid waste landfills.

45.     NYSDEC first issued the Landfill Permit in 1993 in conjunction with the approval

of the Western Expansion of the Landfill (the "WEX," located in the north and west portion of the Landfill, consisting of Cells 1 through 9), which would be partially constructed on top of the closed original Landfill.  A site plan of the Landfill providing a graphic depiction of the layout of the Landfill is annexed hereto as **Exhibit "D**."

46.    By this time, it had already become very difficult to site new landfills in New York.

47.    Historically there had been more than 1,700 landfills in the State, which has dwindled down to 26 permitted MSW landfills at the present time.  Therefore, it has been a trend that NYSDEC approves vertical expansion on old landfills, in lieu of permitting new ones, due to the difficulty in permitting, essentially "mega-sizing" the few remaining existing landfills.

48.    Despite the policy set forth in ECL §27-0106[2] which states that waste-to energy facilities constitute a superior method for managing MSW than landfilling since waste rich in carbon is converted to energy, NYSDEC has failed to facilitate the development of such facilities due to concerns by environmental groups and local communities that such facilities cause harmful emissions, discounting the significance landfill emissions of the greenhouse gas methane, and other landfill gases, as well as Odors caused to communities surrounding landfills.

49.    NYSDEC has also made it exceedingly difficult to permit a waste-to-energy facility, which on average can take up to 10 years.

50.    This has discouraged companies such as WMNY, which have waste-to-energy

---

[2] ECL §27-0106 provides for the following priorities for solid waste management (the "Solid Waste Hierarchy"):
In the interest of public health, safety and welfare and in order to conserve energy and natural resources, the state of New York, in enacting this section, establishes as its policy that:
1. The following are the solid waste management priorities in this state:
        (a) first, to reduce the amount of solid waste generated;
        (b) second, to reuse material for the purpose for which it was originally intended or to recycle material that cannot be reused;
        (c) third, to recover, in an environmentally acceptable manner, energy from solid waste that cannot be economically and technically reused or recycled; and
        (d) fourth, to dispose of solid waste that is not being reused, recycled or from which energy is not being recovered, by land burial or other methods approved by the department....

divisions (Wheelabrator) from pursuing permits for such facilities and since NYSDEC continues to provide vertical landfill permits.

51.     Waste companies prefer landfills over waste-to-energy facilities because they are cheaper to construct and operate than waste-to-energy facilities.

52.     However, upon information and belief, New York State only have 26 landfills remaining and only 15 or so will still be operational in the near future.

53.     These 15 or so landfills, which have already become mountains of garbage are concentrated in western New York.

54.     A modification to the Landfill Permit was approved by NYSDEC in 2001 to permit an expansion of the Landfill known as the Parkway Expansion Phase I ("Phase I Expansion").

55.     The Phase I Expansion area is located southeast of the WEX, and consists of Cells 6V-OL, 7V-OL, and 8V/9V-OL, and overlays a portion of the closed original Landfill.  *See* **Exhibit D.**

56.     A modification to the Landfill Permit was approved by NYSDEC in 2003 to permit an expansion of the Landfill known as the Parkway Expansion Phase II ("Phase II Expansion").

57.     The Phase II Expansion area is east of the WEX and Phase I Expansion, overlays a portion of the closed original Landfill, and consists of Cells 10 and 11.  *See* **Exhibit D.**

58.     The WEX, Phase I Expansion and Phase II Expansion areas are all located in Perinton.  A modification to the Landfill Permit was approved by NYSDEC in 2008 to permit an expansion of the Landfill known as the Parkway Expansion Phase III and Vertical Expansion, but was modified in 2011 to eliminate a 100-foot vertical expansion in Perinton (the "Phase III Expansion") after a New York State Supreme Court decision concluding that NYSDEC did not have permit authority to approve the Vertical Expansion more than 10 years before it would be constructed because NYSDEC only has 10 year permit authority and changes in law, area

population and alternative preferred technologies to handle garbage may occur in the future, which must be analyzed at that time. *See Preserve Scenic Perinton Alliance, Inc., v. Lisa M. Porter, as Environmental Analyst for The New York State Department of Environmental Conservation, et al.*, 32 Misc. 3rd 1216(A), 934 N.Y.S.2d 36, 2010 WL 6983307 (Sup. Ct. Monroe Co. 2010).

59.    The 147-acre Phase III Expansion area includes Cells 12, 13, 13-OL, 14, 15, 16, and 17, which are located to the east of the WEX, Phase I Expansion, and Phase II Expansion, and is largely located in Macedon. *See* **Exhibit D.**

60.    As further discussed in paragraphs 87 to 105 below, modification of the Landfill Permit was approved by NYSDEC in 2013 to authorize the construction and operation of an intermodal rail facility to accept MSW by train from a new CSX rail spur.

61.    According to the 2017 Annual Report for the Landfill, about 20.6 million tons of waste have been placed in the Landfill.   The remaining capacity of the Landfill that was already been constructed is 2.09 million cubic yards of air space, and the future Landfill capacity authorized by the Landfill Permit is 46 million cubic yards of airspace.  Based on WMNY's in situ waste density, this remaining air space is sufficient to dispose of about 41 million tons of waste at the Landfill.

62.    The approved design capacity for the Landfill is 3,500 tons/day of solid waste, based on an annual average, excluding solid waste generated at the Landfill and any daily or intermediate cover wastes allowed by beneficial use determination.

63.    The maximum permitted height of the Phase III Expansion is 788.9 feet above mean sea level, and the maximum permitted height for the Landfill in Perinton is 688 feet above mean sea level.

64.    Upon information and belief, there is only about 20 feet of approved vertical space remaining in Perinton.

65.    Unless expressly authorized in writing by NYSDEC, the Landfill Permit requires, among other things, that the construction and operation of the Landfill be carried out in strict conformance with the plans, specifications, and reports submitted as part of the Landfill Permit applications for the WEX, and Phase I, II, and III Expansions. *See* **Exhibit C**, Special Condition I(1).

66.    The Landfill Permit requires, among other things, that WMNY comply with the regulations at Part 360.

67.    The regulations in place at the time the Landfill Permit was last modified in 2013 required that "odors [from the Landfill] must be effectively controlled so that they do not constitute nuisances or hazards to health, safety or property [6 N.Y.C.R.R. § 360-1.14(m)]."

68.    Current regulations require that WMNY "must ensure that odors are effectively controlled so that they do not constitute a nuisance as determined by [NYSDEC] [6 N.Y.C.R.R. § 360.19(i)]."

69.    The Landfill must also comply with federal regulations at 40 C.F.R. § 258.21 which requires that sufficient cover material be placed to "at the end of each operating day, or at more frequent intervals if necessary, to control disease vectors, fires, odors, blowing litter, and scavenging."

## B.    The Air Permit

70.    Landfill Gas is emitted from the Landfill as the deposited waste undergoes aerobic and anaerobic decomposition.

71.    The Landfill Gas consists of methane, carbon dioxide, and non-methane organic compounds ("NMOC").

72.    According to the USEPA NMOCs include volatile organic chemicals ("VOCs"),

hazardous air pollutants ("HAP"), and odorous compounds, and reduced sulfur compounds.

73.    Landfill Gas also includes hydrogen sulfide, an odorous reduced sulfur compound that smells of rotten eggs.

74.    According to the U.S. Agency for Toxic Substances and Disease Registry ("ATSDR"), the NMOCs most commonly found in landfills include acrylonitrile, benzene, 1,1-dichloroethane, 1,2-cis dichloroethylene, dichloromethane, carbonyl sulfide, ethylbenzene, hexane, methyl ethyl ketone, tetrachloroethylene, toluene, trichloroethylene, vinyl chloride, and xylenes.

75.    Landfill fires can also cause uncontrolled emission of dioxins and other hazardous chemicals.

76.    Based on recent sampling and analysis performed by WMNY, the composition of VOCs and hydrogen sulfide and other odorous reduced sulfur compounds in the Landfill Gas are presented in the tables in the attached **Exhibit "E."**

77.    In 1991, NYSDEC issued an Air State Facility Permit for Landfill Gas emissions from the Landfill.

78.    In 2001, NYSDEC approved the Air Permit, NYSDEC Permit No. 8-9908-00162/00043.  A copy of the current Air Permit is attached hereto as **Exhibit "F."**

79.    The Air Permit requires the Landfill to comply with regulations for New Source Performance Standards ("NSPS") found at 40 C.F.R. Part WWW.

80.    Because the design capacity of the Landfill is greater than 2.5 million megagrams (about 2.75 million U.S. tons), and the potential to emit of NMOC emissions from the Landfill is greater than 50 megagrams (about 55 U.S. tons) per year, the NSPS requires the Landfill to operate an active Landfill Gas collection system that minimizes the off-site migration of Landfill Gas.

81.    As part of the active Landfill Gas collection system at the Landfill, some of the

Landfill Gas generated in the Landfill is collected and piped to control equipment that burns the collected Landfill Gas by utilizing two flares and eight internal combustion engines that generate electricity.

82.     Based on information provided by WMNY, the Air Permit assumes that the Landfill Gas collection system is 85% efficient; therefore, the remaining 15% of the Landfill Gas (referred to as the "Fugitive Emissions") is not collected or treated, but is instead released directly into the Community.

83.     The Fugitive Emissions of NMOC released to the Community from the Landfill were reported by WMNY in its Annual Emissions Statement to NYSDEC to be 64,521 pounds in 2017, and 65,311 pounds in 2016.

84.     If the Landfill Gas collection system is defective, it is operating at less than the claimed efficiency of 85%, and excess uncontrolled and uncollected Landfill Gas (the "Excess Fugitive Emissions"), including the associated emissions of VOCs, HAPs, and odorous hydrogen sulfide and reduced sulfur compounds, is directly released into the Community as additional Fugitive Emissions.

85.     The Air Permit, citing 6 N.Y.C.R.R. §211.1, provides in Condition 30 that "no person shall cause or allow emissions of air contaminants to the outdoor atmosphere of such quantity, characteristic or duration… which unreasonably interfere with the comfortable enjoyment of life or property. Notwithstanding the existence of specific air quality standards or emission limits, this prohibition applies, but is not limited to, any … gas… odor… toxic or deleterious emission, either alone or in combination with others."

86.     Thus, both the Landfill Permit and Air Permit require that Odors from the Landfill be controlled so that they do not constitute a nuisance, regardless of the existence of specific air quality standards or emission limits.

**C.    The Landfill Permit Modification for the Rail Facility**

87.    In February 2013, WMNY applied to the Macedon Town Board for a modification to the Landfill's special use permit (the "Rail Facility Application") to permit construction and operation of a rail siding to bring waste to the Landfill via intermodal rail (the "Rail Facility").

88.    The Macedon Town Board acted as the lead agency for the State Environmental Quality Review Act ("SEQRA," ECL Art. 8) environmental review for the Rail Facility Application.

89.    As part of the SEQRA environmental assessment for the Rail Facility Application, the Macedon Town Board identified one "small to moderate" environmental impact in their review of the project "related to the long term production of methane gas, odors and the disposal of this gas (flaring vs. productive re-use), which is proposed to be mitigated… ."  This environmental impact arose because of a "potential 50% increase in land fill deposit rate (still under max permit per day) to increase methane production."

90.    Nonetheless, the Macedon Town Board concluded that the Rail Facility would not result in any adverse impacts and issued a negative declaration pursuant to SEQRA.

91.    In April 2013, WMNY submitted to NYSDEC an Intermodal Rail Unloading Facility Permit Modification Application (the "Rail Permit Modification Application"), which was approved.

92.    Beginning in mid-2015, following construction of the Rail Facility, WMNY began importing large quantities of MSW by rail, largely consisting of NYC Garbage.

93.    MSW arriving by rail at the Landfill is significantly more odorous, as compared to MSW received by direct truck hauling, because of the increased residence time for the MSW to decompose in the rail containers prior to being tipped at the working face of the Landfill.

94.    Upon information and belief, the NYC Garbage takes weeks from curb pick-up to

receipt by rail at the Landfill, making this waste more odorous than waste which is disposed at the Landfill from more local sources received by truck.

95.    After the MSW is collected via truck at the curbs of New York City, it is taken to one of two transfer stations before being placed in sealed intermodal containers.

96.    These sealed waste containers are transported by barge either 11 nautical miles (12.65 miles) from the Hamilton Avenue Marine Transfer Station in the Red Hook section of Brooklyn, or 14 nautical miles (16.11 miles) from the Southwest Brooklyn Marine Transfer Station in the Bensonhurst section of Brooklyn, to the Elizabeth Marine Terminal, trucked six miles to the Transflo Intermodal Facility in Elizabeth, New Jersey, then loaded onto railcars and transported via rail transport approximately 367 miles to the Landfill.

97.    Upon information and belief, the more than 385-mile long journey in an anaerobic environment via the sealed container, causes the NYC Garbage to partially decompose and become especially odorous when the containers are opened and the garbage is tipped on the open working face of the Landfill.

98.    The Odor Impacts analysis contained in Section 4.3 of the Supplementary Final Environmental Impact Statement for the Phase II Expansion, dated January 2003, recognized that when waste has remained in transit for extended periods of time, especially during period of hot weather, the delivered waste will have noticeable odors.

99.    To manage these issues of odorous waste, the odor control plan contained in the Operations & Maintenance Manual ("OMM") that is part of the Landfill Permit provides that "repeat offender delivering odorous waste to the facility (such as treatment plant sludge that is not properly stabilized) may receive a warning and, in the case of multiple offenses, be banned from bringing such material to the site."

100.    Despite the recognition by WMNY of the Odor issues associated with waste

delivered after extended transit time, the Rail Permit Modification Application ignored the potential nuisances from such increased Odors associated with disposal of MSW received by rail, such as the NYC Garbage, while handled at the Landfill.

101.    No changes to the Odor Control Plan for the Landfill were proposed or made in the Rail Permit Modification Application.

102.    Nor were any time limits imposed on the length of time NYC Garbage was allowed to "cook" in rail cars before a shipment should be rejected.

103.    According to WMNY's annual reports for the Landfill, the increase in "landfill deposit rate" for MSW has been significantly greater than the 50% assumed in the SEQRA review for the Rail Facility in 2013.   As shown in the table below, beginning in mid-2015, rates of NYC Garbage brought to the Landfill by rail caused the "landfill deposit rate" to increase by more than 250%, such that NYC Garbage currently represents about 71% of all MSW disposed at the Landfill:

|  | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Rail NYC Garbage tons per year ("tpy") | - | 284,392 | 559,214 | 567,711 |
| Total MSW (tpy) | 211,317 | 475,316 | 750,084 | 796,065 |
| % increase of Landfill deposit rate since 2014 from Rail NYC Garbage | Base year | 125% | 255% | 277% |
| Rail NYC Garbage as Percent of Total MSW | 0% | 60% | 75% | 71% |

104.    Thus, since mid-2015, the Landfill has primarily been functioning as a disposal facility for NYC Garbage.

105.    In February 2017, WMNY committed to continuing to cause the Landfill to be a primary disposal facility for NYC Garbage for 30 years when WMNY and New York City entered into a $3.3 billion contract ("NYC Contract") to dispose of 14,976 sealed waste containers of NYC

Garbage, about 1,106,660 tons, per year at the Landfill.

## WMNY VIOLATED AND CONTINUES TO VIOLATE THE LANDFILL PERMIT BECAUSE IT DISCONTINUED THE INSTALLATION OF HORIZONTAL GAS COLLECTION TRENCHES

106.    For Cells 10 and 11, which are part of the Phase II Expansion, the Landfill Permit requires horizontal gas collection trenches (the "Horizontal Gas Collectors") near the bottom of each cell, and then typically spaced 40 feet apart in the vertical plane and 130 feet apart in the horizontal plane (the "Horizontal Gas Collection Permit Requirement").

107.    Horizontal Gas Collectors consist of perforated pipes connected to vertical wells and are typically installed in gravel filled trenches in the waste mass as lifts of MSW are being placed. The purpose of the Horizontal Gas Collectors is to provide a greater vacuum zone of influence in the waste mass to initially collect low quality landfill gas for combustion. Once the horizontal perforated pipes are installed and enough MSW has been placed in a cell, vertical wells are installed and connected to the Horizontal Gas Collectors.

108.    Prior to 2014, the vertical wells at the Landfill were drilled into the waste. These wells were then connected to a control device such as a flare or an internal combustion engine, which draws a vacuum on the waste mass.

109.    According to a Perinton Conservation Board communication dated March 14, 2018 (*see* **Exhibit "J"** defined below), in 2014, WMNY's corporate parent decided to eliminate the use of the Horizontal Gas Collectors in all new Landfill cells and instead install only a new form of slip vertical wells, which action was intended to save the company money. This change in policy was done without proper consideration of the Community impact or without going through a public Permit modification process with the NYSDEC.

110.    The Horizontal Gas Collection System Requirement is detailed in Phase II Expansion Landfill Permit Drawing 29 ("Drawing 29"), which is incorporated into the Landfill

Permit by Special Condition I.1(c).  *See* **Exhibit C**.

111.    Drawing 29 also states that for Cells 10 and 11 "the vertical spacing of the gas extraction and collection system *shall* not exceed 75 feet." [emphasis added].  This requirement is incorporated into the Landfill Permit by Special Condition I.1(c), so it is part of the Horizontal Gas Collection Permit Requirement.

112.    The Phase II Permit Modification Application, dated September 2002, which is incorporated into the Landfill Permit by Special Condition I.1(c) (*see* **Exhibit C**), states "[t]he existing landfill gas collection system will be extended into the area of Cells 10 and 11 as well as the overliner area.  The existing system will be a combination of horizontal collectors and vertical wells . . . During the operation of Cells 10 and 11, a horizontal gas collection system will be installed.  This system will provide positive control of gas that is generated prior to final cover placement."

113.    Section 2.2.8.1 of the 2003 FSEIS for the Phase II Expansion (the "Phase II FSEIS"), referring to Drawing 29, indicates that the Landfill plans to install Horizontal Gas Collectors during the filling of Cells 10 and 11 and the Horizontal Gas Collectors are intended to mitigate odor problems during filling.

114.    Section 3.4.7.2.1 of the 2007 Final SEIS for the Phase III Expansion (the "Phase III FSEIS") states "WMNY will also continue the practice of installing horizontal landfill gas collection trenches as an interim method of collecting gas and controlling odors as waste placement activities progress in the Parkway Expansion − Phase III area. In general, horizontal gas collection trenches will be installed in the Phase III landfill expansion area at waste thickness increments of 40 to 60 feet."

115.    The Phase III FSEIS also indicates that the Landfill Gas collection system is one of the "primary" means by which the Landfill mitigates odors.

116.    Section 4.7 of the 2016 Supplemental Environmental Impact Statement ("SEIS") for the Air Permit for the Phase III Expansion (the "2016 SEIS"), referring to operational mitigation measures, indicated that:

> horizontal collectors are installed within the waste mass as waste is being placed and allows landfill gas collection as soon as gas begins to be generated. Horizontal collectors are especially useful for gas collection before the landfill reaches final grade…. *The horizontal collectors are the primary means of controlling odors* before final grade is reached…. [emphasis added].

117.    Despite WMNY's own conclusions in these SEISs, as recently as in 2016, that Horizontal Gas Collectors are the primary means of controlling odors, WMNY made a negligent determination to eliminate the Horizontal Gas Collectors in Cell 11 in 2014 or 2015 as it admitted at a Town of Perinton Conservation Board public meeting held on January 16, 2018 (the "January 16 Meeting").    The    January    16    Transcript    is    available    at: http://www.perinton.org/filedepot_download/996/697.

118.    According to the Cell 11 Construction Certification Reports, in 2013 and 2014 Horizontal Gas Collectors were installed near the bottom of Cell 11 at elevations ranging from about 472 to 484 feet above mean sea level.

119.    No Horizontal Gas Collectors were installed in Cell 11 in 2015 or 2016 even though the Landfill elevation in Cell 11 was 590 feet above mean sea level by year end 2016 -more than 100 feet above the horizontal gas collection trenches installed in 2013 and 2014.

120.    Because the Horizontal Gas Collection System Requirement provided for Horizontal Gas Collectors "typically spaced 40 feet apart in the vertical plane" which "*shall* not exceed 75 feet," WMNY violated the Landfill Permit when it constructed Cell 11 without Horizontal Gas Collectors in 2015 and 2016.

121.    WMNY District Manager Jeffrey Richardson admitted that WMNY did not install

the Horizontal Gas Collectors in Cell 11 at the January 16 Meeting when he stated "Cell 11 is the only cell at High Acres that does not have horizontal collection…."

122.    WMNY's Area Director of Disposal Operations, Steve Poggi, also admitted that "things have changed. And what has changed is in cell 10 and 11. The gas system that was installed was changed. We went to a different system. And it was not effective enough to capture the gas."

123.    Further, the Senior Project Manager, Don Gentilcore, from WMNY's Landfill consultants, Barton and Loguidice, admitted that "the primary cause of increased odors relate[s] to the effectiveness of the gas collection system in cell 11. This effectiveness was compromised by the sole reliance on the vertical gas wells …"

124.    In a December 20, 2017 letter (the "December 20 Letter," attached hereto as **Exhibit "G"**) to NYSDEC, WMNY admitted its "Reliance solely on vertical gas wells and previous generation slip form well technology (Figures 1 and 2) in cell 11 for operational landfill gas collection resulted in reduced collection, given 2017's wet weather conditions."

125.    At the January 16 Meeting, Mr. Richardson also stated that "[w]e know that we are not efficiently collecting the gas in cell 11."

126.    Upon information and belief, NYSDEC did not expressly authorize in writing, or modify the Landfill Permit for the waiver of the Horizontal Gas Collection Permit Requirement for Cell 11, as would be required under Special Condition I(1) of the Landfill Permit for such a change.

127.    The failure by WMNY to meet the Horizontal Gas Collection Permit Requirement in Cell 11 constitutes a violation of the Landfill Permit because WMNY did not construct Cell 11 in strict conformance with the plans, specifications, and reports submitted as part of the Landfill Permit application, as required by the Landfill Permit.  *See* **Exhibit C**, Special Condition I(1).

128.    The failure of WMNY to meet the Horizontal Gas Collection Permit Requirement

in Cell 11 constitutes a continuing violation of the Landfill Permit because Cell 11 continues to not conform to the Horizontal Gas Collection Permit Requirement.

129. Upon information and belief, Horizontal Gas Collectors have not been installed in Cell 10 since no later than 2015 in violation of the Horizontal Gas Collection Permit Requirement.

130. According to the topographical surveys contained in the WMNY Annual Reports, Cell 10 had an elevation of about 502 feet above mean sea level at year end 2014. By year end 2016, this elevation was about 576 feet above mean sea level, meaning at least one layer of Horizontal Gas Collectors should have been installed in Cell 10 in 2016.

131. WMNY admitted that the Landfill Gas collection system in Cell 10 was ineffective.

132. At the January 16 Meeting, Steve Poggi, the Area Director for Disposal Operations for WMNY stated that the

> [Landfill has] a history of a strong operating record, and obviously, things have changed. And what has changed is in Cell 10 and 11. The gas system that was installed was changed. We went to a different system. And it was not effective enough to capture the gas. So we are going back to what we have used in the past and supplementing that with additional collector cells. So it is not the entire site. It is just these two recent areas that we have made a change to the operation.

133. Mr. Poggi therefore admitted that *both* Cells 10 and 11 do not meet the Horizontal Gas Collection Permit Requirement.

134. Mr. Poggi also stated that "we know the odors are a nuisance."

135. Upon information and belief, NYSDEC did not expressly authorize in writing, or modify the Landfill Permit for, the waiver of the Horizontal Gas Collection Permit Requirement for Cell 10, as would be required under Special Condition I(1) of the Landfill Permit for such a change.

136. The failure by WMNY to meet the Horizontal Gas Collection Permit Requirements

in Cell 10 constitutes a violation of the Landfill Permit because WMNY did not construct Cell 10 in strict conformance with the plans, specifications, and reports submitted as part of the Landfill Permit application, as required by the Landfill Permit.  *See* **Exhibit C**, Special Condition I(1).

137.    The failure of WMNY to meet the Horizontal Gas Collection Permit Requirement in both Cells 10 and 11 constitutes a continuing violation of the Landfill Permit because Cells 10 and 11 will continue in perpetuity to not conform to the Horizontal Gas Collection Permit Requirement because Horizontal Gas Collectors cannot be retrofitted deep into these large existing Landfill Cells.

**THE ODORS ARE A CONTINUING NUISANCE**
**AND A CONTINUING VIOLATION OF THE**
**LANDFILL PERMIT AND AIR PERMIT**

**A.    The Odors Began to Escalate in the Summer of 2015**

138.    The Odors from the Landfill escalated after WMNY began receiving the NYC Garbage by rail at the Landfill in the summer of 2015.

139.    As stated in the chart in Paragraph 101 of this Complaint, the total tons per year ("tpy") of waste received at this Landfill went from 211,317 tpy with no waste received by rail, up to 284,392 tpy of MSW just received by rail in 2015, which then doubled again by 2017 to 567,711 tpy received by rail.  WMNY began violating the Horizontal Gas Collection Permit Requirement by 2015.

140.    After the NYC Garbage began to arrive by rail, complainants described the Odors as a "putrid" "unbelievable smell of new garbage."

141.    WMNY's response to these initial Odor complaints was an investigation into whether they were "politically motivated" or a statement that the Landfill was in compliance with all applicable regulations.

142.    In January 11, 2016 correspondence, WMNY admitted that the Odor complaints

had increased and that to address the Odors it would apply additional cover as needed, install new vertical collection wells, replace dewatering pumps, and install a new 18" "odor control line."

143.    By the Spring of 2017, members of the Community complained that the Odors continued to increase.

144.    The Odors persisted and worsened through the Summer of 2017 when, in addition to the non-compliance with the Horizontal Gas Collection Permit Requirement and increased volumes of NYC Garbage began arriving at the Landfill subsequent to the NYC Contract, WMNY dug up a road on the top of Cell 10 over a formerly landfilled area of sludge.

145.    Upon information and belief, in the Fall of 2017, in an attempt to rectify the Odors caused by its negligence as a result of violations of the Horizontal Gas Collection Permit Requirement during construction of Cells 10 and 11, WMNY began to dig into already Landfilled waste in Cells 10 and 11 in an attempt to retroactively install Horizontal Gas Collectors toward the top of these Cells, which were already emitting Excess Fugitive Emissions and Odors into the surrounding Community.

146.    Digging into the existing waste in Cells 10 and 11 to install the Horizontal Gas Collectors caused even more severe Odors.

147.    By early November 2017, desperate after months of complaining to WMNY, local officials[3] and government agencies to no avail, Community members formed a Facebook group called Fresh Air for the Eastside to bring awareness to the increase in frequency, potency and distance of Odors impacts in the Community and to vent with fellow neighbors about their utter

---

[3] According to a recent flyer distributed by WMNY to Perinton residents around the Landfill, WMNY touted that the Town of Perinton has been paid $23 million from the presence of the Landfill in the Town during all of its years in operation. The Town of Macedon, seeking similar income, allowed the 147-acre expansion into its Town in 2013 but has far fewer residents surrounding the Landfill. Obviously, based on simply the NYC Contract alone, WMNY's income compare to the alleged $23 million Community Host Benefit payments it has made to Perinton since 1972 is a paltry amount. According to some estimates, if the Town did not receive the little it receives from WMNY each year, the effect would only mean a $100 per year tax increase to Perinton residents.

frustration. FAFE began collecting odor reports via a Google Docs spreadsheet starting on November 4, 2017.

148.    The Fresh Air for the Eastside Facebook group has over 3,300 individuals that have been monitoring the Landfill situation closely and are concerned, and live in the Community and beyond, including the Towns of Walworth, Macedon, Victor, and Palmyra. The individuals who continue to be the most impacted have commenced this action.

149.    As the number of Odor complaints continued to escalate in the Fall of 2017, in mid-December 2017, some Community members who formed the Fresh Air for the Eastside Facebook group created a cell phone application (the "FAFE App") as an even more convenient and precise means of reporting and tracking the Odors than the system of calling WMNY or NYSDEC to log a complaint. The FAFE App can be viewed here: https://itunes.apple.com/us/app/fresh-air-for-the-eastside/id1320639050?mt=8.

150.    The FAFE App is capable of locating via GPS the approximate physical location of where the Odor report is being made, tracking the weather conditions and wind direction, and generating real-time Odor reports and emails to the Supervisor of the Town of Perinton, the Supervisor of the Town of Macedon, Monroe County Department of Public Service, NYSDEC, local senators and assemblyman, and various people at WMNY.

151.    Between November 2017 and the present, the FAFE App and its Google Docs predecessor have logged almost 10,000 Odor complaints.

152.    Despite the clear increase in Odor complaints by the Fall of 2017, as of November 1, 2017, NYSDEC maintained that WMNY was in compliance with the Landfill Permit and Air Permit and the regulations governing odors at 6 N.Y.C.R.R. § 360-1.14(m) and 6 N.Y.C.R.R. § 211.1 because WMNY was "applying extra soil cover and adding horizontal and vertical gas collectors."

153.    At this time, neither NYSDEC nor WMNY explained to the public that the reason the Odors were even more horrific than they had been is because WMNY was retroactively digging into landfilled garbage to install the Horizontal Gas Collectors in an attempt to correct a violation. Rather, this work was touted as "remedial."

154.    Special Condition No. 28(a) of WMNY's Landfill Permit requires WMNY to place a "minimum of six (6) inches of compacted cover material and/or approved alternative daily cover must be applied on all exposed surfaces of solid waste at the close of each operating day to control vectors, fire, odors, blowing litter, and scavenging."

155.    40 C.F.R. § 258.21 requires that WMNY "cover disposed solid waste with six inches of earthen material at the end of each operating day, or at more frequent intervals if necessary, to control disease vectors, fires, odors, blowing litter, and scavenging."

156.    NYSDEC's determination that WMNY complied with soil cover requirements was inconsistent with observations made in daily inspection reports made by NYSDEC inspectors, which show WMNY was routinely *not* applying adequate soil cover at the end of each day, in violation of the Landfill Permit and 40 C.F.R. § 258.21.

157.    With the Odors reaching levels of severity not previously experienced because already landfilled "ripe" MSW was now being excavated, around November 15 NYSDEC staff required WMNY "to come to the [NYSDEC] office for a meeting in early December to describe the additional measures they have currently planned, or feel they may need to take, to address [the Odor] problem, and when those measures are to be fully implemented."

158.    On December 4, 2017, WMNY issued a community notification on its website acknowledging its "recent odor challenges" indicating they were in an "execution phase of the mitigation which includes the installation of more than 10,000 ft. of landfill gas collection and conveyance pipe, the installation of 9 acres of geosynthetic cover and the opening of a new cell

which incorporates the latest technology in landfill gas collection and management."

**B.      WMNY's December 2017 Odor Mitigation Plan**

159.    WMNY met with NYSDEC on December 13, 2017.

160.    Subsequently on December 20, 2017, WMNY issued a letter to NYSDEC (the "December 20 Letter"), which was "intended to summarize the topics and items discussed at the December 13th meeting." *See* **Exhibit G.**

161.    The December 20 Letter ignored the Odor notifications prior to the late Summer of 2017 as "intermittent odors associated with any solid waste facility."

162.    WMNY blamed the late summer 2017 Odors on the removal of Landfill access road materials from the top of Cell 10, which required intrusive excavation into old previously landfilled waste and sewage sludge and on-site transport of odorous materials. *See* **Exhibit G.**

163.    However, the Odors continued to increase after the road removal was completed, so WMNY indicated they initiated "an extensive site review" including internal and external industry experts, who concluded that the Odors were caused by:

a.      heavy rainfall causing a "watering out" of gas collection wells and the collection header in Cells 10 and 11;

b.      heavy rainfall compromising the ability to place and compact cover soils;

c.      reliance solely on vertical gas wells and prior slip form well technology in Cell 11 resulting in reduced collection given 2017's wet weather conditions;

d.      a restriction in a 24-inch landfill gas header reducing gas collection efficiency; and

e.      an inadequate header system configuration which limited gas collection flexibility.

*See* **Exhibit G**.

164.    The WMNY experts, therefore, primarily blamed the weather for the Odors, based on its observation of 42 inches of rain received in 2017 compared to 27 inches in 2016.

165.    According to National Weather Service data, while 2017 was a rainy year, 2016 was a dry year, the driest since 2001.

166.    Seven of the ten wettest years in the 46 years the Landfill has been open have been since 1996, and 1996 was as wet as 2017.

167.    Rather than being caused by the rain, the restrictions in collection piping, watering out of gas collection wells, and an alleged compromised ability to place and compact cover soils were instead evidence of deficient operating, monitoring, and maintenance practices by WMNY, resulting in the inability to timely react to variations in Landfill conditions.

168.    Instead of the rain causing the Odors, it was WMNY's negligent removal of the primary means of Odor mitigation (i.e. the Horizontal Gas Collectors) from its design, which if installed, would have helped to maintain its Landfill Gas management systems to accommodate natural swings in annual precipitation that substantially contributed to the Odors.

169.    Failing to meet the Horizontal Gas Collection Permit Requirement, and insufficient operations, maintenance, and monitoring resources to manage the more odorous NYC Garbage, were clear signs of cost cutting on the part of WMNY management at the expense of the Community, at the same time they were realizing huge revenue from NYC Garbage.

170.    This conclusion is not only that of Plaintiffs, but that of the Town of Perinton Conservation Board ("PCB").

171.    The PCB is an advisory board that provides comments and recommendations on matters pertaining to environmental issues to the Town Board, Planning Board, and Zoning Board of Appeals for the Town of Perinton.

172.    In a March 14, 2018 letter (the "PCB March 14 Letter," attached as **Exhibit "J"**) to the Perinton Town Board, the PCB provided its assessment of the cause of the Odors based on its experience with the Landfill and its consultants review of available data.

173. The PCB concluded:

It is our opinion that <u>instead of waiting</u> until after the access road to Cell 10 had been removed, WM should have begun assessing the cause of the odors when they first noticed the increase early in 2017. As a matter of fact, some of the tuning data, if it existed (or was available) should have provided a signal to WM officials that something was not performing well in the Cell 11 gas collection and conveyance system. If the technicians were performing the required monthly monitoring of the gas collection wells, including gas flow from the wells, they would have noted the loss of vacuum and flow. A "proactive" instead of "reactive" monitoring and analysis posture would have initiated faster trouble shooting and the possible implementation of mitigation measures sooner to fix the issues. The PCB has concerns that the landfill gas collection system has lost collection efficiency over the past 4-5 years due to possible financial constraints placed on High Acres by its parent company. The fact that WM corporate dictated design changes to the gas collection system design leads the PCB to wonder what other mandates were issued that might reduce the efficiency of the gas collection and control systems at the landfill. [emphasis in original.]

174. The PCB also concluded that "We believe that the use of the slip form well design without horizontal gas collectors resulted in an ineffective gas collection system in Cell 11, causing increased gas emissions from the landfill surface and therefore increased odor complaints during 2017." *See* **Exhibit J**.

175. The PCB also stated: "In 2014, WM (corporate) issued a directive to the High Acres facility to change or modify its gas collection system in all new landfill cells by eliminating the installation of horizontal collectors and utilizing a newly designed vertical slip form well. The slip form well is designed to be installed as the waste is being placed within a cell, which alleviates the need to drill vertical wells. While the slip form wells might be more expensive than a typical drilled well, the cost is supposedly offset by not having to install the horizontal collectors." *See* **Exhibit J**.

C.    **The Mitigation Plan Proposed in the December 20 Letter Consisted of Retroactive Permit Compliance**

176.    Based on WMNY's assessment of the causes of the Odors, the December 20 Letter offered "primary mitigation measures" that represented a minimalist, incremental approach, including many measures which were already required by the Landfill Permit and 40 C.F.R. § 258.21, or maintenance and construction measures that should have been routinely performed or identified as necessary through process monitoring. *See* **Exhibits C and G.**

177.    WMNY's plan for "primary mitigation measures" included:

a.    "The identification and removal of a restriction within the 24-inch perimeter gas collection header," which should have been identified through routine process monitoring and addressed well before compromising system performance, and which maintenance work was the standard of care in the industry and was required by its Landfill Permit;

b.    "The design, approval and installation of approximately 10,000 lineal feet of horizontal collection piping in cell 10 and cell 11," which represented only a portion of what should have been installed between 2015 and 2017 had WMNY complied with the Horizontal Gas Collection Permit Requirement;

c.    "The design, approval, installation of an additional 24 and 18-inch vacuum header from the flare/gas to energy plant to cell 11," which should have been present at the beginning of the construction of Cell 11 to provide basic vacuum capacity;

d.    "The identification, abandonment, and replacement of an approximate 1100 lineal foot sub header in cell 11," which should not have "watered out" had proactive monitoring and corrective actions been taken pursuant to standard of care in the industry and the Landfill Permit and Air Permit maintenance requirements;

e.  "The design, approval and installation of 9 acres of exposed temporary geomembrane cover along the North and East slopes of cell 11," which was a band aid approach to temporarily correcting the failure to comply with the Horizontal Gas Collection Permit Requirement and daily cover soil placement requirements, as documented in numerous NYSDEC inspection reports; and,

f.  "The initiation of waste placement efforts into the newly constructed cell 12, which incorporates improved gas collection measures," which was not a mitigation measure at all, but instead an announcement that WMNY was going to continue to operate even though the Odors were persisting, except they would comply with the Horizontal Gas Collection Permit Requirement already contained in their Phase III Landfill Permit design.

*See* **Exhibit G.**

178.    In other words, except for the temporary membrane cover, WMNY's mitigation plan merely agreed to conform to the construction and maintenance specifications already required by the Landfill Permit and Air Permit.

179.    At no point in time up to December 20, 2017, did NYSDEC explain to the Community or Town of Perinton that these so-called mitigation measures were largely required by the Permits and 40 C.F.R. § 258.21.

180.    The December 20 Letter also proposed various "Long Term Odor Management" "initiatives" that "represent design and performance improvements to the long-term collection of landfill gas at the [Landfill]," including:

a.  The incorporation of next generation free draining slip form wells, complemented with a regularly installed horizontal collection piping network on all new cell construction in the future;

b. Hiring additional, permanent staff to support this new infrastructure construction, increase monitoring and maintenance of the Landfill Gas collection and conveyance system; and

c. Continued identification, replacement and repair of impaired Landfill Gas collection wells, laterals and headers.

*See* **Exhibit G.**

181.    These "initiatives" amounted to hiring adequate staff and monitoring and maintaining the Landfill Gas collection system in a way that should have done been all along in order for WMNY to remain in compliance with its Permits. The December 20 Letter then proposed various "operational improvements" including (again) the placement and compaction of additional daily and intermediate cover soils, and limiting the acceptance of odorous materials, which were already requirements under the Odor Control Plan contained in the Operations and Maintenance Manual ("OMM") that is incorporated into the Landfill Permit.  *See* **Exhibit C.**  The December 20 Letter is thus a laundry list of admissions that WMNY had completely failed to comply with its Permits.

**D.    Alternative Handling for or Elimination of NYC Garbage Was Not Assessed in WMNY's December 2017 Odor Mitigation Plan in Violation of the Landfill Permit**

182.    As noted above, since June 2015, the Landfill has primarily functioned as a disposal facility for the more odorous NYC Garbage.

183.    The experts performing the "extensive site review" for WMNY to identify the source of the Odors, referenced in the December 20 Letter, did not acknowledge or assess whether the NYC Garbage was also a significant contributor to the Garbage Odors, even though required to do so under the Odor Control Plan for the Landfill and 40 C.F.R. § 258.21.  *See* **Exhibit G.**

184.    Section 4.8 of the OMM contains the operation and maintenance requirements for

odor control for the Landfill Permit and requires that:

> Any waste that is anticipated to be exceptionally odorous generally is accepted only until 2:30 p.m. to allow sufficient time to cover the waste and avoid any odor emissions. In addition, these wastes may need to be covered with soil material immediately, instead of waiting until the end of the operating day, in order to reduce the potential for odors emanating from them.

185.    The Odor Control Plan included in Appendix A of the OMM (Section 5.3) additionally provides that:

> If certain wastes continue to be problematic over time, even with special handing, acceptance of the waste shall be discontinued.

186.    40 C.F.R. § 258.21 required that WMNY "must cover disposed solid waste with six inches of earthen material at the end of each operating day, or at more frequent intervals if necessary, to control ... odors...."

187.    Based on statements from the Town of Perinton, WMNY appears to have recognized that the NYC Garbage was a source of Garbage Odors at this time, but chose not to discuss it in its December 20 Letter.

188.    In responses to February 23, 2018 Town of Perinton FAQs about the causes of the Odors from the Landfill, the Town indicated "[WMNY] has said there have been occurrences of extended hold times for rail-car waste containers loaded with municipal solid waste, which, once disposed at High Acres, exposed odorous materials." *See* http://www.perinton.org/files/Data/Documents/QA%20on%20High%20Acres_for%20Perinton%20Town%20Website-revised%202-23-18.pdf.

189.    By 2017, even though more than 70% of the MSW being disposed at the Landfill was NYC Garbage, the December 20 Letter required no changes to the handling, or even mention of, this especially noxious putrescible waste.

190.    The failure to change the handling practices for, or eliminate the receipt of, the

NYC Garbage to mitigate the Garbage Odors constitute a violation of Odor Control Plan for the Landfill Permit and 40 C.F.R. § 258.21.

**E.    Response to the WMNY Mitigation Plan - NYSDEC and the Town of Perinton Declare the Landfill a Public Nuisance**

191.    The mitigation plan described in WMNY's December 20 Letter was not well-received since the Odors had not only continued to increase, but the Landfill had caused Tremors to occur in the surrounding Community a few days after New Year's Day in 2018.

192.    At the January 16 Meeting, WMNY admitted to causing a public nuisance and that Odors would get worse before they would get better because "remediation" was now required involving excavation into already landfilled waste to install Horizontal Gas Collectors and 18 new vertical wells because 40% of the existing vertical wells were not functioning.

193.    WMNY's engineers showed photos that large areas of the surface of the Landfill were not properly covered in violation of the Landfill Permit, Air Permit, and 40 C.F.R. § 258.21, which were also contributing to the Excess Fugitive Emissions.

194.    Shortly before the January 16 Meeting, there were several days on or about January 3, 2018 when Tremors from the Landfill impacted homes in the surrounding area.

195.    At least as early as the Spring of 2017, several Plaintiffs experienced the Tremors, which caused their houses to shake vigorously causing visible cracks in the house, and their windows to rattle.

196.    Some Plaintiffs have indicated that their houses, and particularly their windows, still periodically shake as a result of Tremors from the Landfill.

197.    Upon information and belief, the Tremors are the result of failure of WMNY to adequately control the operation of the Landfill emission control flares because of high oxygen levels in the Landfill Gas, which can also lead to explosive subsurface conditions.

198.    The high oxygen levels in the Landfill Gas were the result of ineffective Landfill Gas collection and inadequate cover systems.

199.    At the January 16 Meeting, WMNY promised the Community in attendance that WMNY would complete with the mitigation measures described in the December 20 Letter by no later than the first quarter of 2018.

200.    Completely at their wits end after this meeting, FAFE hired an environmental consultant to conduct air sampling on three days at the end of January 2018 for volatile organic compounds (VOCs), Landfill fragrances, and hydrogen sulfide levels.

201.    According to the NYS Department of Health, hydrogen sulfide has the odor of rotten eggs that has an odor detection threshold for some people as low as 0.5 parts per billion (ppb).

202.    FAFE's environmental consultant documented airborne hydrogen sulfide concentrations ranging from 3.0 ppb to 13 ppm.

203.    FAFE's environmental consultant sampled air roughly 0.8 miles from the Landfill, which results revealed that the hydrogen sulfide concentration of 13 ppb over a half-hour period on January 19, 2018 was "indicative that detectable levels of hydrogen sulfide were found during an odor event that may potentially exceed the NYSDEC one-hour ambient air quality standard of one-hour 10 ppb provided in 6 N.Y.C.R.R. § 257-10.3."

204.    After the January 16 Meeting, the PCB recommended to the Perinton Town Board that it petition NYSDEC for changes to the Landfill Permit, including immediate compliance with new NYSDEC Part 360 regulations for Landfill Gas collection recently promulgated in the Fall of 2017, which require Horizontal Gas Collectors every 20 feet in the horizontal plane, enhanced monitoring, and suspension of MSW disposal at the Landfill within Perinton until WMNY demonstrated compliance.

205.    The PCB also recommended vibration monitoring and control improvements to address the Tremors.

206.    On February 2, 2018, NYSDEC issued a Notice of Violation (the "NOV," attached hereto as **Exhibit "H"**) to WMNY concluding that WMNY was in violation of state solid waste and air pollution control regulations and had caused a public nuisance, stating that "[s]ince approximately September 2017, on numerous occasions continuing to date, the Landfill has emitted odors in a manner that unreasonably interferes with the Community's comfortable· enjoyment of life and property."

207.    Therefore, as of February 2, 2018, NYSDEC had determined WMNY was in violation of the Landfill Permit, Air Permit, and 40 C.F.R. § 258.21 because the Odors were a public nuisance.

208.    In addition to completing the measures promised by WMNY in the December 20 Letter, NYSDEC incorporated many of the PCB recommendations into the Landfill Permit requirements by issuing the NOV, requiring compliance with new gas collection regulations (including Horizontal Gas Collectors every 20 feet in the horizontal plane), additional soil cover placement in Cells 10 and 11, preparation for a design for a 40-mil geomembrane cover on cells 10 and 11, and enhanced quarterly surface scans of the Landfill for detection of Landfill Gases.

209.    Upon information and belief, NYSDEC has not mandated compliance with the NOV through an Administrative Consent Order.

210.    The NOV also required discontinuance of waste disposal in Cells 10 and 11, after placement of additional cover and gas collection wells, until the Odors have been resolved, but this requirement was clarified in a subsequent NYSDEC letter to the Town of Perinton on February 12, 2018 to note that as Cell 12 is filled, the waste would be placed against (and on top of) the slope of Cell 11 in Perinton.

211.    In other words, the temporary cover that was being required to be placed on dysfunctional Cells 10 and 11 would be removed in the future, thus leading to Plaintiffs' concern that in the future, Plaintiffs and the Community would once again be subjected to the severe Odors they were currently experiencing.

212.    The NOV also required WMNY to take measures to address the Tremors and submit to NYSDEC a standard operating procedure for the system.

213.    The NOV did not require that WMNY perform a vibration analysis or foundation evaluation of nearby homes that have been impacted by the Tremors, thus leaving some Plaintiffs with cracks in the foundations and potentially compromised foundations.

214.    WMNY responded to and accepted the requirements of the NOV in a letter to NYSDEC dated February 16, 2018.

215.    Absent in WMNY's correspondence was follow up to the operational improvements promised in the WMNY December 20 Letter for the placement and compaction of additional daily and intermediate cover soils, evaluation of the characteristics of soils types used for cover, and limiting the acceptance of odorous materials.  No mention was made of limiting the acceptance of the high volumes of odorous NYC Garbage or improving the practices for handling and covering NYC Garbage to minimize Odors from this material.

216.    On March 8, 2018, the Town of Perinton Deputy Director of Code Enforcement issued a Compliance Order ("Compliance Order," attached hereto as **Exhibit "I"**) to WMNY, determining that WMNY was out of compliance with the terms of its Town of Perinton Special Use Permit because the Landfill was "unduly interfering with the quiet enjoyment of adjacent properties, and has not sufficiently guarded against the creation of odor, fumes or noises, resulting in an ongoing nuisance to the community."

217.    The Compliance Order directed WMNY to resolve the issues at the Landfill at once.

218.    On March 14, 2018, the PCB presented its recommendations regarding the mitigation measures required by WMNY at the Landfill and these measures were adopted by the Perinton Town Board.  The PCB stated that NYSDEC had agreed to require Cell 11 be completely covered with a 40-mil geomembrane, as had been done with Cell 10, "so there would be no question that the landfill gas odors from Cell 11 were being controlled."

219.    The PCB also recommended that if WMNY did not complete all mitigation tasks by April 30 that NYSDEC take additional measures to deal with the Odors including the suspension of disposal of MSW at the facility until the Odors were resolved.

220.    Instead of installing the approved 40-mil geomembrane to cover Cell 11, WMNY instead installed a 30-mil geomembrane.  This thinner geomembrane blew off during an April 4 windstorm.

221.    The reason a 40-mil geomembrane was included by WMNY in its own work plan is because it is thicker, and possibly could have withstood the windstorm on April 4 even if not yet covered with soil.

222.    In late March 2018, WMNY performed its first 2018 surface screening of the Landfill for Landfill Gas.

223.    This screening is required pursuant to 40 C.F.R. Subpart WWW and measures the concentration of methane at the surface of the Landfill.  Methane is the primary constituent of Landfill Gas, so high methane concentrations imply high leakage of Landfill Gas as Excess Fugitive Emissions.

224.    The regulations and Air Permit require WMNY to take action if the surface methane concentration in any screen location exceeds 500 parts per million ("ppm").  NYSDEC required WMNY to lower its action level to 200 ppm.

225.    In the March 2018 screening, seven detections were between 200 ppm and 500

ppm.

226.    Ten detections were above 500 ppm.

227.    Of those ten detections, six were at levels greater than 10,000 ppm.  Since the upper measurement limit of the screening equipment used was 10,000 ppm, the true reading could have been much higher than 10,000 ppm.

228.    Upon information and belief, it was necessary for WMNY to apply additional cover and improve the seals around their wells to bring the surface scan concentration to less than 200 ppm methane.

229.    Since these Landfill surface scans only take place quarterly and not during snow cover, the Landfill could have been emitting Landfill Gas at levels exceeding action levels since late fall 2017.

**F.    The Actions Required by NYSDEC in the NOV Did Not Abate the Nuisance, Permit Violations Persist and No Further Enforcement has Been Initiated by NYSDEC**

230.    The actions required in the December 20 Letter, the NOV, and subsequent agreements between NYSDEC and WMNY, still have not abated the nuisance caused by the Odors.

231.     On May 3, 2018, WMNY published a Community Update, where it concluded that it had allegedly completed mitigation activities when it stated in a Community Update that "[t]he mitigation efforts proposed by WMNY in the December 20, 2017 letter to NYSDEC as well as those required by [NYSDEC] in the [NOV] have been completed and ongoing monitoring and maintenance activities are being performed."

232.    However, on May 8, WMNY indicated a temporary utility flare would not start up until the following week.  On May 17, WMNY declared its mitigation complete when it stated in another Community Update that the temporary flare was operational, the installation of additional

geomembrane cover and a "wind defender" on the slopes of Cell was complete, and that they were finalizing waste placement in Cells 10 and 11 and applying intermediate cover.  WMNY also claimed a "significant reduction" in Landfill Gas Odors.

233.    While the frequency of the Landfill Gas Odors had been reduced since the peak gassing of the community by the Landfill between the Fall of 2017 and May 2018, this was only accomplished by wrapping Cells 10 and 11 in a plastic geomembrane and with the installation of intermediate cover.  In other words, Cells 10 and 11 are temporarily closed.

234.    Removal of the geomembrane and the intermediate cover to fill Cells 10 and 11 in the future will only cause the Landfill Gas Odors to revert to the levels present in the Fall of 2017 and Winter and Spring of 2018 because of the failure of WMNY to comply with the Horizontal Gas Collection Permit Requirement in these cells and because the slip vertical wells continue to fail.

235.    Further, since May 17, 2018, Landfill Gas Odors persist at a frequency and intensity that unreasonably impacts the Plaintiffs' comfortable enjoyment of life and property.

236.    More significantly, WMNY made no claim that the Garbage Odors had reduced in frequency and intensity, and odor reports prepared by NYSDEC's Environmental Conservation Officers ("ECO") since May 17, 2018, when NYSDEC finally used its ECOs to patrol the Community *after* all of the alleged mitigation measures were completed, show a regular, continuing presence of Garbage Odors in the community.

237.    To the date of this Complaint, the Odors persist at an intensity and frequency that unreasonably impacts the Community's comfortable enjoyment of life and property in violation of the Landfill Permit, Air Permit, and 40 C.F.R. § 258.21.

238.    The continuing presence of Garbage Odors should come as no surprise because there has been no change in the management of the NYC Garbage by WMNY.

239.    Based solely on NYSDEC ECO patrol reports conducted from May 18 to June 13 (at the time of this Complaint, Plaintiffs have only been provided ECO reports through June 13), the Odors still persisted in the Community.

240.    On most days during this time period, NYSDEC ECOs conducted odor patrols in the Perinton and Macedon areas in addition to responding to reported Odor complaints.

241.    Odors were "detected" by ECOs on all 31 of the 31 days of ECO reports.

242.    Eighteen of the 31 days of reports included an observation by an ECO of a "moderate" to "strong" Odor in the Community, including on May 20, 21, 22, 23, 25, 27, 30, and 31, and June 1, 3, 4, 5, 6, 7, 9, 11, 12, and 13.

243.    "Strong" Odors were noted by the ECOs on 8 of 31 days (May 23, 25, 30, and 31, and June 4, 7, 9, and 12).

244.    The ECOs observed the prevalent Odor description as Garbage Odors, which were observed by the ECOs in 45 of 54 (83%) "moderate" and "strong" Odor descriptions.

245.    Still, 12 of 54 (22%) "moderate" and "strong" ECO Odor descriptions observed Landfill Gas Odors.

246.    Garbage Odors were present in every "strong" ECO Odor observation and Landfill Gas Odors were present in 2 of 8 "strong" Odor observations.

247.    Thus, based solely on the NYSDEC ECO observations, there is no basis for anyone to claim that the nuisance caused by the Odors has been abated.  Garbage Odors are pervasive and the Landfill Gas Odors are still consistently present beyond the footprint of the Landfill.

248.    No significant actions to further abate the Odors have been taken by WMNY, NYSDEC or the Towns of Perinton or Macedon since mid-May 2018.

249.    NYSDEC implied in an email to the Town of Perinton on June 12 that they were reducing patrols, and on July 19, Petitioners were notified that calls to the "DEC Hotline" would

result in a "Waste Management Official" being dispatched to the complainant's location instead of an ECO. This amounts to the fox guarding the henhouse and will likely lead to a false sense that the situation has improved.

250.    The ECO observations from May 18 to June 13 are consistent with the complaints reported in the FAFE App during this time period. From May 18 to June 13, more than 250 complaints were reported, with days of more than 10 complaints occurring on May 18, 19, 22, 30, and 31, and June 7 and 13. Five of these seven days were days when the ECOs observed "moderate" to "strong" odors and 3 of the 7 were days of "strong" odors. Of these reported complaints, 78% reported Garbage Odors and 20% reports Landfill Gas. These percentages are consistent with the observations of the ECOs for this time period of Garbage (83%) and Landfill Gas (22%) Odors.

251.    Since June 13 until the present, more than 700 reports of Odors have been reported in the FAFE App. In particular, significantly bad Odor days report in the FAFE App. included June 20, 22, 23, 26, and 27, and July 7, 13, 16, and 19, 20, 21, 23, 24, 30, and 31, and August 1, 3, and 8, and the three weeks between July 19 and August 8 have been particularly bad with approximately 427 complaints reported in the last three weeks.

252.    Therefore, Plaintiffs remain similarly affected by the Odors as they had during the height of the gassing from the Landfill in the winter, but now it is the summer. Because of the continuing Odors, a majority of Plaintiffs continue to report the need to refrain from using and entertaining in their back yards, refrain from allowing their children to play outside, and refrain from exercising outdoors, and the Odors have caused them to close their windows because the Odors are entering their homes.

253.    Plainly, the Odors are still present at a frequency and intensity that adversely impacts the Community's comfortable enjoyment of life and property and present a continuing

nuisance.

254.    Because of the continuing nuisance caused by the Odors, WMNY continue to violate the Landfill Permit, Air Permit, and 40 C.F.R. § 258.21.

255.    Because of the continuing nuisance, on July 25, 2018, Plaintiffs filed a Petition with the NYSDEC to modify WMNY's Permits.

256.    Further and permanent mitigation by WMNY is necessary to abate this nuisance, as follows:

    a.    Cells 10 and 11 should not be reopened for any future disposal, since reopening these cells will start another cycle of the release of severe Landfill Gas Odors.  For example, on July 19-24, work was being conducted on top of Cell 10 and Odors were significant.

    b.    WMNY has failed to manage the Garbage Odors caused by the massive volumes of NYC Garbage, which now constitutes more than 70% of the MSW received at the Landfill.  The permitted volumes of MSW received by rail, including the NYC Garbage, should be reduced to 50% or less of the current volumes, and additional immediate and daily cover requirements should be imposed and the no landfilling of odorous materials after 2:30 PM requirement enforced.

    c.    If the NYC Garbage and other rail received MSW continues to be problematic, even with the reduced volumes and special handling, the Court should enforce the Odor Control Plan in the Landfill Permit and direct that the acceptance of the NYC Garbage be discontinued.

    d.    New Contingency Plan provisions for Tremors should include, at a minimum, a vibration analysis and foundation evaluation of nearby homes that have been impacted to determine what property damage has occurred.

e.    A property value protection plan for Plaintiffs where if a homeowner cannot sell their home due to Landfill impacts, WMNY should compensate the homeowner lost property value.

## OTHER NUISANCES FROM THE LANDFILL IMPACT THE COMMUNITY IN VIOLATION OF THE LANDFILL PERMIT

257.    Plaintiffs also continue to be impacted by nuisances from the Landfill in addition to the Odors.

258.    In an attempt to mask the Odors, WMNY uses chemical "deodorizers" that are sprayed into the ambient air.

259.    These deodorizers do not eliminate the Odors, but instead attempt to substitute and mask one unnatural odor for another.

260.    Plaintiffs have complained of feeling ill from the deodorizers.

261.    Chemicals commonly found in deodorizers have been documented in the Community, almost a mile away from the Landfill.

262.    The Community has experienced increased populations of Vectors, including rats, mice, and flies emanating from the Landfill.

263.    Some Plaintiffs have been forced to hire exterminators and purchase of vermin control devices to place on their properties.

264.    6 N.Y.C.R.R. § 360.19(h) and 40 C.F.R. § 258.22 require that WMNY effectively control on-site populations of Vectors.

265.    By failing to control the Vectors, WMNY is in violation of 6 N.Y.C.R.R. § 360.19(h) and 40 C.F.R. § 258.22 and is thereby violating its Landfill Permit and creating a nuisance to the Community.

266.    WMNY is violating its Landfill Permit by operating the Landfill in manner that

causes the excessive Noise to be present beyond its property line outside of the hours for operations directly related to the acceptance of MSW of the Landfill provided in the Landfill Permit.

267.    6 N.Y.C.R.R. § 360.19(j) requires that WMNY operate the Landfill in a manner "does not exceed the following energy equivalent sound levels beyond the property line owned or controlled by the owner or operator of the facility at locations authorized for residential purposes."

268.    40 C.F.R. § 243.202-1 requires all vehicle uses in the transportation of solid waste to comply with federal Noise Emission Standards for Motor Carriers Engaged in Interstate Commerce at 40 C.F.R. Part 202.

269.    Landfill Permit Special Condition 20(a) (the "Landfill Operating Hours") requires that

> Operation of the [L]andfill and [L]andfill related activities will be in accordance with the following:
>
> (a) Operations directly related to the acceptance…of solid waste at [the Landfill] shall be limited to the following:
>
> Monday through Friday 6:00 a.m. to 4:30 p.m.
> Saturday 6:00 a.m. to 2:00 p.m.
> Saturday following a Major Holiday 6:00 a.m. to 4:30 p.m.
>
> The landfill shall not be operated on Sundays or Major Holidays.

270.    WMNY has violated Landfill Permit and 40 C.F.R. § 243.202-1 as many Plaintiffs have been impacted and disturbed by the Noise emanating from the Landfill outside of the Landfill Operating Hours, specifically from the Rail Facility.

271.    Many Plaintiffs have been awakened in the middle of the night, nightly, by the Noise emanating from the switching of trains at the Landfill.  Plaintiffs are losing sleep due to the excessive Noise.

272.    Some Plaintiffs are unable to hear their television at typical volumes and are

distracted from reading books.

273.    The Noise is particular invasive in the late evening, between 9:00 p.m. and midnight, and can last many hours, all the way until the early morning.

274.    The Noise is heard for miles.

275.    As discussed above, WMNY has caused the Tremors to occur in the Community, shaking Plaintiffs' homes and properties.

276.    WMNY admitted it caused vibrations to occur on January 3, 2018 in a Community Update.

277.    In January 2018, WMNY apparently installed a flare reverberation control system to eliminate the Tremors.

278.    Since that time, more Tremors have occurred.

279.    Because of the Tremors, uncontrolled Vectors, Noise, and Odors from the deodorizer masking agent, the Landfill is creating a public nuisance in violation of the Landfill Permit.

**AS AND FOR A FIRST CAUSE OF ACTION
UNDER CLEAN AIR ACT §304(A)(1) FOR
CURRENT AND REPEATED VIOLATIONS OF TITLE V PERMIT**

280.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "279" of this Complaint, as if set forth in this paragraph at length.

281.    The citizen suit provisions of the CAA provide that "any person may commence a civil action on his own behalf - (1) against any person … who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under [the CAA] or (B) an order issued by the Administrator or a State with respect to such a standard or limitation."  CAA §304(a), 42 U.S.C. § 7604(a).

282.    Plaintiffs FAFE and the Individual Plaintiffs are "person[s]" who may bring citizen

suits pursuant to the provisions of the CAA.

283.    WMNY is a "person" and subject to the citizen suit provisions of the CAA.

284.    The Air Permit was issued pursuant to Title V of the CAA.

285.    WMNY is the owner and/or operator of the Landfill, the permittee for the Air Permit, and the permitting and operation of the Landfill is subject to emission standards or limitations under the CAA.

286.    On January 20, 2018, Plaintiff FAFE on behalf of itself and the Individual Plaintiffs who are members of FAFE issued formal notices of intent to file suit under the CAA to WMNY via registered mail, return receipt requested, with copies sent via certified mail to the registered agent for WMNY, the Administrator of the USEPA, the Regional Administrator for USEPA Region 2, the Governor of New York, and the NYSDEC, among others.

287.    WMNY has been and is currently in violation of the Air Permit due to the Odors and Excess Fugitive Emissions.

288.    The Air Permit, citing 6 N.Y.C.R.R. §211.1, provides in Condition 30 that "no person shall cause or allow emissions of air contaminants to the outdoor atmosphere of such quantity, characteristic or duration … which unreasonably interfere with the comfortable enjoyment of life or property. Notwithstanding the existence of specific air quality standards or emission limits, this prohibition applies, but is not limited to, any … gas… odor… toxic or deleterious emission, either alone or in combination with others."

289.    In the NOV, NYSDEC determined that the "Landfill has emitted odors in a manner that unreasonably interferes with the Community's comfortable enjoyment of life and property."

290.    From the date of the NOV, the nuisance from the Odors has not been abated.

291.    Therefore, WMNY has violated its Air Permit and the CAA by causing a nuisance due to the continuing Odors and Excess Fugitive Emissions.

292.    Condition No. 83 of the Air Permit requires WMNY "site active collection wells, horizontal collectors, surface collectors, or other extraction devices at a sufficient density throughout all gas producing areas …. The sufficient density of gas collection devices … shall address landfill gas migration issues …. The placement of gas collection devices … above shall control all gas producing areas."

293.    WMNY continues to violate Condition 83 of the Air Permit by failing to install a Landfill Gas collection system that collects Landfill Gas at a sufficient extraction rate to prevent the Excess Fugitive Emissions and Odors.

294.    This Court should issue an injunction, pursuant to 42 U.S.C. 7604(a), requiring WMNY to comply with the Air Permit by abating the Odors and Excess Fugitive Emissions by:

a.    Enjoining WMNY from removing the geomembrane cover and intermediate cover from Cells 10 and 11;

b.    Enjoining WMNY from restarting disposal operations in Cells 10 and 11;

c.    Directing WMNY to permanently close Cells 10 and 11;

d.    Directing WMNY to comply with the Odor Control Plan with respect to its handling of NYC Garbage and any other MSW received by rail by:

    i.    initially reducing the volume of such material received by 50% or more, and then performing an evaluation with Plaintiffs' input to determine if this volume reduction eliminates the Odor, Excess Fugitive Emissions fragrance, Noise, Vectors, Tremors and any other nuisance conditions;

    ii.    requiring additional immediate and daily cover requirements on rail received MSW and placement of this material only until 2:30 p.m.; and

    iii.    if Garbage Odors persist from NYC Garbage and other rail received MSW, discontinuing receipt of all such material at the Landfill.

295.     This Court should also award appropriate civil penalties to the United States Treasury for each day of these violations of the CWA, pursuant to 42 U.S.C. §7604(a).

296.     This Court should also award the City the costs of this litigation (including reasonable attorney and expert witness fees), pursuant to 42 U.S.C. § 7604(d).

### AS AND FOR A SECOND CAUSE OF ACTION
### UNDER RCRA §7002(A)(1)(A) FOR A
### CONTINUING VIOLATION OF RCRA STANDARDS

297.     Plaintiffs repeat and reallege the allegations of paragraphs "1" through "296" of this Complaint, as if set forth in this paragraph at length.

298.     The citizen suit provisions of RCRA provide that "any person may commence a civil action on his own behalf against any person… who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to [RCRA]."  RCRA §7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A).

299.     Pursuant to 42 U.S.C. §6903(15), Plaintiffs FAFE and the Individual Plaintiffs are "person[s]" who may bring citizen suits pursuant to the provisions of RCRA, 42 U.S.C. §6972.

300.     Pursuant to 42 U.S.C. §6903(15), WMNY is a "person" and subject to the citizen suit provisions of RCRA, 42 U.S.C. §6972.

301.     WMNY is the owner and/or operator of the Landfill, the permittee for the Landfill Permit, and the permitting and operation of the Landfill is subject to standards, regulations, conditions, requirements, prohibitions, or orders effective pursuant to RCRA.

302.     On January 20, 2018, Plaintiff FAFE on behalf of itself and the Individual Plaintiffs who are members of FAFE issued formal notices of intent to file suit under RCRA to WMNY via registered mail, return receipt requested, with copies to the Administrator of the USEPA, the Regional Administrator for USEPA Region 2, and the NYSDEC, among others.

303.     40 C.F.R. § 258.21 requires that WMNY "cover disposed solid waste with six

inches of earthen material at the end of each operating day, or at more frequent intervals if necessary, to control disease vectors, fires, odors, blowing litter, and scavenging."

304.    This is consistent with 6 N.Y.C.R.R. § 360.19(i), which states that a landfill "must ensure that odors are effectively controlled so that they do not constitute a nuisance as determined by [NYSDEC]."

305.    The Odor Control Plan in the OMM requires that "[i]f certain wastes continue to be problematic over time, even with special handing, acceptance of the waste shall be discontinued."

306.    WMNY has and continues to violate 40 C.F.R. § 258.21 by failing to adequately cover the Landfill with daily cover or at more frequent intervals as necessary to control odors, and failing to comply with its Odor Control Plan.

307.    WMNY's handling of the NYC Garbage continues to cause Garbage Odors that unreasonably impacts the Community's comfortable enjoyment of life and property.

308.    WMNY is violating and continues to violate 40 C.F.R. § 258.22 and 6 N.Y.C.R.R. § 360.19(l) by failing to effectively control on-site populations of Vectors.

309.    WMNY is violating and continues to violate 40 C.F.R. § 342.202-1 and 6 N.Y.C.R.R. § 360.19(j) by conducting its operations with excessive Noise outside of the Landfill Operating Hours.

310.    Pursuant to RCRA §7002(a)(1)(A), 42 U.S.C. §6972(a)(1)(A), WMNY should be directed to comply with applicable regulations by:

      a.    Directing WMNY to immediately investigate and remediate all impacts to the Community from the Odors;

      b.    Enjoining WMNY from removing the geomembrane cover and intermediate cover from Cells 10 and 11;

c.  Enjoining WMNY from restarting disposal operations in Cells 10 and 11;

d.  Directing WMNY to permanently close Cells 10 and 11;

e.  Directing WMNY to comply with 40 C.F.R. § 258.21 by complying with the Odor Control Plan with respect to its handling of NYC Garbage and any other MSW received by rail by:

   i.  initially reducing the volume of such material received by 50% and then performing an evaluation with Plaintiffs' input to determine if this volume reduction eliminates the Odor, Excess Fugitive Emissions, fragrances, Noise, Vectors, Tremors and any other nuisance conditions;

   ii.  requiring additional immediate and daily cover requirements on rail received MSW and placement of this material only until 2:30 p.m.; and

   iii.  if Garbage Odors persist from NYC Garbage and other rail received MSW, discontinuing receipt of all such material at the Landfill.

f.  Directing WMNY to comply with 40 C.F.R. §258.22 by controlling on-site populations of vector.

g.  Directing WMNY to comply with 40 C.F.R. § 342.202-1 by controlling excessive Noise from its operations at the Landfill and directing that any Noise producing activities associated with the Rail Facility be performed only during Landfill Operating Hours.

311.  This Court should also award Plaintiffs the costs of this litigation (including reasonable attorney and expert witness fees), pursuant to 42 U.S.C. §6972(e).

**AS AND FOR A THIRD CAUSE OF ACTION**
**UNDER RCRA §7002(A)(1)(B) FOR AN**
**IMMINENT AND SUBSTANTIAL ENDANGERMENT**

312.  Plaintiffs repeat and reallege the allegations of paragraphs "1" through "311" of

this Complaint, as if set forth in this paragraph at length.

313.    The Odors and Excess Fugitive Emissions present an imminent and substantial endangerment to human health and the environment.

314.    On January 20, 2018, Plaintiff FAFE, on behalf of itself and the Individual Plaintiffs who are members of FAFE, issued formal notices of intent to file suit under RCRA to WMNY via registered mail, return receipt requested, with copies to the Administrator of the USEPA, the Regional Administrator for USEPA Region 2, and the NYSDEC, among others.

315.    The citizen suit provision of RCRA allows any "person" to commence an action "against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present ... owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid ...waste which may present an imminent and substantial endangerment to health or the environment…." 42 U.S.C. §6972(a)(1)(B).

316.    Pursuant to 42 U.S.C. §6903(15), Plaintiffs FAFE and the Individual Plaintiffs are "person[s]" who may bring citizen suits pursuant to the provisions of RCRA, 42 U.S.C. §6972.

317.    Pursuant to 42 U.S.C. §6903(15), WMNY is a "person" and subject to the citizen suit provisions of RCRA, 42 U.S.C. §6972.

318.    Solid waste is defined as "any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities."  42 U.S.C. §6903(27).

319.    The MSW constitutes a solid waste.

320.    The MSW at the Landfill is especially noxious and odorous and has caused a nuisance by emitting the Odors.

321.    The Excess Fugitive Emissions consists of VOCs, HAPs, odorous reduced sulfur compounds, including hydrogen sulfide, and other noxious chemicals and hazardous substances. *See* **Exhibit E.**

322.    The Odors and Excess Fugitive Emissions of Landfill Gas present or may present an imminent and substantial endangerment to health or the environment, including a continuing threat to the health of the Community.

323.    Adequate remediation or corrective action has not occurred and Plaintiffs are still impacted by the Odors and Excess Fugitive Emissions.

324.    This Court should issue an injunction, pursuant to 42 U.S.C. §6972(a), directing WMNY to abate this imminent and substantial endangerment by:

   a.    Directing WMNY to immediately investigate and remediate all impacts to the Community by the Odors and Excess Fugitive Emissions;

   b.    Enjoining WMNY from removing the geomembrane cover and intermediate cover from Cells 10 and 11;

   c.    Enjoining WMNY from restarting disposal operations in Cells 10 and 11;

   d.    Directing WMNY to permanently close Cells 10 and 11;

   e.    Directing WMNY to comply with the Odor Control Plan with respect to its handling of NYC Garbage and any other MSW received by rail by:

      i.    initially reducing the volume of such material received by 50% or more, and then performing an evaluation with Plaintiffs' input to determine if this volume reduction eliminates the Odor, Excess Fugitive Emissions, fragrances, Noise, Vectors, Tremors and any other nuisance conditions;

ii.   requiring additional immediate and daily cover requirements on rail received MSW and placement of this material only until 2:30 p.m.; and

iii.   if Garbage Odors persist from NYC Garbage and other rail received MSW, discontinuing receipt of all such material at the Landfill.

325.   This Court should also award Plaintiffs the costs of this litigation (including reasonable attorney and expert witness fees), pursuant to 42 U.S.C. §6972(e).

### AS AND FOR A FOURTH CAUSE OF ACTION FOR PUBLIC NUISANCE

326.   Plaintiffs repeat and reallege the allegations of paragraphs "1" through "325" of this Complaint, as if set forth in this paragraph at length.

327.   The Odors, Excess Fugitive Emissions, Noise, Vectors, and Tremors are a public nuisance, because they interfere with rights common to all, including interfering with the use by the public of the outdoors, school and work facilities, and their homes, and has caused deleterious health effects and discomfort to a considerable number of persons.

328.   WMNY (including their officers, agents, servants, and/or employees) proximately caused this public nuisance by their intentional or negligent acts.

329.   In the Compliance Order, the Town of Perinton determined WMNY was creating a public nuisance by unduly interfering with the quiet enjoyment of adjacent properties, because of odor, fumes, vibration and Noise beyond the property line of the Landfill.  *See* **Exhibit I.**

330.   In the NOV, NYSDEC determined that "since approximately September, 2017, on numerous occasions continuing to date, the Landfill has emitted odors in a manner that unreasonably interferes with the Community's comfortable· enjoyment of life and property." *See* **Exhibit G.**

331.   Such illegality makes the nuisance a nuisance per se.

332.     Having a reasonable opportunity to abate the nuisance caused the Odors, Excess Fugitive Emissions, Noise, Vectors, and Tremors, WMNY failed to do so in a reasonably prompt and effective manner.

333.     Therefore, WMNY has interfered with rights common to all.

334.     Plaintiff has sustained special damages from this public nuisance including but not limited to the following ways:

    a.  Causing diminution of value of Plaintiffs' home and property;

    b.  Causing Plaintiffs to remain inside their homes and forego use of their yards;

    c.  Causing Plaintiffs to keep doors and windows closed when weather conditions otherwise would not so require;

    d.  Causing Plaintiffs embarrassment and reluctance to invite guests to their homes;

    e.  Causing Odors and Excess Fugitive Emissions to invade Plaintiffs' home so that they are exposed within their own homes;

    f.  Causing Plaintiffs to experience headaches, eye irritation, nausea, coughing, choking, breathing problems, and lost sleep.

335.     WMNY, by reason of this public nuisance, is liable for all of the damages to Plaintiffs proximately caused by the Odors, Excess Fugitive Emissions, Noise, Vectors, and Tremors, including compensatory, exemplary, and punitive relief since WMNY's actions were, and continue to be, willful, reckless, or wantonly negligent and made with a conscious disregard for the rights of Plaintiffs, entitling Plaintiffs to such damages.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**FOR PRIVATE NUISANCE**

336.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "335" of this Complaint, as if set forth in this paragraph at length.

337.    WMNY (including their officers, agents, servants, and/or employees), by negligently, recklessly, or intentionally and unreasonably failing to promptly and adequately investigate and remediate the Odors, Excess Fugitive Emissions, Noise, Vectors, and Tremors, has unreasonably and substantially interfered with the use and enjoyment of Plaintiffs' properties.

338.    NYSDEC's NOV and the Town of Perinton's Compliance Order have determined that WMNY has violated its relevant permits and applicable regulations because the Odors, Excess Fugitive Emissions, Noise, Vectors, and Tremors unreasonably interfered with the Community's comfortable enjoyment of life and property.

339.    Such illegality makes the nuisance a nuisance per se.

340.    WMNY, by reason of this private nuisance, WMNY is liable for all of the damages to Plaintiffs proximately caused by the Odors, Excess Fugitive Emissions, Noise, Vectors, and Tremors, including compensatory, exemplary, and punitive relief since WMNY's actions were, and continue to be, willful, reckless, or wantonly negligent and made with a conscious disregard for the rights of Plaintiffs, entitling Plaintiffs to such damages.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**FOR NEGLIGENCE AND GROSS NEGLIGENCE**

341.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "340" of this Complaint, as if set forth in this paragraph at length.

342.    WMNY has a duty to install an adequate gas collection control system that would manage the Odors and Landfill Gas in a way that does not interfere with the rights of Plaintiffs.

343.    WMNY has a duty to manage the odorous NYC Garbage in a manner that does not

cause the Garbage Oder to interfere with the rights of Plaintiffs

344.    WMNY was obligated to do so according it its Air Permit, Landfill Permit and applicable regulations.

345.    WMNY owed, and continues to owe, a duty to Plaintiffs to prevent and abate the interference with the invasion of the private interests of the Plaintiffs; to control the Landfill's odorous emissions by capturing and destroying them to prevent them from traveling offsite and impacting the Community; and to promptly and responsibly respond to known Odors in a manner which would prevent exposure to the Odors, and otherwise protect Plaintiffs from the Odors and the impacts they have on Plaintiffs' properties.

346.    WMNY breached that duty when it failed to meet the Horizontal Gas Collection Permit Requirement and handle the NYC Garbage in a manner inconsistent with the Odor Control Plan, causing the Odors to be emitted from the Landfill.

347.    WMNY knowingly breached its duty to exercise ordinary care and diligence when it improperly constructed, maintained, and operated the Landfill, and knew or should have known upon reasonable inspection, such actions would cause Plaintiffs' properties to be invaded by noxious Odors and Excess Fugitive Emissions.

348.    WMNY knew or should have known that such actions would cause Plaintiffs' properties to be invaded by noxious Odors and Excess Fugitive Emissions.

349.    As a direct and proximate result of the failure of WMNY to exercise ordinary care, Plaintiffs' homes and properties were invaded by the Odors and Excess Fugitive Emissions, causing and constituting damage to their properties and impacting Plaintiffs' quality of life.

350.    The conduct of WMNY in knowingly allowing conditions to exist which caused noxious Odors and Excess Fugitive Emissions to physically invade Plaintiffs' properties, constitutes gross negligence as it demonstrates a substantial lack of concern for whether an injury

resulted to Plaintiffs' properties.

351.    WMNY's negligence was, and continues to be, gross, willful, reckless, or wantonly negligent and made with a conscious disregard for the rights of Plaintiffs, which entitles Plaintiffs' to an award of compensatory, exemplary, and punitive relief.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**FOR TRESPASS**

352.    Plaintiffs repeat and reallege the allegations of paragraphs "1" through "351" of this Complaint, as if set forth in this paragraph at length.

353.    WMNY by its intentional acts and omissions and/or the intentional acts and omissions of its officers, agents, and/or employees, caused Odors and Excess Fugitive Emissions to be emitted into the Community and onto Plaintiffs' properties.

354.    WMNY by its intentional acts and omissions and/or the intentional acts and omissions of its officers, agents, and/or employees, has also caused Vectors, in the Community and on Plaintiffs' properties.

355.    The Odors, Excess Fugitive Emissions, and Vectors in the Community was the inevitable result of those intentional acts and omissions.

356.    WMNY by its acts and omissions, or the acts or omissions of its agents, employees or predecessors, have interfered with the rights of the Plaintiffs' to maintain exclusive possession of their properties, and threaten to do so in the future.

357.    WMNY, by reason of this trespass, are liable for all of the damages to Plaintiffs and the property proximately caused by the Odors, Excess Fugitive Emissions, and Vectors.

358.    WMNY's trespass was, and continues to be, willful, reckless, or wantonly negligent and made with a conscious disregard for the rights of Plaintiffs' properties, which entitles Plaintiffs to s of compensatory, exemplary, and punitive relief.

**WHEREFORE,** Plaintiffs request that this Court award the following relief:

1. A declaratory judgement that WMNY's operation of the Landfill constitutes a nuisance;

2. An injunction directing WMNY to immediately investigate and remediate all impacts to the Community from the Odors;

3. An injunction enjoining WMNY from removing the geomembrane cover and intermediate cover from Cells 10 and 11;

4. An injunction enjoining WMNY from restarting disposal operations in Cells 10 and 11;

5. An injunction directing WMNY to permanently close Cells 10 and 11;

6. An injunction directing WMNY to comply with 40 C.F.R. §258.21 and the Odor Control Plan with respect to its handling of NYC Garbage and any other MSW received by rail by:

   a. initially reducing the volume of such material received by 50% and then performing an evaluation with Plaintiffs' input to determine if this volume reduction eliminates the Odor, Excess Fugitive Emissions fragrance, Noise, Vectors, Tremors and any other nuisance conditions;

   b. requiring additional immediate and daily cover requirements on rail received MSW and placement of this material only until 2:30 p.m.; and

   c. if Garbage Odors persist from NYC Garbage and other rail received MSW, discontinuing receipt of all such material at the Landfill.

7. An injunction directing WMNY to comply with 40 C.F.R. § 258.22 and 6 N.Y.C.R.R. § 360.19(l) by controlling on-site populations of Vectors;

8. An injunction directing WMNY to comply with 40 C.F.R. § 243.202-1 and 6

N.Y.C.R.R. § 360.19(j) by controlling excessive Noise from its operations at the F and directing that any Noise producing activities associated with the Rail Facility be performed only during Landfill Operating Hours;

9. An award of money damages;

10. An award of exemplary and punitive damages;

11. Plaintiffs' costs for this litigation, including reasonable attorney and expert witness fees.

12. Any and all other relief that that Court deems just and proper.

Dated: August 14, 2018               /s/ Linda R. Shaw
                                     **KNAUF SHAW LLP**
                                     *Attorneys for Plaintiffs*
                                     Linda R. Shaw, Esq.,
                                       Dwight E. Kanyuck, Esq., and
                                       Melissa M. Valle, Esq. of Counsel
                                     1400 Crossroads Building
                                     2 State Street
                                     Rochester, New York 14614
                                     Tel: (585) 546-8430