UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES DISTRICT COURT
FILED
SEP 1 6 2019
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

———————————————————————

FRESH AIR FOR THE EASTSIDE, INC.,
et al.,

                Plaintiffs,

    v.

WASTE MANAGEMENT OF
NEW YORK, L.L.C., and THE CITY OF
NEW YORK,

                Defendants.

———————————————————————

**DECISION AND ORDER**

6:18-CV-06588-EAW

## INTRODUCTION

Plaintiff Fresh Air for the Eastside, Inc. ("FAFE") and over 220 individual plaintiffs (collectively, "Plaintiffs") filed this action against Waste Management of New York, LLC ("WMNY") and New York City ("NYC") (collectively, "Defendants") alleging violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* ("RCRA"), the Clean Air Act, 42 U.S.C. § 7401 *et seq.* (the "CAA"), and various common law obligations arising from WMNY's operation of the High Acres Landfill and Recycling Center (the "Landfill") in Perinton, New York, and NYC's agreement with WMNY (the "NYC Contract") to ship hundreds of thousands of tons of municipal solid waste ("MSW") to the Landfill each year for thirty years. (Dkt. 15).

Presently before the Court are WMNY's motion to dismiss the Complaint (Dkt. 9), WMNY's motion to dismiss the Amended Complaint (Dkt. 22), and NYC's motion to dismiss (Dkt. 27). For the following reasons, WMNY's motion to dismiss the Complaint

is dismissed as moot, WMNY's motion to dismiss the Amended Complaint is granted as to the private nuisance and trespass claims but it is otherwise denied, and NYC's motion to dismiss is denied.

## BACKGROUND[1]

FAFE is a not-for-profit corporation organized "to preserve and protect the environment for the benefit of the residents living in proximity to the Landfill[.]" (Dkt. 15 at ¶¶ 15-16). Plaintiffs include just over 220 individual residents and members of FAFE, who live between 0.3 to 4 miles from the Landfill. (*See id.* at ¶¶ 18, 20). Plaintiffs claim that the Landfill's operations have prevented the quiet use and enjoyment of their property by emitting noxious odors and excess fugitive emissions, creating an environment conducive for the spread of vector species,[2] and causing noise and tremors. (*See, e.g.*, Dkt. 15 at ¶ 17). As a result, Plaintiffs allege that a "large number" of landowners have considered selling their houses, and "some" have actually done so and moved out of the community or have sought mental health counseling. (*Id.* at ¶¶ 21-23). Plaintiffs further allege that the odors and the "general stigma from the Landfill . . . ha[ve] permanently stigmatized the Community" and have given rise to fears of diminishing property values.

---

[1]   The following facts are taken from the Amended Complaint unless otherwise indicated. (Dkt. 15).

[2]   The Landfill's operations have allegedly fostered conditions resulting in increased populations of rats, mice, and flies within several nearby properties. (*See, e.g.*, Dkt. 15 at ¶¶ 10, 17, 304, 403); *see generally* 6 N.Y.C.R.R. § 360.2(b)(301) ("*Vector* means a carrier organism that is capable of transmitting a pathogen to another organism and includes, but is not limited to, flies and other insects, rodents, birds and vermin.").

(*Id.* at ¶ 24). These noxious emissions are also noticeable in public spaces, such as at business and recreational locations and a local elementary school. (*Id.* at ¶ 29).

Plaintiffs have identified specific impacts to certain individual landowners. (*See id.* at ¶ 32). Outside of selling their property, some landowners have observed "visible cracks" in their houses caused by tremors resulting from Landfill activities.[3] Furthermore, the odors and fugitive emissions have caused certain plaintiffs to experience headaches, eye, nose, and throat irritation, anxiety, and nausea, and have resulted in diminished property values. (*See also id.* at ¶ 28). Some plaintiffs have spent money on pest exterminators and on devices to prevent the odors from entering their homes. (*See id.* at ¶¶ 25, 27, 32).

## I.    The Landfill Permit and the Air Permit

The Landfill operates under a New York State Department of Environmental Conservation ("DEC") permit, issued pursuant to Article 27 of the Environmental Conservation Law and its corresponding regulations for MSW landfills (the "Landfill Permit"). (*Id.* at ¶ 46). The Landfill Permit was first issued in 1993, "in conjunction with the approval of the Western Expansion of the Landfill" (the "WEX"), and the DEC has since modified it to allow further expansions to take place. (*Id.* at ¶¶ 51, 62-67). The WEX and the first two modifications, which took place in 2001 ("Parkway Expansion Phase I") and 2003 ("Parkway Expansion Phase II"), are all located in the Town of Perinton, New

---

[3]    Plaintiffs allege "the [t]remors are the result of [the] failure of WMNY to adequately control the operation of the Landfill emission control flares because of high oxygen levels in the Landfill Gas, which can also lead to explosive subsurface conditions." (Dkt. 15 at ¶ 212). Plaintiffs also claim "[t]he high oxygen levels in the Landfill Gas were the result of ineffective Landfill Gas collection and inadequate cover systems." (*Id.* at ¶ 213).

York. (*Id.* at ¶ 66). A third modification occurred in 2011 ("Parkway Expansion Phase III"), which is "largely located in [the Town of] Macedon." (*See id.* at ¶¶ 66-67).

The Landfill emits gaseous compounds as the MSW decomposes, including "methane, carbon dioxide, and non-methane organic compounds ('NMOC')." (*Id.* at ¶¶ 78-79). NMOCs include volatile organic chemicals ("VOCs") and hazardous air pollutants ("HAPs") as well as "odorous compounds," such as hydrogen sulfide. (*Id.* at ¶¶ 80-81). The DEC issued WMNY's current Air Permit in 2001, which requires the Landfill "to operate an active Landfill Gas collection system [(the 'Collection System')] that minimizes the off-site migration of Landfill Gas." (*Id.* at ¶¶ 86-88). The Air Permit assumes the Collection System will collect and burn about 85% of all Landfill Gas, while the remaining 15% of emissions will be released into the surrounding environment. (*Id.* at ¶ 90). According to Plaintiffs, "Excess Fugitive Emissions" constitutes Landfill Gas that is released into the environment in excess of that 15% base assumption due to operating or maintenance deficiencies. (*Id.* at ¶ 92). The Landfill Permit and the Air Permit require WMNY to prevent noxious odors from becoming nuisance conditions. (*Id.* at ¶ 94).

## II.     The Rail Facility and the NYC Contract

In 2013, the DEC "authorize[d] the construction and operation of an intermodal rail facility to accept MSW by train from a new CSX rail spur." (*Id.* at ¶ 68; *see id.* at ¶ 99). Once this facility was completed in mid-2015, NYC began to ship MSW to the Landfill. (*Id.* at ¶ 100). Plaintiffs claim this MSW is "significantly more odorous" because it takes "weeks from curb pick-up to receipt by rail at the Landfill," thereby increasing the duration of pre-landfill decomposition. (*Id.* at ¶¶ 101-02). NYC sends hundreds of thousands of

tons of MSW to the Landfill per year, and the NYC MSW constituted 75% and 71% of the total MSW deposited at the Landfill in 2016 and 2017, respectively. (*Id.* at ¶ 111).

In February 2017, WMNY and NYC entered into the NYC Contract, whereby WMNY agreed to deposit NYC MSW at the Landfill for 30 years. (*Id.* at ¶ 113). NYC allegedly retained some authority to "direct changes to the WMNY operating schedule for disposal operations at the Landfill," and it required WMNY to comply with all laws applicable to the Landfill, to report permit violations to NYC, and to make any necessary operating and management changes to resolve nuisance conditions. (*Id.* at ¶¶ 115-18).

### III. Horizontal Gas Collectors

The Landfill Permit requires that Landfill Cells 10 and 11, which are part of Parkway Expansion Phase II, contain "horizontal gas collection trenches" ("Horizontal Gas Collectors"). (*Id.* at ¶ 120; *see id.* at ¶¶ 125, 127). Horizontal Gas Collectors "consist of perforated pipes connected to vertical wells" and "provide a greater vacuum zone of influence . . . to initially collect low quality landfill gas for combustion." (*Id.* at ¶¶ 121-22). In 2014, "WMNY's corporate parent [allegedly] decided to eliminate the use of Horizontal Gas Collectors in all new Landfill cells and instead install only a new form of slip vertical wells," as a cost-savings measure. (*Id.* at ¶ 124). Plaintiffs further allege that WMNY had previously indicated that Horizontal Gas Collectors would be installed to control Landfill odors and were the primary means to do so. (*Id.* at ¶¶ 128-29, 131).

Plaintiffs claim that WMNY personnel previously admitted that the Horizontal Gas Collectors were not installed in Landfill Cells 10 and 11, and that WMNY's reliance upon vertical gas wells compromised the Collection System and was the primary cause of the

excessive noxious emissions. (*See id.* at ¶¶ 136-40, 146-49). Plaintiffs assert that these actions constitute continuing violations of WMNY's permit obligations. (*Id.* at ¶ 152).

## IV.    Plaintiffs Allege that the Odors Constitute a Continuing Nuisance

The Landfill odors intensified once NYC began to ship MSW to the Landfill in 2015, coinciding with WMNY's decision to forgo the installation of Horizontal Gas Collectors (*id.* at ¶¶ 153-54), and they worsened again in the summer of 2017, when WMNY dug into Landfill Cells 10 and 11 to "retroactively install Horizontal Gas Collectors," releasing additional fumes (*id.* at ¶¶ 160-61). The individual Plaintiffs subsequently formed FAFE in November 2017 and began collecting reports of odors. (*Id.* at ¶ 162). Over 11,000 odor reports were submitted between November 2017 and the filing of the Amended Complaint. (*Id.* at ¶ 166).

Plaintiffs allege that WMNY's failure to install and maintain Horizontal Gas Collectors and its inadequate management of the NYC MSW resulted in increased noxious emissions. (*Id.* at ¶ 184). Plaintiffs describe WMNY's mitigation actions as retroactive attempts to comply with established permit obligations, rather than actual solutions to its operational deficiencies. (*See id.* at ¶¶ 191-96). Plaintiffs also allege that WMNY never assessed whether it should handle the NYC MSW differently or eliminate its receipt, even though WMNY's "Odor Control Plan"[4] required it do so. (*Id.* at ¶¶ 196, 198-200).

At a January 16, 2018, public meeting, WMNY allegedly admitted that it had caused a public nuisance and that the odors would likely worsen before they improved because the

---

[4]    The Odor Control Plan is part of the "Operations and Maintenance Manual" for the Landfill, which is incorporated into the Landfill Permit. (*See* Dkt. 15 at ¶ 196; Dkt. 15-4).

Landfill Cells needed to be retrofitted with Horizontal Gas Collectors, and new vertical gas wells were required because "40% of the existing vertical wells were not functioning." (*Id.* at ¶ 207). On February 2, 2018, the DEC issued a Notice of Violation (the "NOV"), which concluded that WMNY was operating the Landfill in violation of state solid waste and air pollution control regulations and its permit obligations, and required WMNY to implement mitigation measures to address these deficiencies. (*Id.* at ¶¶ 221-23, 226, 228). On March 8, 2018, the Town of Perinton Deputy Director of Code Enforcement issued a Compliance Order, also determining that WMNY was not in compliance with the Town of Perinton's Special Use Permit issued for the Landfill due to nuisance conditions. (*Id.* at ¶ 232).

## V. **Mitigation Measures Have Not Been Completely Effective**

Although WMNY "published a Community Update" on May 17, 2018, declaring its mitigation measures to be complete, and while Plaintiffs note that the Landfill odors have reduced in frequency since the peak period "between the Fall of 2017 and May 2018," Plaintiffs attribute this reduction to the fact that Landfill Cells 10 and 11 have been "temporarily closed" and covered by a plastic geomembrane. (*Id.* at ¶¶ 254-56). Plaintiffs further allege that the odors have "persist[ed] at a frequency and intensity that unreasonably impacts [their] . . . enjoyment of life and property" after May 17, 2018. (*Id.* at ¶ 258).

DEC's personnel patrolled the community between May 17, 2018, and June 13, 2018, and discerned "regular, continuing presence of Garbage Odors in the community." (*Id.* at ¶ 259; *see id.* at ¶¶ 261-71). Over 2,000 odor reports were filed "from about 400 distinct complainants" between June 13, 2018, and December 1, 2018. (*Id.* at ¶ 275).

## VI.    Additional Requirements Imposed by the DEC

In a letter dated September 24, 2018, the DEC informed WMNY that it was "not to dump NYC [MSW] and any other waste delivered via rail on any operating day prior to 10:15 a.m., and was required to process all rail cars of NYC [MSW] on the business day following delivery." (*Id.* at ¶ 286). The DEC also "supported a 12-month study evaluating whether railcars of NYC [MSW] were more 'ripe' in summer months" and whether the NYC MSW was a significant contributor to the Landfill's odor problems. (*Id.* at ¶ 287).

## VII.    Additional Harms

In addition to the noxious odors and Excess Fugitive Emissions, Plaintiffs allege that WMNY's use of "chemical 'deodorizers,'" which "substitute and mask" the Landfill odors, have caused several residents to feel ill. (*Id.* at ¶¶ 300-02). Plaintiffs also contend that WMNY is failing to "effectively control on-site populations of [v]ectors," which has required some residents to hire exterminators and purchase "vermin control devices." (*See id.* at ¶¶ 304-07). Furthermore, Plaintiffs complain that the Landfill emanates audible sounds into the community throughout the late evening and sometimes "until the early morning" hours in violation of noise control standards. (*See id.* at ¶¶ 308-16). Lastly, Plaintiffs contend that they are adversely impacted by tremors reverberating from the Landfill, and that while WMNY "apparently installed a flare reverberation control system" in January 2018, "[s]ince that time, more [t]remors have occurred." (*See id.* at ¶¶ 317-21).

## PROCEDURAL HISTORY

Plaintiffs allege that they served a notice of intent to sue upon all relevant parties as required by RCRA and the CAA, and that by the end of the statutorily required notice

periods neither the United States Environmental Protection Agency (the "EPA") nor the State of New York have initiated enforcement proceedings. (*See id.* at ¶¶ 41-44). On August 14, 2018, Plaintiffs commenced this action (Dkt. 1), and on November 16, 2018, WMNY filed a motion to dismiss the Complaint (Dkt. 9). On December 7, 2018, Plaintiffs filed an Amended Complaint, which remains the operative pleading. (Dkt. 15).

Plaintiffs allege three statutory causes of action against WMNY: (1) Violations of the Air Permit under the CAA; (2) Violations of RCRA Standards; and (3) an Imminent and Substantial Endangerment to Health or the Environment under RCRA (the "RCRA Endangerment Claim"). (Dkt. 15 at 64-72). Plaintiffs also allege common law claims for public and private nuisance, negligence and gross negligence, and trespass against WMNY. (*Id.* at 73-79). Only the RCRA Endangerment Claim and public nuisance claim have been asserted against NYC. (*Id.* at 70-72, 78-79).

On January 25, 2019, WMNY filed a motion to dismiss the Amended Complaint. (Dkt. 22). WMNY argues that the Court should dismiss or, alternatively, stay the CAA and RCRA claims pursuant to doctrines of abstention and primary jurisdiction, and the political question doctrine. (Dkt. 22-1 at 11-22). WMNY also argues that Plaintiff's common law causes of action and the RCRA Endangerment Claim must be dismissed for failure to state a claim. (*Id.* at 22-30). Alternatively, WMNY argues that the Court should dismiss the entire Amended Complaint under the "first-to-file" rule because the issues raised and the parties involved in a related putative class action, *D'Amico v. Waste Mgmt. of N.Y., L.L.C.*, Case No. 6:18-cv-06080-EAW, are substantially the same. (*Id.* at 30-32). Lastly, WMNY argues that Plaintiffs' claims for money damages should be stayed to the

extent they are not dismissed. (*Id.* at 32-34). Plaintiffs oppose WMNY's motion. (Dkt. 24).

On February 28, 2019, NYC filed a separate motion to dismiss, adopting several of WMNY's arguments and challenging the two specific claims asserted against it. (Dkt. 27). NYC contends that Plaintiffs' causes of action are based on activities for which NYC maintains government function immunity. (Dkt. 27-1 at 6-9). NYC also requests the Court to dismiss or stay this action under the same abstention, primary jurisdiction, and political question doctrines raised by WMNY. (*Id.* at 9-11). NYC further contends that the causes of action fail to state a claim. (*Id.* at 11-17). Finally, NYC argues that this case should be dismissed under the "first-to-file" rule for the same reasons set forth in WMNY's motion papers. (*Id.* at 18). Plaintiffs oppose NYC's motion. (Dkt. 30).

On March 12, 2019, the DEC issued its Response to FAFE's administrative petition (the "Petition"), which sought to modify WMNY's obligations under the Landfill Permit and the Air Permit. (Dkt. 30-2). While DEC denied each and every one of FAFE's requests, the DEC also imposed additional obligations upon WMNY that the agency anticipated would later become enforceable permit requirements, and at least one of FAFE's requests was denied subject to review of a waste study.

On March 25, 2019, the Court issued its decision in *D'Amico v. Waste Mgmt. of N.Y., LLC,* No. 6:18-CV-06080 EAW, 2019 WL 1332575 (W.D.N.Y. Mar. 25, 2019). The Court granted WMNY's motion to dismiss in part, dismissing the public nuisance and gross negligence claims without prejudice, but denying WMNY's motion as to the ordinary negligence claim. The Court subsequently granted WMNY's request to file supplemental

briefing in the present case (Dkt. 34), and on April 22, 2019, WMNY filed its brief arguing that neither the *D'Amico* decision nor the DEC's Response undermined its previous positions (Dkt. 36). Plaintiffs filed a responsive brief opposing WMNY's supplemental assertions. (Dkt. 37).

On August 7, 2019, the Court held oral argument on Defendants' motions as well as a pending motion in *D'Amico*, and reserved decision. (Dkt. 38; Dkt. 41; Dkt. 43).

## DISCUSSION

## I. Defendants' Jurisdictional Arguments

### A. Legal Standard

"A motion to dismiss based on the abstention doctrine is . . . considered as a motion made pursuant to Rule 12(b)(1)." *Rehab. Support Servs., Inc. v. Town of Esopus, N. Y.*, 226 F. Supp. 3d 113, 125 (N.D.N.Y. 2016) (alteration in original) (quotation omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "When considering a motion to dismiss for lack of subject matter jurisdiction or for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). "[T]he district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002).

## B. *Burford* Abstention and Primary Jurisdiction

"Although federal courts have a 'virtually unflagging obligation' to exercise their jurisdiction, there are several traditional categories of abstention." *Village of Westfield v. Welch's*, 170 F.3d 116, 120 (2d Cir. 1999) (citation omitted) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Because "[a]bstention is generally disfavored, . . . the balance is heavily weighted in favor of the exercise of jurisdiction." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) (quotations omitted).

"An 'extraordinary and narrow exception' to a federal court's general duty to review all matters properly before it occurs when the court finds that 'exceptional circumstances' exist in which the court should defer to important, countervailing state interests." *DMJ Assocs., L.L.C. v. Capasso*, 228 F. Supp. 2d 223, 230 (E.D.N.Y. 2002) (quoting *Allegheny County v. Frank Mashuda Co.*, 360 U.S. 185, 188-89 (1959)). The Supreme Court outlined this form of abstention in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).

> Under the *Burford* doctrine, a federal court must decline to interfere with the orders or proceedings of state administrative agencies: (1) if there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) if the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*Dittmer v. County of Suffolk*, 146 F.3d 113, 116 (2d Cir. 1998) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989)).

Defendants contend that *Burford* abstention should apply because New York maintains a "comprehensive regulatory scheme governing the construction and operation

of landfills, including the issuance, modification, and enforcement of permits for air emissions and landfill operations." (Dkt. 22-1 at 15). Defendants argue that, even though the DEC has issued its Response to Plaintiff's Petition, their abstention arguments remain viable because the DEC denied much of the same relief Plaintiffs seek in this action, required WMNY to implement remedial measures, and engaged in additional investigations regarding the NYC MSW. (*See* Dkt. 36 at 3-6).

Plaintiffs argue that *Burford* is inapplicable because the CAA and RCRA "explicitly provide the exceptions for when pending administrative or court actions bar a citizen suit," and that applying *Burford* in this case "would have this Court usurp the role of Congress[] and write new exceptions into the law." (Dkt. 24 at 16). Although there may be scenarios where *Burford* applies to a CAA or RCRA citizen suit, at least where, as here, a citizen suit is filed to *enforce against the violation of either statute*, *Burford* does not apply.

RCRA's citizen suit provision permits "any person" to "commence a civil action on his own behalf" to enforce against violations of its requirements. *See* 42 U.S.C. § 6972(a). In "conferring standing to the fullest extent permitted by Article III, Congress sought to maximize the number of potential enforcers of environmental regulations." *Williams v. Ala. Dep't of Transp.*, 119 F. Supp. 2d 1249, 1256 (M.D. Ala. 2000); *accord DMJ Assocs., L.L.C.*, 228 F. Supp. 2d at 229 ("Congress clearly intended citizen's suits to be an integral part of the enforcement efforts for this federal environmental law, supplementing where necessary the actions of state and federal agencies, and offering a judicial forum to avoid undue delay."). Nonetheless, "[p]rior to filing a citizen's suit, a plaintiff must provide notice to the [EPA] and appropriate state officials, to afford them the first opportunity to

enforce the statute, and to potential defendants, to allow them to comply voluntarily with RCRA." *DMJ Assocs., L.L.C.*, 228 F. Supp. 2d at 229 (citing 42 U.S.C. § 6972(b)); *see Williams*, 119 F. Supp. 2d at 1256 (same). Once these requirements are satisfied, "a citizen is free to file a federal court action with certain narrow exceptions specifically enumerated in the statute." *DMJ Assocs., L.L.C.*, 228 F. Supp. 2d at 229.

Where a state agency has been delegated responsibilities under RCRA, Congress has enacted the following statutory bars to filing a citizen suit:

> No action may be commenced under subsection (a)(1)(B) of this section if the State, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment . . . has commenced and is diligently prosecuting an action under subsection (a)(1)(B); . . . is actually engaging in a removal action under . . . [the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA")]; or . . . has incurred costs to initiate a Remedial Investigation and Feasibility Study under [CERCLA] and is diligently proceeding with a remedial action under that Act[.]

42 U.S.C. § 6972(b)(2)(C).

Congress also enacted a citizen suit provision in the CAA, permitting "any person" to "commence a civil action on his own behalf" to enforce against violations of its requirements as well. 42 U.S.C. § 7604(a). Like RCRA, the CAA also contains the following preconditions to the commencement of a viable citizen suit:

> No action may be commenced . . . under subsection (a)(1) . . . prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or . . . if the Administrator or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order[.]

*Id.* § 7604(b).

Neither the Supreme Court nor the Second Circuit has weighed in on whether *Burford* is applied differently in the context of a RCRA or CAA citizen suit. Many courts have declined to apply this doctrine to citizen suits seeking to enforce either statute's requirements. The Seventh Circuit has concluded that the application of *Burford* under such circumstances, or the comparable doctrine of primary jurisdiction, "would be an end run around RCRA" due to the specific "conditions under which the pendency of other proceedings bars suit under RCRA." *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 619 (7th Cir. 1998). The First Circuit, relying upon *Sherwin-Williams*, similarly concluded that "[t]o abstain in situations other than those identified in the statute . . . threatens an 'end run around RCRA,' and would substitute [the court's] judgment for that of Congress about the correct balance between respect for state administrative processes and the need for consistent and timely enforcement of RCRA." *Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd.*, 633 F.3d 20, 31 (1st Cir. 2011) (citation omitted) (quoting *Sherwin-Williams Co.*, 151 F.3d at 619). The *Chico Service* court was "distinctly reluctant to countenance abstention" in light of "the careful structure of federal court jurisdiction under RCRA," observing that Congress had "carefully delineat[ed] (via the diligent prosecution bar) the situations in which a state or federal agency's enforcement efforts will foreclose review of a citizen suit in federal court." *Id.* While the court stopped short of categorically ruling out the possibility that *Burford* could apply to a RCRA citizen suit, it "believe[d] that the circumstances justifying abstention [would] be exceedingly rare." *Id.* at 32.

Most recently, the Sixth Circuit determined that *Burford* was inapplicable when the requirements to commence a RCRA citizen suit were satisfied. *See Ky. Waterways All. v.*

*Ky. Utils. Co.*, 905 F.3d 925 (6th Cir. 2018). The *Kentucky Waterways* court recognized that the case was "a strong contender for *Burford* abstention at first glance." *Id.* at 939. Indeed, the court noted that because "Kentucky is actively regulating the problems [p]laintiffs are worried about through the Agreed Order, . . . *Burford* might counsel federal courts against second-guessing the State's decisions on that score." *Id.* However, *Kentucky Waterways* concluded that the application of *Burford* "would be akin to grafting a new provision onto RCRA's diligent prosecution bar," which "would effectively add a new component to that bar precluding citizen suits where a state is already trying to remedy the problem, regardless of the regulatory mechanism it is using." *Id.* The Sixth Circuit declined to apply *Burford* "[b]ecause [the p]laintiffs have met the requirements needed to pursue a RCRA citizen suit" and Congress had "already considered which state actions should preclude federal intervention." *Id.* at 939-40.

Beyond these circuit court decisions, "[t]he majority of courts to have considered [whether to abstain from a RCRA citizen suit] have found abstention, whether under *Burford* or related doctrines such as primary jurisdiction, to be improper." *Chico Serv. Station, Inc.*, 633 F.3d at 30 (footnote omitted); *see DMJ Assocs., L.L.C.*, 228 F. Supp. 2d at 230 ("[A] number of courts have found the enactment of the citizen's suit provision of RCRA to be an expression of Congress's intent that the federal courts should not abstain under *Burford* in RCRA actions, where plaintiffs have satisfied the conditions set forth in the Act."); *Williams*, 119 F. Supp. 2d at 1256 ("Primary jurisdiction is particularly inappropriate in situations involving a statute like RCRA, which expressly allows for citizens to bring suit in order to ensure uniform enforcement of federal environmental

laws."). Moreover, the reasoning adopted by these courts is transferable to the CAA context. For one, "[l]ike RCRA, the [CAA] expressly provides the conditions under which a citizen suit is barred." *Anderson v. Farmland Indus., Inc.*, 45 F. Supp. 2d 863, 868 (D. Kan. 1999). It also appears that "[t]he majority of federal cases addressing the issue have found the doctrine of primary jurisdiction to be inapplicable to suits brought under the citizen suit provisions of the CAA." *Paper, Allied-Indus., Chem. & Energy Workers Int'l Union*, No. CIV-04-438-F, 2005 WL 1389431, at *15 (W.D. Okla. June 10, 2005); *see, e.g., Anderson*, 45 F. Supp. 2d at 867-68; *Sierra Club v. Tri-State Generation & Transmission Ass'n, Inc.*, 173 F.R.D. 275, 283-84 (D. Colo. 1997); *see also Ass'n of Irritated Residents v. Fred Schakel Dairy*, No. 1:05-CV-00707 OWW SMS, 2008 WL 850136, at *13 (E.D. Cal. Mar. 28, 2008) (noting that "Congress has provided broad federal enforcement powers to citizens" under the CAA, and that "to abstain from addressing CAA violations because of the involvement of scientific and technical expertise, would foreclose many of the citizen suits filed, as the CAA regularly involves specialization, technical and scientific expertise that would in most cases support the administrative agency deciding the issue"); *L.E.A.D. (Lead Envtl. Awareness Dev.) Grp. of Berks v. Exide Corp.*, No. CIV. 96-3030, 1999 WL 124473, at *22 (E.D. Pa. Feb. 19, 1999) (stating that application of primary jurisdiction "in citizen suits actions would greatly reduce the instances in which a plaintiff could pursue such an action to facilitate broad enforcement of the environmental-protection laws and regulations," and declining to apply *Burford* abstention because "[t]he considerations underlying *Buford* [sic] abstention simply do not apply to a scheme that contemplates citizen suits as a supplement to state government action").

While the DEC may revisit certain issues raised in the Petition, no formal state proceedings are ongoing. *See Sherwin-Williams Co.*, 151 F.3d at 619 (the statutory bars to a RCRA citizen suit refer "only to formal proceedings in federal or state court," but "there may be room for applying the doctrines of abstention or primary jurisdiction . . . in cases in which a state has *a formal administrative proceeding in progress* that the citizens' suit would disrupt" (emphasis added)); *cf. Coal. for Health Concern v. LWD, Inc.*, 60 F.3d 1188, 1189 (6th Cir. 1995) (reversing where the district court "declined to dismiss plaintiffs' claims *because of the ongoing state administrative proceedings*" (emphasis added)). In other words, the DEC has initiated no formal proceedings against WMNY to enforce against the alleged regulatory violations outside its issuance of the NOV, which is not an enforceable order. *See* N.Y. Envtl. Conserv. Law § 19-0505. Furthermore, it is undisputed that Plaintiffs "filed this case under the citizen's suit provision[s] of RCRA[ and the CAA] after providing statutory notice to state and federal agencies and waiting the prescribed length of time." *DMJ Assocs., L.L.C.*, 228 F. Supp. 2d at 230.

Defendants rely heavily upon *Browning-Ferris, Inc. v. Baltimore Cty., Md.*, 774 F.2d 77 (4th Cir. 1985), where the Fourth Circuit considered the presence of a "comprehensive regulatory scheme governing the operation of landfills" and noted that "land use questions, especially those that involve the regulation of trash dumps, are the peculiar concern of local and state governments[.]" *Id.* at 79. However, the *Browning-Ferris* case did not involve a citizen suit; rather, the regulated entity filed an action pursuant to 42 U.S.C. § 1983, claiming that the state agency wrongfully refused to renew its permit after the agency determined the entity had violated a permit condition. *Id.* at 77-78.

Furthermore, "state proceedings" remained "ongoing" during the pendency of the federal action. *Id.* at 79-80.

The other cases Defendants rely upon are also distinguishable as they each involved ongoing state proceedings and/or challenges to the state's permitting process rather than a lawsuit seeking to enforce a regulated entity's legal obligations. *See Sugarloaf Citizens Ass'n v. Montgomery Cty., Md.*, 33 F.3d 52, 1994 WL 447442, at *2-8 (4th Cir. 1994) (unpublished table decision) (affirming decision to abstain "in favor of the proceedings still pending" in state court where the case "centers on the permitting of a waste facility that may affect Maryland's environment"); *Palumbo v. Waste Techs. Indus.*, 989 F.2d 156, 158-60 (4th Cir. 1993) (*Burford* applied where challenge to permit modifications approved by state agency was also pending in an administrative proceeding); *Ada-Cascade Watch Co. v. Cascade Res. Recovery, Inc.*, 720 F.2d 897, 905 (6th Cir. 1983) (applying *Burford* where the appellants challenged "two provisions of state law which are an integral part" of "a complex system of permit review and approval process" and asked the court to "second-guess a state agency in its determination that no other permits were necessary to construct a hazardous waste facility"). The Seventh Circuit similarly concluded that each one of these cases involved "improper collateral attacks on permitting decisions for which there were other channels for judicial review," and thus, "the plaintiffs were acting contrary to the states' respective decisions to issue the permits in question, not in concert with those decisions." *Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 505-06 (7th Cir. 2011); *see DMJ Assocs., L.L.C.*, 228 F. Supp. 2d at 230 (distinguishing cases where courts abstained from deciding a RCRA citizen suit because "the plaintiffs were essentially asking a federal court

to review a permit decision already made by a state administrative agency"); *see also Sherwin-Williams Co.*, 151 F.3d at 619 (distinguishing case where the plaintiff was challenging the lawfulness of the state regulatory scheme). Similarly, in this case, Plaintiffs do not assert "a collateral attack on any permitting or other regulatory decision" by the DEC; rather, their lawsuit seeks to "complement and enhance" the DEC's enforcement efforts, "as citizen suits brought under RCRA [and the CAA] should." 644 F.3d at 506.

Defendants also rely on *Johnson v. Nyack Hosp.*, 964 F.2d 116 (2d Cir. 1992) in support of their primary jurisdiction arguments, but that case dealt with the unique procedural mechanism under state law requiring a physician challenging the denial of medical staff privileges to pursue a claim before the New York Public Health Council. *See generally Gelbard v. Genesee Hosp.*, 87 N.Y.2d 691 (1996). By contrast, "Congress clearly signaled that the federal courts have a duty to hear and decide [RCRA citizen suit] claims and carefully limited the deference courts should pay to the expertise of an administrative agency." *DMJ Assocs., L.L.C.*, 228 F. Supp. 2d at 229-30; *see also L.E.A.D.*, 1999 WL 124473, at *22 ("Congress intended that federal courts have jurisdiction over such [environmental enforcement] matters by enacting citizen suit provisions" in the CAA and the Clean Water Act).

The CAA and RCRA citizen suit provisions "empower citizens to enforce [both statutes'] provisions except in certain circumstances not present here," and thus the doctrines of *Burford* abstention or primary jurisdiction would effectively "strip United States citizens of rights given them by their government." *Wilson v. Amoco Corp.*, 989 F.

Supp. 1159, 1170 (D. Wyo. 1998). Considering the narrow circumstances in which abstention is appropriate and the obligation of federal courts to exercise jurisdiction when it exists, the structure of the CAA and RCRA demonstrate that abstention is inappropriate where these citizen suit provisions are satisfied and a plaintiff merely seeks to enforce regulatory requirements. *See generally Lefkowitz v. Bank of N.Y.*, 528 F.3d 102, 106 (2d Cir. 2007) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given[.]" (quotation omitted)). Because *Burford* abstention is comparable to primary jurisdiction in this context, Defendants' primary jurisdiction arguments fail for the same reasons. *See, e.g., DMJ Assocs., L.L.C.*, 228 F. Supp. 2d at 230 (declining to apply *Burford* abstention for the same reasons as it declined to apply primary jurisdiction); *Williams*, 119 F. Supp. 2d at 1256 (the "application of primary jurisdiction in response to a RCRA citizen suit would frustrate Congress' overall legislative intent of furthering waste disposal in a comprehensive, safe, and uniform manner"); *see also Cal. Sportfishing Prot. All. v. City of West Sacramento*, 905 F. Supp. 792, 807 n.21 (E.D. Cal. 1995) (the primary jurisdiction doctrine "has no application [under the Clean Water Act] because Congress has expressly set forth the ground rules for citizen suits and only bars penalty actions in specified circumstances"); *see generally Sherwin-Williams Co.*, 151 F.3d at 619 (primary jurisdiction "amounts to the same thing" as *Burford*).

Therefore, the Court concludes that neither *Burford* abstention nor primary jurisdiction are appropriate grounds to dismiss Plaintiffs' CAA or RCRA causes of action.

## C. *Colorado River* Abstention

"*Colorado River* abstention is appropriate in limited 'situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts.'" *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 862 F. Supp. 2d 170, 181 (E.D.N.Y. 2012) (quoting *Colo. River Water Conservation Dist.*, 424 U.S. at 817). Under *Colorado River*, a federal district court "may abstain from exercising jurisdiction over a controversy properly before it when parallel state court litigation could result in the comprehensive disposition of litigation and abstention would conserve judicial resources." *Superior Site Work, Inc. v. NASDI, LLC*, No. 2:14-CV-01061(ADS)(SIL), 2018 WL 4834558, at *1 (E.D.N.Y. Oct. 2, 2018) (quotation omitted).

"*Colorado River* abstention only applies where state and federal courts exercise concurrent jurisdiction simultaneously." *Doyle v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 98 CIV. 2161(JGK), 1999 WL 177441, at *5 (S.D.N.Y. Mar. 30, 1999) (citing *Village of Westfield*, 170 F.3d at 120); *see also Burnett v. Physician's Online, Inc.*, 99 F.3d 72, 76 (2d Cir. 1996) ("In *Colorado River*, . . . the Supreme Court announced an abstention doctrine for use in limited situations in which state and federal courts exercise concurrent jurisdiction simultaneously."). Courts in this Circuit have rejected the application of this doctrine where parallel state proceedings do not exist. *See Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 2d 273, 289 (E.D.N.Y. 2013) ("In light of th[e] dismissal [of the state action] and the fact that there is no state court parallel proceeding, *Colorado* abstention is inapplicable and the Court need not proceed to assess the relevant six-factor test."); *Fisher v. O'Brien*, No. 09 CV 42(CBA)(LB), 2010 WL 1269793, at *4 (E.D.N.Y.

Mar. 9, 2010) (finding *Colorado River* arguments to be "moot as there is no parallel state court proceeding pending"), *report and recommendation adopted*, 2010 WL 1286365 (E.D.N.Y. Mar. 30, 2010); *Doyle*, 1999 WL 177441, at *5 (finding "no basis upon which [the court] can refuse to exercise federal jurisdiction" where there was "no parallel state proceeding and jurisdiction is not being exercised simultaneously").

Here, *Colorado River* does not apply because there are no parallel state proceedings.

## D. Political Question Doctrine

"The political question doctrine calls for a careful and delicate analysis into whether a 'matter has been committed by the Constitution to another branch of government or whether the action of that branch exceeds whatever authority has been committed.'" *In re MTBE Prods. Liab. Litig.*, 438 F. Supp. 2d 291, 295 (S.D.N.Y. 2006) (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962)). "The Judiciary is particularly ill suited to make such decisions, as courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986) (quotation omitted). Political questions are those that "lie beyond the competence and proper institutional role of the federal courts." *Belgrade v. Sidex Int'l Furniture Corp.*, 2 F. Supp. 2d 407, 415 (S.D.N.Y. 1998).

In *D'Amico*, the Court relied upon *Bell v. Cheswick Generating Station*, 734 F.3d 188 (3d Cir. 2013), where the Third Circuit explained that "[n]o court has ever held that such a constitutional commitment of authority regarding the redress of individual property rights for pollution exists in the legislative branch." *Id.* at 198; *see D'Amico*, 2019 WL 1332575, at *17. This Court also determined that WMNY's reliance upon *Comer v.*

*Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849 (S.D. Miss. 2012), *aff'd*, 718 F.3d 460 (5th Cir. 2013) was misplaced because that case involved litigation seeking to apply common law remedies to address global climate change—an exceedingly more complex issue, *see D'Amico*, 2019 WL 1332575, at *17. Both conclusions apply with equal force here.

Plaintiffs raise several common-law claims for Defendants' alleged interference with their possessory interests in and enjoyment of their property and for damages resulting from Landfill operations. Whether a landfill operator—or, in this case, a generator of MSW—is liable for property damages arising from the release of noxious emissions is a determination squarely within the traditional competency of the judiciary to adjudicate. *See Bell*, 734 F.3d at 198; *D'Amico*, 2019 WL 1332575, at *17. Congress also charged federal courts with adjudicating citizen suits to enforce against violations of the CAA and RCRA. Determining whether Defendants have failed to comply with these regulatory requirements, likewise, falls well-within the competency of a federal court to decide. Thus, the Court rejects Defendants' assertion of the political question doctrine.

### E. First-to-File Rule

"[W]here there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience . . . or . . . special circumstances . . . giving priority to the second." *First City Nat'l Bank & Tr. Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989) (omissions in original) (quotation omitted). "The first to file rule embodies considerations of judicial administration and conservation of resources." *BuddyUSA, Inc. v. Recording Indus. Ass'n of Am., Inc.*, 21 F. App'x 52, 55 (2d Cir. 2001) (quoting *Simmons*, 878 F.2d at 80). Yet, "the first-filed rule does not constitute an invariable mandate." *Emp'rs Ins. of*

*Wausau v. Fox Entm't Grp., Inc.*, 522 F.3d 271, 275 (2d Cir. 2008). "Instead, it creates a presumption in favor of proceeding in the forum where the first complaint was filed. It is not meant to be applied in a rigid or mechanical way, and is quite commonly overcome where circumstances warrant." *AEI Life, LLC v. Lincoln Ben. Life Co.*, 305 F.R.D. 37, 44 (E.D.N.Y. 2015) (citation and quotations omitted).

Defendants contend that this action should be dismissed under the first-to-file rule because the *D'Amico* matter was filed first, involves substantially similar parties and issues, and has proceeded further than this case. (Dkt. 22-1 at 30-32; Dkt. 36 at 2-3). The Court disagrees. Not only are the issues raised in this action substantially more varied, nuanced, and complex than those raised in *D'Amico*, but there is no need to undertake a traditional analysis under this doctrine because it is inapplicable for a far simpler reason—both cases are currently pending in the same district before the same judge.

"Some courts have applied the first-to-file rule notwithstanding the fact that two actions had both been filed in the same district." *Guill v. All. Res. Partners, L.P.*, No. 16-CV-0424-NJR-DGW, 2017 WL 1132613, at *2 (S.D. Ill. Mar. 27, 2017); *see Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997) (stating that the first-to-file rule "applies where related cases are pending before two judges in the same district"); *Jones v. Singing River Health Servs. Found.*, Nos. 1:14CV447-LG-RHW, 1:15CV1-LG-RHW, 1:15CV44-LG-RHW, 2015 WL 12672726, at *3 (S.D. Miss. June 5, 2015) (same). "But courts have regularly declined to apply the first-to-file rule in those situations where the two actions at issue are pending before the same judge." *Sheehy v. Santa Clara Valley Transp. Auth.*, No. 5:14-CV-01325-PSG, 2014 WL 2526968, at *2 (N.D. Cal. June 4, 2014)

(collecting cases); *see Green Tree Servicing, L.L.C. v. Clayton*, 689 F. App'x 363, 367-68 (5th Cir. 2017) ("[W]e have never applied the first-to-file rule to two cases pending before the same judge."); *Powell v. Oldham*, No. 2:16-CV-2907-SHM-TMP, 2018 WL 1249909, at *3 (W.D. Tenn. Mar. 9, 2018) ("Courts generally decline to apply the first-to-file rule when the two actions are actively pending before the same judge."); *Huawei Techs. Co. v. T-Mobile US, Inc.*, No. 2:16-CV-00052-JRG-RSP, 2017 WL 3928836, at *1 (E.D. Tex. Aug. 21, 2017) ("There is no basis to apply the first-to-file rule to related cases pending before the same judges."), *report and recommendation adopted*, 2017 WL 3927168 (E.D. Tex. Sept. 6, 2017); *Woodards v. Chipotle Mexican Grill, Inc.*, No. 14-CV-4181 (SRN/SER), 2015 WL 3447438, at *5 n.3 (D. Minn. May 28, 2015) (same). "This is generally because concerns justifying application of the rule, such as comity, efficiency, and uniformity, are nonexistent or greatly reduced in this scenario." *Guill*, 2017 WL 1132613, at *2; *see Sheehy*, 2014 WL 2526968, at *2 (same); *Olin Corp. v. Cont'l Cas. Co.*, No. 2:10-CV-00623-GMN-RRJ, 2011 WL 1337407, at *2 (D. Nev. Apr. 6, 2011) (where the "cases are before the same judge, the concerns about treading upon the authority of other courts or blindly engaging in duplicative litigation become far less pertinent").

This action and *D'Amico* were reassigned to the undersigned before Defendants asserted their first-to-file challenge. (*See* Dkt. 7); *D'Amico v. Waste Mgmt. of N.Y., LLC*, Case No. 6:18-cv-06080-EAW, Dkt. 15. Since both actions are pending within the same district before the same judge, the Court rejects Defendants' assertion of the first-to-file rule.

## F.     NYC's Government Function Immunity Defense

"Although New York State has waived sovereign immunity on behalf of itself and its municipal subdivisions, 'the common-law doctrine of governmental immunity continues to shield public entities from liability for discretionary actions taken during the performance of government functions.'" *Denis v. Town of Haverstraw*, 852 F. Supp. 2d 405, 410 (S.D.N.Y. 2012) (quoting *Valdez v. City of New York*, 18 N.Y.3d 69, 75-76 (2011)). "Governmental immunity under the decisional law of [New York State] does not attach to every act," *Haddock v. City of New York*, 75 N.Y.2d 478, 484 (1990), and "when the action is exclusively ministerial," liability will attach if the alleged misconduct "is otherwise tortious and not justifiable pursuant to statutory command," *Tango v. Tulevech*, 61 N.Y.2d 34, 40 (1983). "[D]iscretionary or quasi-judicial acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result." *Haddock*, 75 N.Y.2d at 484 (quoting *Tango*, 61 N.Y.2d at 41).

The New York Court of Appeals has held that the retention of "an alcoholic, armed police officer *presenting a known danger to the public*" was ministerial. *Id.* (emphasis added); *see McCrink v. City of New York*, 296 N.Y. 99, 106 (1947) (stating that where "the retention of an employee may involve a known risk of bodily harm to others, the field in which that discretion may be exercised by the head of a department is limited," and noting that in that situation any discretion "is superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived"). Similarly, "a municipality does not have 'any immunity from legal responsibility for creating or maintaining

nuisances.'" *Cangemi v. United States*, No. 12-CV-3989(JS)(SIL), 2017 WL 1274060, at *9 (E.D.N.Y. Mar. 31, 2017) (quoting *Musumeci v. State of New York*, 43 A.D.2d 288, 292 (4th Dep't 1974)); *see Ass'n for Cmty. Reform Now ("Acorn") v. Bloomberg*, 13 Misc. 3d 1209(A), at *17 (Sup. Ct., N.Y. Cty. 2006) (unpublished table decision) ("By overwhelming weight of authority local governments creating or maintaining nuisances are liable in tort, regardless of whether the activity resulting in harm is locally characterized as proprietary, 'ministerial,' or governmental."), *aff'd*, 52 A.D.3d 426 (1st Dep't 2008).

Although NYC argues that the nuisance exception to government function immunity applies "only where [the municipality] actually operates the facility or landfill which caused the nuisance" (Dkt. 35 at 7), immunity will not attach where a municipality's actions *create* a nuisance condition. Under those circumstances, the municipality is treated as any other joint tortfeasor. *See Noonan v. City of Albany*, 79 N.Y. 470, 476 (1880) ("A municipal corporation *has no greater right than an individual* to collect the surface-water from its lands or streets into an artificial channel, and *discharge it upon the lands of another, nor has it any immunity* from legal responsibility for creating or maintaining nuisances." (emphases added)); *see generally Miller v. State*, 62 N.Y.2d 506, 513 (1984) ("When the liability of a governmental entity is at issue, it is the specific act or omission out of which the injury is claimed to have arisen and the capacity in which that act or failure to act occurred which governs liability, *not whether the agency involved is engaged generally in proprietary activity or is in control of the location in which the injury occurred*." (quotation and alteration omitted) (emphasis added)).

NYC relies primarily upon *Nehrbas v. Incorporated Village of Lloyd Harbor*, 2 N.Y.2d 190 (1957), where the "disposition of refuse and rubbish" was deemed to be a governmental function. *See id.* at 194. However, that case is distinguishable because there was "no evidence in the record . . . of a use amounting to a 'nuisance in fact,'" and thus, the *Nehrbas* court declined to consider the outcome "if the situation were different." *Id.* at 195; *see Town of Queensbury v. City of Glens Falls*, 19 Misc. 2d 671, 673 (N.Y. Sup. Ct., Warren Cty. 1959) (distinguishing *Nehrbas* on this ground), *aff'd*, 9 A.D.2d 836 (3d Dep't 1959).

The allegations in the Amended Complaint, taken as true, allege that NYC is generating the MSW that is contributing to a public nuisance. (*See, e.g.*, Dkt. 15 at ¶¶ 100-02, 108, 153, 155, 240). NYC allegedly transported over half a million tons of MSW to the Landfill in 2016 and 2017, constituting over 70% of the waste deposited in both years. (Dkt. 15 at ¶ 111). No specific volume of waste necessarily delineates whether a municipality has contributed to a nuisance condition. However, it is clear from Plaintiff's allegations that NYC's contribution to the Landfill's waste has been substantial in recent years. Indeed, the NYC Contract is an extensive 30-year agreement to dispose similar quantities of MSW at the Landfill annually. (*See id.* at ¶ 113). The Amended Complaint depicts the disposal of NYC MSW at the Landfill as a joint operation and suggests that NYC knew or should have known how the Landfill was being managed.

While a municipality may be obligated to collect and dispose MSW for the benefit of its inhabitants, this duty does not entitle it to ignore the health and well-being of others affected thereby if it knows or has reason to know that its actions may have contributed to

a public nuisance.  As discussed further below, because Plaintiffs allege sufficient facts to establish—at the motion to dismiss stage—that NYC's actions contributed to a public nuisance, NYC is not entitled to government function immunity on this claim.

Regarding the RCRA Endangerment Claim, neither side has provided any case law in favor or against the application of government function immunity.  Nonetheless, several considerations counsel in favor of finding this doctrine inapplicable in this context.

RCRA is a federal environmental statute.  Government function immunity is a *common-law* doctrine intended to shield municipalities and municipal officials from *tort* liability.  A common-law tort doctrine is readily displaced by a federal statutory cause of action, especially since Congress specifically contemplated that a RCRA Endangerment Claim could be brought against municipalities arising from their handling or disposal of solid waste.  *See* 42 U.S.C. § 6903(15) (defining a "person" to include municipalities and the political subdivisions of a State); *id.* § 6972(a)(1)(B) (permitting "any person . . . [to] commence a civil action . . . against any person" who has or is contributing to acts "which may present an imminent and substantial endangerment to health or the environment").

Furthermore, a citizen's RCRA endangerment claim pursuant to § 6972(a)(1)(B) is "essentially a codification of the common law public nuisance" and is intended to be construed "more liberal[ly] than [its] common law counterparts."  *United States v. Waste Indus., Inc.*, 734 F.2d 159, 167 (4th Cir. 1984) (interpreting 42 U.S.C. § 6973(a)) (quoting Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce, Report on Hazardous Waste Disposal, H.R. Comm. Print No. 96-IFC 31, 96th

Cong., 1st Sess. 31 (1979)).[5] If government function immunity is inapplicable when a municipality creates or maintains a nuisance, immunity is no more viable when the municipality contributes to the handling of solid waste in a manner that violates § 6972(a)(1)(B), which appears to be a federal complement to state nuisance law. Simply put, this common-law immunity doctrine does not apply in this context; NYC has *no discretion* to handle MSW in a manner that may present an imminent and substantial endangerment to health or the environment.

Therefore, the Court concludes that NYC is not entitled to government function immunity where, as here, NYC is alleged to have participated in the creation of a public nuisance and is allegedly contributing to the handling or disposal of solid waste in a manner that states a RCRA Endangerment Claim.

## II.    Defendants' Motions to Dismiss for Failure to State a Claim

### A.    Legal Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court

---

[5]    Section 6973(a) authorizes the EPA to file an endangerment claim for the same reasons that a citizen is authorized to do so under § 6972(a)(1)(B) and "contains language *identical* to the citizen suit provision." *Cox v. City of Dallas, Tex.*, 256 F.3d 281, 294 n.22 (5th Cir. 2001). Because the "normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning," *Comm'r v. Lundy*, 516 U.S. 235, 250 (1996) (quotation omitted), this legislative history is equally persuasive in construing § 6972(a)(1)(B).

should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2279 (2017). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).

### B.    Plaintiffs' Third Cause of Action: RCRA Endangerment Claim

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). "Congress expressly authorized citizens to bring imminent and substantial endangerment claims in the federal courts as 'part of a comprehensive scheme

designed to deal consistently with a serious national problem.'" *DMJ Assocs., L.L.C.*, 228 F. Supp. 2d at 229 (quoting *Williams*, 119 F. Supp. 2d at 1256). That congressional authorization is found in § 6972(a)(1)(B) which provides, in pertinent part, as follows:

> any person may commence a civil action . . . against any person, . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment[.]

42 U.S.C. § 6972(a)(1)(B). A plaintiff must satisfy three elements to state a claim under this section:

> (1) the defendant was or is a generator or transporter of solid or hazardous waste or owner or operator of a solid or hazardous waste treatment, storage or disposal facility, (2) the defendant has contributed or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste, as defined by RCRA, and (3) that the solid or hazardous waste in question may pose an imminent and substantial endangerment to health or the environment.

*Prisco v. A & D Carting Corp.*, 168 F.3d 593, 608 (2d Cir. 1999).

The first two elements are not in dispute on WMNY's motion to dismiss; WMNY's motion focuses exclusively on whether Plaintiff alleged an "imminent and substantial endangerment to health or the environment." (*See* Dkt. 22-1 at 22-25). NYC incorporates WMNY's arguments but also challenges the sufficiency of the Amended Complaint as to the second element of the RCRA Endangerment Claim. (Dkt. 27-1 at 16-17). Accordingly, the Court first addresses NYC's contentions relating to the second element of this claim.

### 1. There Is a Sufficient Causal Nexus Between NYC's Conduct and Plaintiffs' Alleged RCRA Violation

A RCRA Endangerment Claim requires that "the defendant has contributed or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste, as defined by RCRA." *Prisco*, 168 F.3d at 608. "Although . . . there must be some level of causation between contamination and the party to be held liable, the precise contours of such causation have yet to be explored by the Second Circuit." *Aiello v. Town of Brookhaven*, 136 F. Supp. 2d 81, 111 (E.D.N.Y. 2001) (quotation and citation omitted). RCRA does not define the phrase "contribute." "When a term goes undefined in a statute, [courts] give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). "[O]ther federal circuit courts have looked to the dictionary definition of 'contribute' to conclude that term for RCRA purposes means that a defendant must 'be actively involved in or have some degree of control over,' 'have a share in any act or effect,' or 'act as a determining factor.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 516 (4th Cir. 2015); *see Hinds Invs., L.P. v. Angioli*, 654 F.3d 846, 850 (9th Cir. 2011); *Sycamore Indus. Park Assocs. v. Ericsson, Inc.*, 546 F.3d 847, 854 (7th Cir. 2008); *Cox v. City of Dallas, Tex.*, 256 F.3d 281, 294 (5th Cir. 2001); *United States v. Aceto Agr. Chems. Corp.*, 872 F.2d 1373, 1384 (8th Cir. 1989). This Court agrees that this interpretation of "contribute" is consistent with RCRA's "relevant legislative history [that] supports a broad . . . construction of the phrase 'contributed to,'" *Aceto Agr. Chems. Corp.*, 872 F.2d at 1383.

Liberally construed, the Amended Complaint sufficiently alleges that NYC's agreement to transport hundreds of thousands of tons of MSW to the Landfill satisfies RCRA's "contributing to" requirement. NYC generates and collects solid waste before transporting it to the Landfill (Dkt. 15 at ¶¶ 100-05) and is "responsible for the proper disposal" of its MSW (*id.* at ¶ 362); *see Sycamore Indus. Park Assocs.*, 546 F.3d at 854 (interpreting the phrase as requiring "active involvement" or some "affirmative action" in "handling" the "materials for liability"). According to Plaintiffs, the disposal of NYC MSW has worsened the Excess Fugitive Emissions released from the Landfill and has contributed to the community's harm. (*See, e.g.*, Dkt. 15 at ¶¶ 153, 155, 365-67). It is reasonable to infer from Plaintiffs' allegations that NYC has "help[ed to] bring about" these nuisance conditions. *See Cox*, 256 F.3d at 294 (quotation omitted).

The *Cox* decision is particularly instructive. There, the Fifth Circuit stated that "RCRA creates, at the very least, a duty on the part of generators not to dispose of their waste in such a manner that it may present an imminent and substantial endangerment to health or the environment. Negligent oversight of disposal is actionable under the RCRA." *Cox*, 256 F.3d at 296 (footnote omitted). In *Cox*, the City of Dallas (the "City") contracted to dispose construction debris, but the City's contractors "dumped loads of debris" at an open dump site. *Id.* at 296-97. The City continued to work with its contractors even after it became aware that the contractors were illegally dumping its waste. *Id.* at 297. The Fifth Circuit concluded that the district court did not err in finding that this "lax oversight" and the "disposal of City waste" was evidence of "contributing to" liability. *Id.*; *see Blue Legs v. U.S. Bureau of Indian Affairs*, 867 F.2d 1094, 1099 (8th Cir. 1989) (concluding that

federal agencies "contributed to open dumping" by "generating solid waste, contracting for its disposal and, in some instances, transporting solid waste to dumps operated in violation of federal law"). Likewise, Plaintiffs allege that NYC contracted for the disposal of its waste, but that WMNY's disposal of NYC MSW violated federal and state requirements. Whether WMNY reported its alleged operational deficiencies to NYC, whether NYC exercised any oversight over WMNY's operations or should have done so, and the extent to which NYC's MSW has caused the alleged nuisance, are factual questions not appropriately determined on a motion to dismiss.

Lastly, Plaintiffs' theory of liability is based on NYC's alleged contributing to the "handling" of solid waste. (*See* Dkt. 30 at 23). Like "contribute," the word "[h]andling" is also "not defined in the relevant statute or regulations, but its ordinary definition is broad, '[t]he action or an act of dealing with a . . . thing; treatment; management[.]'" *Goldfarb*, 791 F.3d at 514 (alterations in original) (quoting Oxford English Dictionary). Plaintiffs' allegations establish that NYC was "dealing with" the collection and disposal of MSW by contracting with WMNY for its disposal at the Landfill. Despite the numerous operational deficiencies alleged throughout the Amended Complaint, NYC continues to ship MSW to the Landfill for disposal. At least at this stage of these proceedings, a sufficient nexus has been established under the principle that "a generator of solid waste is subject to liability even when someone else conducted the disposal at the generator's request." *Cox*, 256 F.3d at 297. In other words, Plaintiffs have plausibly alleged that NYC has "contributed" and is "contributing to" the "handling" of solid waste at the Landfill. *See generally C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 408 (1994) ("RCRA is a

sweeping statute intended to regulate solid waste from cradle to grave.") (O'Connor, J., concurring in judgment).

## 2. Imminent and Substantial Endangerment

"The Second Circuit has given an expansive construction to RCRA," *87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1217 (S.D.N.Y. 2002); *see Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 210 (2d Cir. 2009) ("[T]he 'imminent and substantial endangerment' standard is a broad one[.]"), and "plaintiffs 'need not establish an incontrovertible imminent and substantial harm to health and the environment,'" *Hudson Riverkeeper Fund, Inc. v. Atl. Richfield Co.*, 138 F. Supp. 2d 482, 488 (S.D.N.Y. 2001) (quoting *Christie-Spencer Corp. v. Hausman Realty Co.*, 118 F. Supp. 2d 408, 419 (S.D.N.Y. 2000)). The Second Circuit has identified what threats are "imminent," "substantial," and pose an "endangerment" under RCRA.

Harm is "imminent" if "a 'risk of threatened harm is present.'" *Simsbury-Avon Pres. Club, Inc.*, 575 F.3d at 210 (quoting *Dague v. City of Burlington*, 935 F.2d 1343, 1356 (2d Cir. 1991), *rev'd in part on other grounds*, 505 U.S. 557 (1992)). Imminent threats need not be "emergency-type situations"; rather, "[a]n 'imminent hazard' may be declared at any point in the chain of events which may ultimately result in harm to the public." *Dague*, 935 F.2d at 1356 (quoting *Envtl. Def. Fund, Inc. v. EPA*, 465 F.2d 528, 535 (D.C. Cir. 1972)); *see Meghrig*, 516 U.S. at 486 (stating that the threat must be "present *now*, although the impact of the threat may not be felt until later" (quotation omitted)). Plaintiffs allege that they are suffering from the Landfill's nuisance conditions (*see* Dkt. 15 at ¶¶ 28, 32, 366-67), and that this harm is ongoing and has not been remedied by

WMNY's mitigation measures (*id.* at ¶¶ 365, 368; *see id.* at ¶¶ 258, 260). Plaintiffs' allegations establish that the Landfill's activities pose a sufficiently "imminent" harm.

"[A]n endangerment is 'substantial' if it is serious." *Simsbury-Avon Pres. Club, Inc.*, 575 F.3d at 210. "An endangerment is 'substantial' where there is reasonable cause for concern that someone or something may be exposed to risk of harm if prompt remedial action is not taken." *Lewis v. FMC Corp.*, 786 F. Supp. 2d 690, 707 (W.D.N.Y. 2011). In addition, "[c]ourts have consistently held that 'endangerment' means a threatened or potential harm and does not require proof of actual harm." *Dague*, 935 F.2d at 1356. "[T]he combination of the word 'may' with the word 'endanger,' both of which are probabilistic, leads us to conclude that a reasonable prospect of future harm is adequate to engage the gears of RCRA § 7002(a)(1)(B) so long as the threat is near-term and involves potentially serious harm." *Me. People's All. v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006).

Plaintiffs have plausibly alleged an "endangerment" that is also "substantial." Defendants contend that odors alone do not constitute an imminent and substantial endangerment to health or the environment. (Dkt. 22-1 at 24). But Plaintiffs do not simply allege exposure to odors; rather, Plaintiffs claim they are exposed to various fugitive emissions, including VOCs. (*See* Dkt. 15 at ¶¶ 78-82). Plaintiffs attach an exhibit to their Amended Complaint enumerating types of pollutants emitted from the Landfill along with quantifications of their concentration. (Dkt. 15-6). Plaintiffs allege that these emissions have resulted in "headaches, eye irritation, nausea, coughing, choking, [and] breathing problems." (Dkt. 15 at ¶ 28). Indeed, while Plaintiffs' sampling results identified a number

of chemical compounds, there were reportable amounts of benzene compounds, a commonly known carcinogen able to cause respiratory issues after acute exposure. *See generally Me. People's All.*, 471 F.3d at 279 n.1 ("[I]f there is a reasonable prospect that a carcinogen released into the environment today may cause cancer twenty years hence, the threat is near-term even though the perceived harm will only occur in the distant future.").

Plaintiffs have plausibly alleged that the Landfill's emissions constitute more than a mere annoyance but may in fact contain dangerous chemical compounds. In analyzing this element of a RCRA Endangerment Claim, consideration is due for RCRA's broad language and remedial purpose. *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 259 (3d Cir. 2005) ("[G]iven RCRA's language and purpose, Congress must have intended that if an error is to be made in applying the endangerment standard, the error must be made in favor of protecting public health, welfare and the environment." (quotation omitted)); *see Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1021 (10th Cir. 2007) (same). This approach comports with the Second Circuit's expansive reading of RCRA and its remedies. *See Simsbury-Avon Pres. Club, Inc.*, 575 F.3d at 210; *87th St. Owners Corp.*, 251 F. Supp. 2d at 1217. Accordingly, Plaintiffs have alleged a "serious" risk of harm from exposure to certain VOCs and HAPs that pose a "reasonable cause for concern" of present and/or future harm. *See Cox*, 256 F.3d at 301 ("As the old waste decomposes, the cover soil can settle, ground and surface water can become contaminated with leachate, *and dangerous gases can form and migrate underground.* This meets the 'may present an imminent and substantial endangerment' standard." (emphasis added) (footnote omitted)).

WMNY relies upon *Crandall v. City & County of Denver, Colorado*, 594 F.3d 1231 (10th Cir. 2010) for the proposition that "an 'offensive odor' [is] insufficient to constitute imminent and substantial danger." (Dkt. 22-1 at 24). First, *Crandall* is procedurally distinguishable because it involved a "five-day bench trial" and was not decided upon a motion to dismiss. *See* 594 F.3d at 1235. Second, while *Crandall* concluded that an endangerment claim based on exposure to hydrogen sulfide vapors was meritless, it did so because, "[a]t the time of trial, . . . there was no detectable hydrogen-sulfide gas . . . and no prospect of there being such gas. . . . Nothing going on at the airport at the time of trial, or expected in the immediate future, would, even without remedial measures, present a prospect of harm to human health." *Id.* at 1238-39. Accordingly, *Crandall* does not stand for the proposition that hydrogen sulfide vapors, or any other gaseous emission, can never amount to an imminent and substantial threat to human health or the environment. *See id.* at 1239. Here, Plaintiffs allege that they have been exposed to unreasonable levels of Excess Fugitive Emissions, which have resulted in breathing problems and eye and throat irritation among other health issues, and that these emissions continue to permeate their residences despite WMNY's mitigation measures.

Section 6972(a)(1)(B) "is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes." *Simsbury-Avon Pres. Club, Inc.*, 575 F.3d at 210 (quotation omitted). Risks resulting from exposure to gases containing known and/or potential carcinogens or other dangerous compounds fit within this broadly-worded mandate. *See Schmucker v. Johnson Controls, Inc.*, No. 3:14-CV-1593 JD, 2019 WL 718553, at *25 (N.D. Ind. Feb. 19, 2019)

(on a motion for summary judgment, the plaintiffs "offered sufficient evidence . . . [of] the endangerment posed by vapor intrusion" by submitting opinion evidence that "the levels of [trichloroethylene] that have been found in indoor air create an unacceptable health risk, by comparing them to EPA screening levels"); *Browning v. Flexsteel Indus., Inc.*, 959 F. Supp. 2d 1134, 1152 (N.D. Ind. 2013) (the court was unable to conclude that the plaintiffs could not plausibly allege a RCRA Endangerment Claim where a report was "inconclusive regarding the possibility of health effects due [to] a process it describes as 'vapor intrusion,' by which volatile organic compounds from contaminated groundwater escape into the air and enter homes"); *United States v. Apex Oil Co.*, No. 05-CV-242-DRH, 2008 WL 2945402, at *79 (S.D. Ill. July 28, 2008) ("Vapors emanating from hydrocarbon contamination in soils . . . present or may present an imminent and substantial endangerment to health, because . . . residents who are exposed [to] chemicals contained in those vapors may suffer adverse health effects."), *aff'd*, 579 F.3d 734 (7th Cir. 2009); *Buchholz v. Dayton Int'l Airport*, No. C-3-94-435, 1995 WL 811897, at *24 (S.D. Ohio Oct. 30, 1995) (concluding that the "handling and storage of solid wastes" that resulted in, among other things "actual, albeit minor and transitory, acute health effects on persons who have been exposed to glycol-type fumes" demonstrated "an imminent and substantial endangerment to the environment and to health within the meaning of RCRA"). Indeed, RCRA expressly contemplates air emissions as a pathway of exposure to solid waste. *See* 42 U.S.C. § 6903(3) (defining the "disposal" to mean, among other things, the "placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or

hazardous waste *or any constituent thereof* may enter the environment *or be emitted into the air* or discharged into any waters, including ground waters" (emphases added)).

Whether Plaintiffs can demonstrate that exposure to these emissions is harmful and is occurring or may reoccur in the reasonably foreseeable future, are questions best answered after discovery. Taking Plaintiffs' allegations as true, and according deference to RCRA's remedial purpose, the Court concludes that Plaintiffs have plausibly alleged that Defendants' actions "may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Defendants' motions are therefore denied as to this cause of action.

C.     **Plaintiffs' Fourth Cause of Action: Private Nuisance**

"There are two types of nuisance actions in New York State, public nuisance and private nuisance." *Hicksville Water Dist. v. Philips Elecs. N. Am. Corp.*, No. 2:17-CV-04442 (ADS)(ARL), 2018 WL 1542670, at *7 (E.D.N.Y. Mar. 29, 2018). "A public nuisance under New York law exists when there is a substantial interference with a public right." *Johnson v. Bryco Arms*, 304 F. Supp. 2d 383, 390 (E.D.N.Y. 2004). By contrast, "[a] private nuisance threatens one person or a relatively few, an essential feature being an interference with the use or enjoyment of land." *Copart Indus., Inc. v. Consol. Edison Co. of N.Y.*, 41 N.Y.2d 564, 568 (1977) (citation omitted); *see Scribner v. Summers*, 84 F.3d 554, 559 (2d Cir. 1996) (same). "A nuisance is the actual invasion of interests in land, and it may arise from varying types of conduct." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292 (2001).

"Under New York law, a private nuisance . . . must affect a relatively small number of people. If not, the wrong becomes a public nuisance." *Baker v. Saint-Gobain Performance Plastics Corp.*, 232 F. Supp. 3d 233, 247-48 (N.D.N.Y. 2017) (citations omitted); *see Taunus Corp. v. City of New York*, 279 F. Supp. 2d 305, 312 n.5 (S.D.N.Y. 2003) ("I also question whether the plaintiffs' claim can be characterized as a private nuisance, given that the conduct complained of affected a large group of people, and not just one person or a small number of persons."); *Cedar & Wash. Assocs., LLC v. Bovis Lend Lease LMB, Inc.*, 95 A.D.3d 448, 449 (1st Dep't 2012) (the private nuisance claim "fails because the alleged nuisance affects a wide area and adjacent properties").

Plaintiffs' opposition papers fail to engage with WMNY's argument that the alleged nuisance conditions are too widespread to sustain a private nuisance claim. (*See* Dkt. 22-1 at 25-26; Dkt. 24 at 34-35). The Amended Complaint's caption contains over 220 individual plaintiffs, who "live or previously lived anywhere from 0.3 to 4 miles from the Landfill" (Dkt. 15 at ¶ 20) and have been "adversely impacted" by the Landfill's activities (*id.* at ¶ 17). The Landfill's impacts have also allegedly reached nearby businesses, recreational facilities, dining areas, and an elementary school. (*Id.* at ¶ 29). The nuisance conditions complained of are ostensibly public in nature, taking into account the number of individuals allegedly affected and the widespread scope of the harm alleged to have occurred. Therefore, because the alleged nuisance conditions are too widespread and threaten far more than one or a few individuals, Plaintiffs' private nuisance cause of action is dismissed with prejudice.

### D. Plaintiffs' Fifth and Eighth Causes of Action: Public Nuisance

"A public nuisance exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons." *532 Madison Ave.*, 96 N.Y.2d at 292. "[T]he historical purpose of the doctrine of public nuisance was primarily to protect the public from harm or danger; the same is equally true of the modern tort of public nuisance." *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 481 (E.D.N.Y. 2003).

"Generally, '[a] public nuisance is actionable by a private person only if it is shown that the person suffered special injury beyond that suffered by the community at large.'" *Janki Bai Sahu v. Union Carbide Corp.*, 528 F. App'x 96, 101 n.4 (2d Cir. 2013) (alteration in original) (quoting *532 Madison Ave.*, 96 N.Y.2d at 292). "In this way, a private wrong may be distinguished from a common injury to the public, and a private right of action is restored." *Baker*, 232 F. Supp. 3d at 248 (citing *Kavanagh v. Barber*, 131 N.Y. 211, 214 (1892)). "This principle recognizes the necessity of guarding against the multiplicity of lawsuits that would follow if everyone were permitted to seek redress for a wrong common to the public." *532 Madison Ave.*, 96 N.Y.2d at 292.

#### 1. Public Nuisance Alleged Against WMNY

WMNY argues that Plaintiffs fail to sufficiently allege a special injury beyond that suffered by the public at large. (Dkt. 22-1 at 26-27). However, Plaintiffs allege that they suffer "special damages . . . beyond that suffered in kind and degree by the community at large." (Dkt. 15 at ¶ 382). Those damages include: (1) the "diminution of value of

- 44 -

Plaintiffs' home and property"; (2) that Plaintiffs are forced "to remain inside their homes and forego use of their yards"; (3) that Plaintiffs must "keep doors and windows closed when weather conditions otherwise would not so require"; (4) "embarrassment and reluctance to invite guests to their homes"; (5) exposure to the odors and Excess Fugitive Emissions in their own homes; and (6) that Plaintiffs "experience headaches, eye irritation, nausea, coughing, choking breathing problems, and lost sleep." (*Id.* at 74; *see id.* at ¶ 32).

WMNY cites to *Read v. Corning Inc.*, 351 F. Supp. 3d 342 (W.D.N.Y. 2018), for the proposition that conclusory allegations that merely recite the elements of a cause of action will not survive dismissal. (Dkt. 22-1 at 26). Here, Plaintiffs have alleged that, as property owners and residents living adjacent to the Landfill, they have suffered injuries that differ from those sustained by the public at large because their properties have diminished in value, and they have suffered physical ailments, mental anguish, and an inability to fully utilize their homes. (*See, e.g.*, Dkt. 15 at ¶¶ 32, 382). As such, the Court finds *Read* inapposite.

While WMNY acknowledges that the alleged "deprivation of the use and enjoyment" of property may satisfy the special injury requirement, it argues that such allegations are insufficient "where the same type of harm is, at a minimum, attributed to over 200 named plaintiffs." (Dkt. 29 at 13). In support of this proposition, WMNY cites to *532 Madison Avenue Gourmet Foods, Inc.*, 96 N.Y.2d 280, a case involving "construction-related disasters in midtown Manhattan," where various businesses sought redress for their lost business and income by alleging, among other things, claims for public

nuisance. *Id.* at 286, 293-94. In *532 Madison*, the New York Court of Appeals concluded that the special injury requirement was not satisfied because:

> [E]very person who maintained a business, profession or residence in the heavily populated areas of Times Square and Madison Avenue was exposed to similar economic loss during the closure periods. Thus, in that the economic loss was "common to an entire community and the plaintiff[s] suffer[ed] it only in a greater degree than others, it is not a different kind of harm and the plaintiff[s] cannot recover for the invasion of the public right."

*Id.* at 294 (alterations within quote in original) (quoting Restatement (Second) of Torts § 821C, comment h).

Diminished property values may constitute a "special injury" under New York law. *See, e.g.*, *Agoglia v. Benepe*, 84 A.D.3d 1072, 1077 (2d Dep't 2011) (finding that "the petitioner adequately stated a cause of action to abate a public nuisance" where, "in addition to the alleged environmental injuries, the petition alleged that the dunes adversely affected property values on the subject streets, a harm not suffered by the community at large"); *Scheg v. Agway, Inc.*, 229 A.D.2d 963, 964 (4th Dep't 1996) ("[T]heir complaint, insofar as it alleges that the value of their property was diminished as a result of its proximity to the landfill, does state a cause of action."); *Acorn*, 13 Misc. 3d 1209(A), at *17 ("The alleged depreciation in plaintiffs' property values, if proven, would constitute special injury resulting from the air pollution, noise pollution, odor and traffic that allegedly would arise out of the proposed [Marine Transfer Station]."). Since Plaintiffs have allegedly suffered diminished property values, lost use of their homes, and health implications due to the Landfill's operation, and because these injuries constitute particularized harms, whether Plaintiffs have alleged a "special injury" hinges upon the

proper scope of the relevant "community." That "community," as it must be defined under the facts alleged here, distinguishes this case from *532 Madison*.

As an initial matter, the Court disagrees with WMNY's position that Plaintiffs cannot establish a special injury because they contend that over 200 individuals suffer the same type of injury. (Dkt. 29 at 13); *see Francis v. Schoellkopf*, 53 N.Y. 152, 154 (1873) ("The idea that if by a wrongful act a serious injury is inflicted upon a single individual a recovery may be had therefor against the wrong-doer, and that if by the same act numbers are so injured no recovery can be had by anyone, is absurd."). A "special injury" need not be "unique," and simply because a large number of individuals suffer from a peculiar injury does not mean that the injury is not different in kind from that sustained by the public at large. *See Wakeman v. Wilbur*, 147 N.Y. 657, 663 (1895) ("the fact that numerous other persons have been injured by the act is no ground for a denial of the relief" for a public nuisance); *Francis*, 53 N.Y. at 154-55 ("[O]ne erecting or maintaining a common nuisance is not liable to an action at the suit of one who has sustained no damage therefrom except such as is common to the entire community, yet he is liable at the suit of one who has sustained damage peculiar to himself. *No matter how numerous the persons may be who have sustained this peculiar damage*, each is entitled to compensation for his injury." (emphasis added)); *see also Sierra Club v. Village of Painted Post*, 26 N.Y.3d 301, 311 (2015) (in the context of an Article 78 proceeding to enforce the State Environmental Quality Review Act, stating that the harm alleged "need not be unique" and that "[t]he number of people who are affected by the challenged action is not dispositive of standing").

The allegations in the Amended Complaint, taken as true, establish that Plaintiffs

do not include all individuals aggrieved by the nuisance conditions. "[T]he proper inquiry

is not whether Plaintiffs have alleged an injury different in kind from other property

owners[,] . . . [but r]ather, it is whether Plaintiffs have alleged an injury different in kind

from the community at large." *Cangemi v. United States*, 939 F. Supp. 2d 188, 206

(E.D.N.Y. 2013). While Plaintiffs have alleged like injuries amongst each other, this harm

is distinct from the deprivation of the rights to clean air and the unimpaired enjoyment of

public spaces suffered by the community at large. *See Iannucci v. City of New York*, No.

CV-02-6135 (CPS), 2006 WL 1026432, at *4 (E.D.N.Y. Apr. 19, 2006) ("While the entire

community is injured in that its access to public streets and sidewalks is restricted due to

defendants' illegal parking, plaintiff has sustained 'special injuries' in that his driveways

and parking lots are blocked and the value of his properties has decreased as a result of the

parking."); *see generally Black v. George Weston Bakeries, Inc.*, No. 07-CV-853S, 2008

WL 4911791, at *7 (W.D.N.Y. Nov. 13, 2008) ("Plaintiffs have pleaded special damages

because they allege that [d]efendants' conduct caused their properties to diminish in value.

As a result, [p]laintiffs have standing to bring a public nuisance suit." (citation omitted)).

For example, Plaintiffs allege that the Landfill's emissions have infiltrated Little

League baseball fields, business and commercial locations, an elementary school property,

and dining and walking spaces. (Dkt. 15 at ¶ 29). One Little League site was even "closed"

for the season due to the Landfill's emissions. (*Id.*). These impacts are common to the

public at large. However, Plaintiffs have allegedly been additionally impacted by a

decrease in their homes' property values, the inability to use and enjoy their homes (versus

public spaces), and the physical ailments resulting from the continuous exposure to the emissions. Compared to individuals who do not own property or reside nearby and are merely affected by the Landfill's impact on public spaces, Plaintiffs' alleged injuries constitute a "special injury." *See Concerned Area Residents for The Env't v. Southview Farm ("CARE")*, 834 F. Supp. 1410, 1421 (W.D.N.Y. 1993) (the court was "not convinced at [the summary judgment] stage that plaintiffs cannot show at trial that they have suffered some harm peculiar to themselves by virtue of their status as landowners and residents near" the polluting activity); *Ouellette v. Int'l Paper Co.*, 602 F. Supp. 264, 274 (D. Vt. 1985) ("Plaintiffs allege . . . that the discharges from defendant's mill 'interfere with [p]laintiffs' use and enjoyment of their property and have decreased the market value and rental value of their property.' Such an allegation is sufficient to state a private cause of action for a 'nuisance' which might generally be classified as 'public.'"), *aff'd*, 776 F.2d 55 (2d Cir. 1985), *aff'd in part, rev'd in part on other grounds*, 479 U.S. 481 (1987); *see also Francis*, 53 N.Y. at 154 (a nuisance was actionable where "offensive smells" made the plaintiff "unable to rent one of her houses at all for a portion of the time" and required her to rent another "for a less[er] sum than she could have otherwise obtained," even though "other houses in the vicinity" were similarly affected); *Leo v. Gen. Elec. Co.*, 145 A.D.2d 291, 294 (2d Dep't 1989) ("[T]he breadth and depth of the tragedy do not preclude a determination that a peculiar or special harm has also been done to these plaintiffs [as commercial fisherman]: diminution or loss of livelihood is not suffered by every person who fishes in the Hudson River or waters of Long Island[.]").

In short, it does not appear that Plaintiffs constitute "all members of the public who come in contact with the nuisance," *AcuSport, Inc.*, 271 F. Supp. 2d at 498 (quotation marks omitted); *cf. Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 335 (1983) ("The economic loss which results from a transit strike is not recoverable in a private action for public nuisance because the class includes *all members of the public who are affected by the strike*." (emphasis added)), and thus, *532 Madison* is distinguishable from the facts alleged here, *cf. 532 Madison Ave. Gourmet Foods, Inc.*, 96 N.Y.2d at 293 ("*[E]very person* who maintained a business, profession or residence in the heavily populated areas of Times Square and Madison Avenue was exposed to similar economic loss during the closure periods." (emphasis added)); *Burns Jackson Miller Summit & Spitzer*, 59 N.Y.2d at 334 (finding no special injury where "out-of-pocket expenses" and "loss of business profits" resulting from a transit strike was "suffered by *every person, firm and corporation* conducting his or its business or profession *in the City of New York*" (emphases added)).

Therefore, the Court denies WMNY's motion as to Plaintiff's public nuisance claim.

## 2. Public Nuisance Alleged Against NYC

To the extent NYC incorporates WMNY's arguments in its motion papers (Dkt. 27-1 at 11), those contentions are rejected for the reasons stated above. NYC also argues that Plaintiffs fail to plausibly allege that its actions proximately caused a nuisance. (*See id.* at 11-13). NYC primarily relies upon *Janki Bai Sahu*, 528 F. App'x 96, where, on a motion for summary judgment, the Second Circuit affirmed the determination that "no reasonable juror could find" that the defendant "participated in the creation of" the nuisance. *Id.* at 102. NYC argues that because Plaintiffs' claims against it are premised

solely upon the existence of the NYC contract, Plaintiffs fail to allege that NYC participated in any decision that created a nuisance. (Dkt. 27-1 at 13).

"Generally, issues of proximate cause are to be decided by the jury." *Cangemi*, 939 F. Supp. 2d at 205 (quoting *Pironti v. Leary*, 42 A.D.3d 487, 489 (2d Dep't 2007)). "[I]ssues of proximate cause are often fact-laden, requiring a fully developed factual record, and not a bare-bones motion to dismiss." *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 462 (S.D.N.Y. 2018) (quotation omitted).

"While ordinarily nuisance is an action pursued against the owner of land for some wrongful activity conducted thereon, *everyone who creates a nuisance or participates in the creation or maintenance of a nuisance* are liable jointly and severally for the wrong and injury done thereby." *State v. Schenectady Chems., Inc.*, 117 Misc. 2d 960, 966 (N.Y. Sup. Ct., Rensselaer Cty. 1983) (quotation omitted) (emphasis added), *aff'd as modified*, 103 A.D.2d 33 (3d Dep't 1984). Indeed, "[e]ven a nonlandowner can be liable for taking part in the creation of a nuisance upon the property of another." *Id.* Furthermore, it is well-established that "[w]here multiple actors contribute to a public nuisance, equity can reach actors whose conduct standing alone might not be actionable." *AcuSport, Inc.*, 271 F. Supp. 2d at 493. According to the Restatement (Second) of Torts:

> Situations may arise in which each of several persons contributes to a nuisance to a relatively slight extent, so that his contribution taken by itself would not be an unreasonable one and so would not subject him to liability; but the aggregate nuisance resulting from the contributions of all is a substantial interference, which becomes an unreasonable one.

Restatement (Second) of Torts § 840E, cmt. b. In other words, "[t]he tortious actions or omissions of a defendant or defendants need not be the immediate cause of the injury to

the public," *AcuSport, Inc.*, 271 F. Supp. 2d at 494, so long as the defendant's conduct "remains the dominant and relevant fact without which the public nuisance would not have resulted where and under the circumstances it did," *United States v. Hooker Chems. & Plastics Corp.*, 722 F. Supp. 960, 968 (W.D.N.Y. 1989) (quotation omitted).

In opposition to NYC's arguments, Plaintiffs point to paragraph 409 of their Amended Complaint (Dkt. 30 at 15), which states as follows:

> By the collection, transport, and disposal of the NYC Garbage, NYC has caused, or has substantially contributed to causing, the Garbage Odors, and/or in spite of having a reasonable opportunity to abate the nuisance by investigation and remediation the Garbage Odors, has failed to do so in a reasonably prompt and effective manner, and/or has failed to cause WMNY to do so by enforcing the NYC Contract, and has interfered with the rights common to all, and/or has assumed liability for that interference.

(Dkt. 15 at ¶ 409). At least at this early stage, Plaintiffs have plausibly alleged that NYC's conduct is a proximate cause to a public nuisance. Plaintiffs allege that NYC and WMNY entered a contract to dispose over 1.1 million tons of MSW in the Landfill each year. (*Id.* at ¶ 113). According to Plaintiffs, WMNY is required to make operational changes to remedy nuisance conditions or the violation of applicable laws (*id.* at ¶¶ 116-17), and "WMNY is required to report to . . . NYC, immediately upon obtaining knowledge thereof, all violation of the terms and conditions of any Permits issued to WMNY for the operation of the Landfill" (*id.* at ¶ 118). Furthermore, NYC allegedly "can direct changes to the WMNY operating schedule for disposal operations at the Landfill." (*Id.* at ¶ 115).

NYC's continued shipments of hundreds of thousands of tons of MSW cannot be analyzed in isolation from WMNY's allegedly unlawful conduct. In fact, Plaintiffs allege that NYC's shipments of MSW coincided with WMNY's decision to refrain from installing

Horizontal Gas Collectors in Landfill Cells 10 and 11. (Dkt. 15 at ¶¶ 153-54). Plaintiffs further allege that odors "escalated" in the summer of 2015, when WMNY began receiving NYC MSW, and "worsened" by the summer of 2017, at which time the volume of NYC MSW disposed at the Landfill had increased from its 2015 levels. (*Id.* at ¶¶ 153-54, 159; *see also id.* at ¶¶ 155, 157-58). Because NYC MSW constituted 60%, 75%, and 71% of the total MSW disposed of at the Landfill during 2015, 2016, and 2017, respectively (*id.* at ¶ 111), NYC's actions cannot be discounted as "the dominant and relevant fact without which the public nuisance would not have resulted where and under the circumstances it did," *see Hooker Chems. & Plastics Corp.*, 722 F. Supp. at 968 (quotation omitted); *see also AcuSport, Inc.*, 271 F. Supp. 2d at 497 ("[W]here the welfare and safety of an entire community is at stake, the cause need not be so proximate as in individual negligence cases."). Whether or not NYC's conduct "created, [or] contributed to . . . the alleged interference with the public right" requires a "fact-specific inquiry" not appropriate on this motion to dismiss. *AcuSport, Inc.*, 271 F. Supp. 2d at 492-93.

Lastly, NYC relies upon *Taggart v. Costabile*, 131 A.D.3d 243 (2d Dep't 2015), in arguing that Plaintiffs fail to allege that it has a "duty to abate" the nuisance because Plaintiffs do not allege that NYC has "the right to possess the Landfill or actually control its operations." (Dkt. 27-1 at 14). Not only do Plaintiffs allege that NYC retained some authority under the NYC Contract to "direct changes to the WMNY operating schedule for disposal operations at the Landfill" (Dkt. 15 at ¶ 115), but in any event, *Taggart* is inapposite. In *Taggart*, the plaintiffs sued the defendant landowners for their tenants' activities. 131 A.D.3d at 245-46. *Taggart* focused on the fact that the tenants were not

named parties; without attributing knowledge or consent "to the landowner at the time the lease is executed, the common-law duty to abate a nuisance that exists during the course of a tenancy lies with the tenant, in his or her capacity as the one in possession of the property." *Id.* at 248. The possessory interests involved in *Taggart* are far afield from the facts alleged here.

Instead, the principles that support the conclusion that Plaintiffs have at least alleged NYC's participation in creating a nuisance apply here as well. If NYC helped create a nuisance, it cannot absolve itself of all responsibility by simply stating that it did not own or operate the Landfill. NYC had a duty to halt or reduce the waste it shipped to the Landfill if it had known, *or should it have known*, that its actions were creating nuisance conditions. *See AcuSport, Inc.*, 271 F. Supp. 2d at 494 ("The Restatement cogently suggests that the liability of a contributing actor under such circumstances may be dependent on that actor's awareness of the other contributors or of the effect of their actions in the aggregate." (citing Restatement (Second) of Tort § 840E, cmt. b)). Taking Plaintiffs' allegations as true, these questions are resolved in their favor at this stage of these proceedings.

Therefore, the Court denies NYC's motion as to the public nuisance cause of action.

### E. Plaintiffs' Sixth Cause of Action: Negligence & Gross Negligence

#### 1. Ordinary Negligence

WMNY contends that a negligence plaintiff must "allege either personal injury or property damage," and argues that "Plaintiffs fail to allege that they suffered either of these types of harm" and that their "conclusory allegations of diminution of property values . . . are insufficient as a matter of law." (Dkt. 22-1 at 27).

Under New York law, "a plaintiff must establish three elements to prevail on a negligence claim: '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quoting *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333 (1981)). "[W]here a plaintiff alleges only economic damages resulting from defendant's alleged negligence, defendants owe no duty to plaintiffs with whom they are not in contractual privity." *Land Mine Enters, v. Sylvester Builders, Inc.*, 74 F. Supp. 2d 401, 407 (S.D.N.Y. 1999), *aff'd*, 234 F.3d 1262 (2d Cir. 2000). However, "'stigma damages' have been recognized as a valid category of damages by the New York courts in environmental cases," *87th St. Owners Corp.*, 251 F. Supp. 2d at 1223 (citing *Commerce Holding Corp. v. Bd. of Assessors of the Town of Babylon*, 88 N.Y.2d 724, 732 (1996)), and are "defined loosely as the public's perhaps unwarranted fears concerning a property" that reduce its value, *Nashua Corp. v. Norton Co.*, No. 90-CV-1351 (RSP/RWS), 1997 WL 204904, at *6 (N.D.N.Y. Apr. 15, 1997). "These damages are recoverable because the diminished property values result from an actual or imminent invasion of a landowner's property by a defendant's polluting conduct." *D'Amico*, 2019 WL 1332575, at *5.

In *D'Amico*, this Court distinguished *532 Madison Avenue Gourmet Foods, Inc.*, 96 N.Y. 2d 280, and relied upon *Baker*, 232 F. Supp. 3d 233, in holding that the plaintiff stated a negligence claim based on an alleged diminution in property values resulting from the stigma of polluted air. *See D'Amico*, 2019 WL 1332575, at *5-7. In *Baker*, the plaintiffs alleged that the contamination of drinking water sources resulted in a "loss in their property values," and the *Baker* defendants, relying on *532 Madison*, sought dismissal of the

negligence claim for the reasons WMNY asserts here. *See Baker*, 232 F. Supp. 3d at 240-41, 244. As *Baker* explained, *532 Madison* did not "announce a talismanic requirement for plaintiffs to allege physical injury to their property" and only "concerned the existence of a legal duty between the plaintiffs and defendants." *Id.* at 245.

The legal duty between the plaintiff and WMNY was critical in *D'Amico*. WMNY owed a duty of care to the plaintiff and the putative class, as adjacent property owners, "to operate the Landfill in a reasonable manner," and this duty was "distinguishable from the more tenuous obligations and intangible losses asserted by the plaintiffs in *532 Madison*." *D'Amico*, 2019 WL 1332575, at *7. The Court explained this distinction as follows:

> While the financial loss suffered by the businesses in *532 Madison* fell outside the zone of danger reasonably expected to be guarded against, Plaintiff and the putative class members in this case have a reasonable expectation that the operator of an adjacent landfill will take reasonable measures to prevent the unreasonable contamination of the immediate air space permeating their properties.

*Id.* Since the noxious odors allegedly permeated the plaintiff's and the putative class members' properties, "the diminished market value of their respective properties [could] be pursued in a claim for ordinary negligence." *Id.*

This Court's reasoning in *D'Amico* holds true here as well. WMNY owes the same duty of care to Plaintiffs, as adjacent landowners and residents, "to operate the Landfill in a reasonable manner." *D'Amico*, 2019 WL 1332575, at *7; *see Baker*, 232 F. Supp. 3d at 245 ("Society has a reasonable expectation that manufacturers avoid contaminating the surrounding environment, an expectation that extends to the pollution of an area's water supply."); *Fitzgibbons v. City of Oswego*, No. 5:10-CV-1038 (FJS/ATB), 2011 WL

6218208, at *14-15 (N.D.N.Y. Dec. 13, 2011) (denying motion to dismiss negligence claim where the adjacent landowner alleged that the defendant "owed him a duty of care with regard to its operation of the [l]andfill"). Plaintiffs have alleged fears of, and, in some cases, actual property diminution, health impacts, and expenses resulting from the odors, Excess Fugitive Emissions, vectors, noise, and tremors associated with the Landfill. (*See, e.g.*, Dkt. 15 at ¶¶ 21-25, 27-29, 32). Indeed, the Amended Complaint contains far more extensive allegations regarding stigma damages and the diminution in value of Plaintiffs' properties than did the operative pleading in *D'Amico*, and greatly expands upon the damages allegedly caused by WMNY's negligent operation and management of the Landfill. (*See, e.g., id.* at ¶¶ 136-40, 146-49, 160-61, 196, 198-200, 304-07, 317-21).

For the reasons outlined in *D'Amico*, Plaintiffs have plausibly stated a cause of action for negligence, and WMNY's motion to dismiss this claim is denied.

## 2. Gross Negligence

"[A] claim for gross negligence will be sustained only if the plaintiff alleges facts plausibly suggesting that the defendant's conduct evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 61 (2d Cir. 2012) (quotation omitted). "Recklessness in the context of a gross negligence claim means 'an extreme departure from the standards of ordinary care,' such that 'the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* at 61-62 (quoting *AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 454 (2d Cir. 2009)).

WMNY contends that Plaintiffs fail to state any facts "demonstrating intentional wrongdoing or reckless disregard" and simply set forth "conclusory allegations that [WMNY] operated the Landfill and . . . acted knowingly and with a 'substantial lack of concern[.]'" (Dkt. 22-1 at 28). Plaintiffs contend that they stated a gross negligence cause of action because WMNY recklessly "eliminated the use of Horizontal Gas Collectors in all new Landfill [C]ells, violated its Landfill Permit, operated an ineffective Landfill, accepted odorous MSW despite numerous odors complaints, failed to properly remediate or mitigate the [o]dors, and failed to properly and timely investigate the [o]dors." (Dkt. 24 at 36 (citations omitted)). Plaintiffs also claim that WMNY misrepresented that it would install Horizontal Gas Collectors within the Landfill Cells in its permit and environmental impact review materials because it decided to forego their installation. (*Id.* at 37).

Plaintiffs set forth factual allegations that, taken as true, demonstrate that WMNY modified its Collection System knowing that those modifications were detrimental to the system's efficiency. Plaintiffs allege that WMNY was aware that Horizontal Gas Collectors were critical to the mitigation of odors and fugitive emissions (*see* Dkt. 15 at ¶¶ 127-32), and yet, WMNY personnel forwent their installation to save on costs (*id.* at ¶¶ 124-25). Plaintiffs further allege that WMNY's initial response to the odor complaints was to initiate "an investigation into whether they were 'politically motivated[.]'" (*Id.* at ¶ 156). Although WMNY knew it did not install the appropriate devices and had received complaints of Landfill odors, WMNY continued to receive additional NYC MSW (*see id.* at ¶¶ 155, 158-59) without considering whether changes to handling practices were necessary under its Odor Control Plan (*see id.* at ¶ 108 (alleging that WMNY "ignored the

potential nuisances from such increased Odors associated with disposal of MSW received by rail"); *id.* at ¶ 205 (alleging that the failure to "change the handling practices for, or eliminate the receipt of, the NYC [MSW]" violated the Odor Control Plan)).

Plaintiffs' allegations establish that WMNY knowingly removed the primary mechanism for odor and emission control—and an alleged permit requirement—and was, at best, slow to respond to the community's complaints and, at worst, antagonistic to their circumstances—acts that smack of intentional wrongdoing. While conclusory allegations of gross negligence may be dismissed for failure to state a claim, *see D'Amico*, 2019 WL 1332575, at *8-9, statements of intentional wrongdoing often present fact issues inappropriate for disposition at this early stage, *see Lundy v. Wells Fargo Bank, N.A.*, No. 08 CIV. 8715 (BSJ), 2011 WL 13128267, at *5 (S.D.N.Y. Mar. 10, 2011) ("Plaintiff's claim for gross negligence also presents questions of fact inappropriate for resolution at the motion to dismiss stage."); *Travelers Indem. Co. of Conn. v. Losco Grp., Inc.*, 136 F. Supp. 2d 253, 256-57 (S.D.N.Y. 2001) ("The issue of gross negligence is a question of fact for a jury to determine." (citing *Gentile v. Garden City Alarm Co.*, 147 A.D.2d 124, 130 (2d Dep't 1989)). Because Plaintiffs have at least alleged that WMNY's behavior "smacks" of intentional wrongdoing or "evinces a reckless disregard for the rights of others," WMNY's motion to dismiss this claim is denied.

## F. Plaintiffs' Seventh Cause of Action: Trespass

"To prevail on a trespass claim under New York law, a plaintiff must show an interference with [its] right to possession of real property either by an unlawful act or a lawful act performed in an unlawful manner." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 119 (2d Cir. 2013) (alteration in original) (quotation omitted). "[A] trespass claim represents an injury to the right of possession, and . . . [c]ourts have precluded trespass claims where the entry or intrusion was intangible." *C & B Enters. USA, LLC v. Koegel*, 136 A.D.3d 957, 959 (2d Dep't 2016) (first alteration in original) (quoting *Ivory v. Int'l Bus. Machs. Corp.*, 116 A.D.3d 121, 129-30 (3d Dep't 2014)). "The traditional common-law view is that, inasmuch as such intangible entries onto land do not interfere with the right of exclusive *possession* of real property, but only with the *use and enjoyment* of property, they do not give rise to a trespass, though they can support a nuisance claim." *CARE*, 834 F. Supp. at 1420.

WMNY argues that Plaintiffs' trespass claim fails because it is based on intangible intrusions that do not amount to an actual physical invasion upon one's right to exclusive possession of property. (*See* Dkt. 29 at 16). Plaintiffs urge this Court to reject WMNY's arguments based on the principles discussed in *Phillips v. Sun Oil Co.*, 307 N.Y. 328 (1954) and *Scribner*, 84 F.3d 554. (Dkt. 24 at 40-41). In *Phillips*, the court affirmed the dismissal of the plaintiff's trespass claim and stated the following rule for cases involving the flow of "noxious fluids" onto or into property:

> that, even when the polluting material has been deliberately put onto, or into, defendant's land, he is not liable . . . unless he (defendant) had good reason

> to know or expect that subterranean and other conditions were such that there
> would be passage from defendant's to plaintiff's land.

*Id.* at 331. Because the evidence linking the defendant's petroleum and the plaintiff's water supply was tenuous, and since there was "nothing to show that defendant knew, or had been put on notice, that gasoline was escaping from its underground tank," the trespass claim was properly dismissed. *Id.* at 330-31. Relying on these principles, *Scribner* reversed the dismissal of the plaintiffs' trespass claims, because the defendant "intended the acts which caused the invasion of the [plaintiffs'] property," and "had good reason to know or expect" that hazardous waste leachate would traverse a pathway of exposure into the plaintiffs' property. *See* 84 F.3d at 557-58 (quotation omitted). Similarly, the *CARE* court denied the defendants' summary judgment motion because "[i]t [was] not clear whether New York law recognizes a cause of action for trespass based on the entry of odors or gases onto another's property," but observed that the "matter [was] not free from doubt." 834 F. Supp. at 1420.

Plaintiffs cite to no New York case that has accepted the notion that odors or fugitive emissions entering the airspace surrounding real property gives rise to a trespass action. However, the Third Department has expressly rejected the assertion that "vapor intrusion and air emissions" support a trespass action under New York law. *Ivory*, 116 A.D.3d at 129-30. The *Ivory* court reasoned that "courts have precluded claims where the entry or intrusion was intangible, such as the occurrence of vibrations, shading of a plaintiff's property, or a permeating odor or vapors of gasoline." *Id.* (citations omitted). As a result,

the *Ivory* court concluded that "plaintiffs have no valid trespass claims based on vapor intrusion or emissions, as those caused only intangible intrusions." *Id.* at 130.

New York law does not recognize a trespass claim based on intangible invasions upon real property. *See, e.g., Koegel*, 136 A.D.3d at 959; *Ivory*, 116 A.D.3d at 129-30. Indeed, a New York trial court recently relied upon *Ivory* to dismiss a trespass claim based on "noise pollution, vibrations and/or blocked natural light." *MacArthur Props., LLC v. Metro. Transp. Auth.*, 61 Misc. 3d 1204(A), 2017 WL 10309769 (Table), at *11 (Sup. Ct., N.Y. Cty. June 2, 2017), *judgment entered*, 2017 WL 10398316 (Sup. Ct., N.Y. Cty. 2017), *and aff'd*, 164 A.D.3d 1165 (1st Dep't 2018) (affirming "for the reasons stated by" the trial judge). While a trespass action may "include[] the entry of a substance onto land," *Berenger v. 261 W. LLC*, 93 A.D.3d 175, 181 (1st Dep't 2012), this principle appears to apply only in the context of liquid or solid substances, not merely gaseous ones, *see, e.g., Crown Assocs., Inc. v. Zot, LLC*, 83 A.D.3d 765, 768 (2d Dep't 2011) (water); *Duane Reade v. Reva Holding Corp.*, 30 A.D.3d 229, 236-37 (1st Dep't 2006) (water and debris). Without an actual *physical* intrusion upon the *possessory* interests of another, there would be little to differentiate a cause of action for trespass resulting from odors and emissions and a claim of nuisance arising from the very same circumstances. *See MacArthur Props., LLC*, 2017 WL 10309769 (Table), at *11 ("[S]uch intangible intrusions 'are treated as nuisances, not trespass [because] they interfere with nearby property owners' use and enjoyment of their land, not with their exclusive possession of it[.]'" (second alteration in original) (quoting *Ivory*, 116 A.D.3d at 129-30)).

For these reasons, Plaintiffs' trespass cause of action is dismissed with prejudice.

- 62 -

### G. Punitive Damages

"Punitive damages are not a separate cause of action and, thus, courts generally find motions to strike punitive damages at the motion to dismiss stage to be premature." *Denis v. Home Depot, U.S.A., Inc.*, No. 10-CV-3227 (ADS)(SIL), 2014 WL 6632486, at *6 (E.D.N.Y. Nov. 21, 2014); *see, e.g., Williams v. Coca Cola Co.*, No. 8:15-CV-1534 (LEK/CFH), 2017 WL 1214503, at *5 (N.D.N.Y. Mar. 31, 2017); *Willman v. Zelman & Assocs., LLC*, No. 11 Civ. 1216 (KBF), 2012 WL 811512, at *5 (S.D.N.Y. Mar. 12, 2012). WMNY's request to strike Plaintiffs' punitive damages allegations is denied as premature.

### III. The Court Declines to Stay Plaintiffs' Claims for Monetary Damages

Finally, WMNY requests the Court stay Plaintiffs' claims for monetary damages for the same reasons the *Read* court stayed those plaintiffs' claim for response costs under CERCLA. (*See* Dkt. 22-1 at 32-34). "Under CERCLA, a party covered by the statute is liable for certain costs and monetary damages resulting from a release of hazardous substances." *Read*, 351 F. Supp. 3d at 360. Plaintiffs do not bring a claim under CERCLA. Since the *Read* plaintiffs' only remaining cause of action sought CERCLA response costs, it may have been prudent to wait until the DEC's remedial actions had concluded so the total response costs incurred could be assessed without proliferating a multiplicity of legal challenges. However, Plaintiffs allege ongoing injuries resulting from the Landfill operations, which continue to afflict them despite the implementation of various mitigation measures. Plaintiffs state serious violations of federal and state law, and the Court sees no reason to stay Plaintiffs' claims for monetary damages in favor of further DEC action that may or may not take place within some indefinite timeframe and with uncertain effect.

## CONCLUSION

For the forgoing reasons, WMNY's motion to dismiss the Complaint (Dkt. 9) is dismissed as moot, WMNY's motion to dismiss the Amended Complaint (Dkt. 22) is granted as to the private nuisance and trespass claims but it is otherwise denied, and NYC's motion to dismiss (Dkt. 27) is denied.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:       September 16, 2019
             Rochester, New York